

Suzie Kircher
Tel: +1.202.663.8322
suzie.kircher@pillsburylaw.com

March 5, 2025

<u>By Hand Delivery</u>

Clerk of the Court
U.S. Court of Appeals for the District of Columbia Circuit
United States Courthouse
333 Constitution Ave., NW, Room 5205
Washington, DC  20001

**Re:**   ***Western States Petroleum Assn. v. U.S. Environmental Protection Agency***

Dear Sir or Madam:

Enclosed please find the following:

- Original Petition for Review package for filing as a new case, along with a check in the amount of $600 representing the filing fee; and

- Copy of the documents to be date stamped and returned to the courier.

Thank you for your assistance.

Sincerely,

Suzie Kircher
Legal Secretary

Enclosures

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 5 2025

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 5 2025

RECEIVED

# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**

Case Caption:     WESTERN STATES PETROLEUM ASSOCIATION,

Petitioner

v.                                          Case Number: _____

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

Respondent

## PETITION FOR REVIEW OF AN AGENCY, BOARD, COMMISSION, OR OFFICER

Notice is hereby given this the 28th day of February 20 25 that petitioner(s)

Western States Petroleum Association hereby petitions the United States Court of Appeals for the District
                                                                                          United States
of Columbia Circuit for review of the order of the respondent(s) Environmental Protection Agency entered
the 20th day of October 20 24 .

Attorney for Petitioner(s)/Pro Se Party,

*/s/ Michael S. McDonough*

Pillsbury Winthrop Shaw Pittman LLP

Address:   725 South Figueroa Street, Suite 3600

Los Angeles, CA 90017

_____

Telephone: ( 213 )  488 - 7100

USCA Form 12
AUGUST 2009 (Revised)

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION, <br><br> Petitioner, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Respondent. | <br><br><br> Case No.: __25-1080__ |

## PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act ("CAA"), 42 U.S.C. § 7607(b)(1), Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, Rule 15(a) of the Federal Rules of Appellate Procedure, and Rule 15(a) of the D.C. Circuit Rules, the Western States Petroleum Association ("WSPA" or the "Petitioner"), hereby petitions the United States Court of Appeals for the District of Columbia Circuit for review of the United States Environmental Protection Agency's ("EPA's") final decision entitled "California State Nonroad Engine Pollution Control Standards; Ocean- Going Vessels At-Berth; Notice of Decision," published in the Federal Register at 88 Fed. Reg. 72,461 (Oct. 20, 2023). A copy of the final

rule is attached as Exhibit A. This Court has jurisdiction and is a proper venue for this action pursuant to 42 U.S.C. § 7607(b)(1).

Date: February 28, 2025

Respectfully submitted,

/s/ *Michael S. McDonough*
Michael S. McDonough
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
725 South Figueroa Street, Suite 3600
Los Angeles, CA 90017
(213) 488-7100
michael.mcdonough@pillsburylaw.com

Matthew W. Morrison
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036-3006
(202) 663-8036
matthew.morrison@pillsburylaw.com

Margaret Rosegay
Stacey Wright
Eric Moorman
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
Four Embarcadero Center, 22nd Floor
Post Office Box 2824
San Francisco, CA 94126-2824
(415) 983-1000
margaret.rosegay@pillsburylaw.com
stacey.wright@pillsburylaw.com
eric.moorman@pillsburylaw.com

*Counsel for Petitioner Western States Petroleum Association*



Steve Tice
VP, Residential EnginEER2ing
Ducted Systems
Johnson Controls, Inc.
steven.a.tice@jci.com

Chris M Forth
VP Regulatory, Codes & Enviro Affairs
Ducted Systems
Johnson Controls, Inc.
chris.m.forth@jci.com

## EXHIBIT A

### JCI Basic Models for Which Test Procedure Waiver Is Requested

| | York | Coleman | Luxaire | Fraser-Johnston | Champion |
|---|---|---|---|---|---|
| **AC** | YXV24B21 | AC21B2421 | AL21B2421 | AL21B2421 | AL21B2421 |
| | YXV36B21 | AC21B3621 | AL21B3621 | AL21B3621 | AL21B3621 |
| | YXV48B21 | AC21B4821 | AL21B4821 | AL21B4821 | AL21B4821 |
| | YXV60B21 | AC21B6021 | AL21B6021 | AL21B6021 | AL21B6021 |
| **HP** | YZV24B21 | HC20B2421 | HL20B2421 | HL20B2421 | HL20B2421 |
| | YZV36B21 | HC20B3621 | HL20B3621 | HL20B3621 | HL20B3621 |
| | YZV48B21 | HC20B4821 | HL20B4821 | HL20B4821 | HL20B4821 |
| | YZV60B21 | HC20B6021 | HL20B6021 | HL20B6021 | HL20B6021 |

[FR Doc. 2023–23205 Filed 10–19–23; 8:45 am]

**BILLING CODE 6450–01–C**

## DEPARTMENT OF ENERGY

### Federal Energy Regulatory Commission

### Combined Notice of Filings

Take notice that the Commission has received the following Natural Gas and Oil Pipeline Rate and Refund Report filings:

**Filings Instituting Proceedings**

*Docket Numbers:* PR24–3–000.
*Applicants:* Northern Illinois Gas Company.
*Description:* § 284.123(g) Rate Filing: Petition for Rate Approval to be effective 11/1/2023.
*Filed Date:* 10/13/23.
*Accession Number:* 20231013–5100.
*Comment Date:* 5 p.m. ET 11/3/23.
*Protest Date:* 5 p.m. ET 12/12/23.

*Docket Numbers:* RP24–41–000.
*Applicants:* El Paso Natural Gas Company, L.L.C.
*Description:* § 4(d) Rate Filing: Negotiated Rate Agreement Update (Pioneer Oct 13 2023) to be effective 10/13/2023.
*Filed Date:* 10/12/23.

*Accession Number:* 20231012–5095.
*Comment Date:* 5 p.m. ET 10/24/23.

Any person desiring to intervene, to protest, or to answer a complaint in any of the above proceedings must file in accordance with Rules 211, 214, or 206 of the Commission's Regulations (18 CFR 385.211, 385.214, or 385.206) on or before 5:00 p.m. Eastern time on the specified comment date. Protests may be considered, but intervention is necessary to become a party to the proceeding.

The filings are accessible in the Commission's eLibrary system (*https://elibrary.ferc.gov/idmws/search/fercgensearch.asp*) by querying the docket number.

eFiling is encouraged. More detailed information relating to filing requirements, interventions, protests, service, and qualifying facilities filings can be found at: *http://www.ferc.gov/docs-filing/efiling/filing-req.pdf.* For other information, call (866) 208–3676 (toll free). For TTY, call (202) 502–8659.

The Commission's Office of Public Participation (OPP) supports meaningful public engagement and participation in Commission proceedings. OPP can help members of the public, including landowners, environmental justice communities, Tribal members and others, access publicly available information and navigate Commission processes. For public inquiries and assistance with making filings such as interventions, comments, or requests for rehearing, the public is encouraged to contact OPP at (202) 502–6595 or *OPP@ferc.gov.*

Dated: October 13, 2023.

**Debbie-Anne A. Reese,**
*Deputy Secretary.*

[FR Doc. 2023–23126 Filed 10–19–23; 8:45 am]

**BILLING CODE 6717–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OAR–2023–012; FRL 10787–03–OAR]

### California State Nonroad Engine Pollution Control Standards; Ocean-Going Vessels At-Berth; Notice of Decision

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency ("EPA") is granting the California Air Resources Board's ("CARB") request for authorization of

amendments to its Ocean-Going Vessels At-Berth regulation ("At-Berth Regulation"). CARB's At-Berth Regulation specifies auxiliary engine emission reduction requirements applicable to container, refrigerated, cargo, cruise, roll on-roll off (ro-ro), and tanker vessels (also emission reduction requirements to tanker vessel auxiliary boilers) while docked or "berthed" at specified marine terminals and ports in California. This decision is issued under the authority of the Clean Air Act ("CAA" or "Act").

**DATES:** Petitions for review must be filed by December 19, 2023.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2023–0152. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air and Radiation Docket in the EPA Headquarters Library, EPA West Building, Room 3334, located at 1301 Constitution Avenue NW, Washington, DC. The Public Reading Room is open to the public on all federal government working days from 8:30 a.m. to 4:30 p.m.; generally, it is open Monday through Friday, excluding holidays. The telephone number for the Reading Room is (202) 566–1744. The Air and Radiation Docket and Information Center's website is *http://www.epa.gov/ oar/docket.html.* The electronic mail (email) address for the Air and Radiation Docket is: *a-and-r-Docket@ epa.gov,* the telephone number is (202) 566–1742, and the fax number is (202) 566–9744. An electronic version of the public docket is available through the federal government's electronic public docket and comment system. You may access EPA dockets at *http:// www.regulations.gov.* After opening the *www.regulations.gov* website, enter EPA–HQ–OAR–2023–0152 in the "Enter Keyword or ID" fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information ("CBI") or other information whose disclosure is restricted by statute.

EPA's Office of Transportation and Air Quality ("OTAQ") maintains a web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are cited in today's notice; the page can be accessed at: *https://www.epa.gov/state-*

*and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.*

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Attorney-Advisor, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460. Email: *dickinson.david@epa.gov.* Telephone: 202–343–9256.

**SUPPLEMENTARY INFORMATION:**

## I. Background

CARB adopted the initial At-Berth Regulation, the Airborne Toxic Control Measure for Auxiliary Diesel Engines Operated on Ocean-Going Vessels At-Berth in a California Port (2007 At-Berth Regulation), on October 16, 2008, and EPA granted California an authorization for that regulation in 2011.[1] The 2007 At-Berth Regulation applied only to fleets of container, refrigerated cargo, and cruise vessels visiting six California ports. The 2007 At-Berth Regulation required affected vessels to reduce emissions at berth by either plugging into shore power or using an equally effective compliance strategy (such as a capture and control system). Specifically, the 2007 At-Berth Regulation required fleets of container and refrigerated cargo vessels making 25 or more visits or cruise vessels making 5 or more visits to any of the six identified ports to limit the operations and emissions of auxiliary diesel engines while docked, reducing nitrogen oxide ($NO_X$) and diesel particulate matter (PM) emissions at berth.[2]

On September 27, 2022, CARB submitted a new authorization request to EPA for its amendments to the 2007 At-Berth Regulation the CARB Board adopted on August 27, 2020 (2020 At-Berth Amendments).[3] The 2020 At-Berth Amendments are designed to build upon the 2007 At-Berth Regulation by extending auxiliary engine emissions reductions requirements to additional categories of ocean-going vessels (OGVs), specifically roll on-roll off (ro-ro) and tanker vessels. The 2020 At-Berth Amendments also added emission reductions requirements for tanker vessel auxiliary boilers and expanded the applicability

of the regulation to additional regulated terminals and ports within California.[4]

The 2020 At-Berth Amendments establish, among other provisions, in-use emissions-related requirements that apply beginning January 1, 2023, with limited exceptions, to any person who owns, operates, charters, or leases any United States or foreign-flag OGV that visits a California port, terminal, or berth; any person who owns, operates, or leases a port, terminal, or berth located where OGVs visit; or any person who owns, operates, or leases a CARB approved emissions control strategy (CAECS) for OGV auxiliary engines or tanker auxiliary boilers.[5] The 2020 At-Berth Amendments establish emission controls that phase in during three separate periods. The requirements are applicable to container, reefer, and cruise vessels on January 1, 2023, all ro-ro vessels and tankers visiting the ports of Los Angeles or Long Beach on January 1, 2025, and tankers visiting all ports other than Los Angeles and Long Beach on January 2, 2027.[6] Compliance with the 2020 At-Berth Amendments must be achieved through the use of a CARB Approved Emission Control Strategy (CAECS).[7]

---

[4] A regulated California marine terminal is any terminal in California that receives 20 or more visits from container, reefer, cruise, ro-ro, or tanker vessels per calendar year the year emissions control requirements begin. Cal. Code Regs. Tit. 17, section 93.130.10(a)(2).

[5] Compliance with the 2020 At-Berth Amendments must be achieved through the use of a CAECS that meets the minimum requirements of section 93130.5(d) of the Amendments. The strategy may include the use of shore power but may also include alternative CAECS such as barge or land-based capture and control technologies not controlled by the vessel or terminal operator. The owners of such alternative technologies are subject to CARB's regulations.

[6] CARB states that the tanker implementation dates are staggered due to fewer infrastructure upgrade challenges expected at the ports subject to a 2025 compliance date. CARB At-Berth Authorization Request at 8.

[7] A summary of CARB's At-Berth Regulation can be found at CARB's At-Berth Authorization Request at 6 to 18. CARB's At-Berth Authorization Request noted that the no ocean going vessel at berth or at anchor in California waters may emit visible emissions of any air pollutant for a period or periods aggregating three minutes in any hour of operation on the vessel that doesn't meet either of 2 different measurements. CARB also noted that "The opacity requirements constitute in-use controls, or characteristics or measures that limit the use of nonroad engines and accordingly do not require EPA authorization action. CARB also addressed comments during its rulemaking, similar to comments EPA received during the authorization proceeding, that the opacity requirements are emission standards and that imposing such standards at anchorage infringes on Internation Maritime Organization and international engine standards to which the United States is a party. CARB noted in part that the opacity requirements are part of its general opacity standards under California's Health and Safety Code section 41701. *See* CARB FSOR at 208–209. Because CARB did not

---

[1] 76 FR 77515 (Dec. 13, 2011).

[2] CARB defines an "auxiliary engine" as "an engine on an ocean-going vessel designed primarily to provide power for uses other than propulsion, except that all diesel-electric engines shall be considered 'auxiliary engines' for purpose of this regulation." Cal. Code Regs. Tit. 17, section 93130.2(b)(9).

[3] CARB At-Berth Authorization Request, EPA–HQ–OAR–2023–0152–0031.

## II. Principles Governing This Review

### A. Clean Air Act Nonroad Engine and Vehicle Authorizations

CAA section 209(e)(1) prohibits states and local governments from adopting or attempting to enforce any standard or requirement relating to the control of emissions from certain new nonroad vehicles or engines.[8] The CAA also preempts states from adopting and enforcing standards and other requirements related to the control of emissions from all other nonroad engines or vehicles.[9] CAA section 209(e)(2)(A), however, requires the Administrator, after notice and opportunity for public hearing, to authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines not preempted by CAA section 209(e)(1) if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. However, EPA shall not grant such authorization if it finds that (1) the protectiveness determination of California is arbitrary and capricious; (2) California does not need such standards to meet compelling and extraordinary conditions; or (3) California standards and accompanying enforcement procedures are not consistent with CAA section 209.

On July 20, 1994, EPA promulgated a rule ("the 1994 rule") that sets forth, among other things, regulations providing the criteria, as found in CAA section 209(e)(2), which EPA must consider before granting any California authorization request for new nonroad engine or vehicle emission standards.[10] EPA revised these regulations in 1997.[11]

As explained below, EPA has interpreted and implemented the first two authorization criteria at section 209(e)(2)(A)(i) and 209(e)(2)(A)(ii) in the same manner as the corresponding first two waiver criteria at section 209(b)(1)(A) and 209(b)(1)(B) (applicable to on-road motor vehicles). Because of the unique language in section 209(e)(2)(A)(iii) (the third authorization criteria), EPA has provided additional information as to the interpretation and implementation of that criterion. As stated in the preamble to the 1994 rule, EPA has historically interpreted the CAA section 209(e)(2)(A)(iii) "consistent with section 209" inquiry to require that California standards and enforcement procedures be consistent with CAA sections 209(a), 209(e)(1), and 209(b)(1)(C) (as EPA has interpreted that subsection in the context of CAA section 209(b) motor vehicle waivers).[12] In order to be consistent with CAA section 209(a), California's nonroad standards and enforcement procedures must not apply to new motor vehicles or new motor vehicle engines. To be consistent with CAA section 209(e)(1), California's nonroad standards and enforcement procedures must not attempt to regulate engine categories that are permanently preempted from state regulation. To determine

consistency with CAA section 209(b)(1)(C), EPA typically reviews nonroad authorization requests under the same "consistency" criteria that are applied to motor vehicle waiver requests. Pursuant to CAA section 209(b)(1)(C), the Administrator shall not grant California a motor vehicle waiver if he finds that California "standards and accompanying enforcement procedures are not consistent with section 202(a)" of the CAA. Previous decisions granting waivers and authorizations have noted that state standards and enforcement procedures are inconsistent with CAA section 202(a) if: (1) there is inadequate lead time to permit the development of the necessary technology giving appropriate consideration to the cost of compliance within that time, or (2) the Federal and state testing procedures impose inconsistent certification requirements.[13] When considering whether to grant authorizations for accompanying enforcement procedures tied to standards (such as record keeping and labeling requirements) for which an authorization has already been granted, EPA has evaluated (1) whether the enforcement procedures are so lax that they threaten the validity of California's determination that its standards are as protective of public health and welfare as applicable Federal standards, and (2) whether the Federal and California enforcement procedures are consistent.[14]

In light of the similar language of sections 209(b) and 209(e)(2)(A), EPA has reviewed California's requests for authorization of nonroad vehicle or engine standards under section 209(e)(2)(A) using the same principles that it has historically applied in reviewing requests for waivers of preemption for new motor vehicle or new motor vehicle engine standards under section 209(b).[15] These principles include, among other things, that EPA should limit its inquiry to the three specific authorization criteria identified

---

seek EPA approval or authorization of the opacity requirement EPA is not taking any action or position with regard to the requirement or its enforceability. EPA's decision to not act on CARB's opacity requirement only pertains to California's regulation and does not relate to EPA's regulatory authority to regulate opacity. In the event CARB submits the requirement along with its At-Berth regulation to EPA as part of a state implementation plan (SIP) revision request then it may be proper to evaluate its enforceability at that time.

[8] CAA section 209(e)(1) prohibits states or any political subdivision from adopting or enforcing any standard or other requirement relating to the control of emissions from new engines which are used in construction equipment or vehicles or used in farm equipment or vehicles, and which are smaller than 175 horsepower, or new locomotives or new engines used in locomotives. *See* 40 CFR 1074.10(a).

[9] *See* CAA section 209(e)(2), 42 U.S.C. 7543(e). *See* 40 CFR 1074(b). Therefore, states and localities are categorically prohibited from regulating the control of emissions from new nonroad vehicles and engines set forth in section 209(e)(1) of the CAA, but "all other" nonroad vehicles and engines (including non-new engines and vehicles otherwise noted in 209(e)(1) and all other new and non-new nonroad engines and vehicles) are preempted unless and until preemption is waived. *See* EPA's nonroad preemption rulemakings at 59 FR 36969 (1994) and revised in 1997 (62 FR 67733). EPA notes that Appendix A to 40 CFR part 1074, subpart A sets out EPA's interpretation of what types of state nonroad engine use and operation provisions are not preempted by section 209.

[10] 59 FR 36969 (July 20, 1994).

[11] 63 FR 18978 (April 16, 1998). These regulations were later recodified to 40 CFR part 1074, 73 FR 59397 (October 8, 2008). Similar to the language in CAA section 209(e)(2)(A), 40 CFR 1074.105 provides the criteria for EPA's consideration of authorization requests:

(a) The Administrator will grant the authorization if California determines that its standards will be, in the aggregate, at least as protective of public health and welfare as otherwise applicable Federal standards.

(b) The authorization will not be granted if the Administrator finds that any of the following are true:

(1) California's determination is arbitrary and capricious.

(2) California does not need such standards to meet compelling and extraordinary conditions.

(3) The California standards and accompanying enforcement procedures are not consistent with section 209 of the Act (42 U.S.C. 7543).

(c) In considering any request to authorize California to adopt or enforce standards or other requirements relating to the control of emissions from new nonroad spark-ignition engines smaller than 50 horsepower, the Administrator will give appropriate consideration to safety factors (including the potential increased risk of burn or fire) associated with compliance with the California standard.

[12] 59 FR at 36982–83.

[13] *Id. See also* 78 FR 58090, 58092 (Sept. 20, 2013).

[14] *See Motor & Equipment Manufacturers Association* v. *Environmental Protection Agency (MEMA I)*, 627 F.2d 1095, 1112 (D.C. Cir. 1979). California certification test procedures need not be identical to the Federal test procedures to be "consistent." California procedures would be inconsistent, however, if manufacturers would be unable to meet both the state and Federal test requirements with the same test vehicle in the course of the same test. *See, e.g.*, 43 FR 32182, (July 25, 1978).

[15] *See Engine Manufacturers Association* v. *EPA*, 88 F.3d 1075, 1092 (D.C. Cir. 1996): ". . . EPA was within the bounds of permissible construction in analogizing § 209(e) on nonroad sources to § 209(a) on motor vehicles."

in section 209(e)(2)(A),[16] and that EPA should give substantial deference to the policy judgments California has made in adopting its regulations. In previous waiver decisions, EPA has stated that Congress intended EPA's review of California's decision-making be narrow. EPA has rejected arguments that are not specified in the statute as grounds for denying a waiver:

The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in California air quality not commensurate with its costs or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California.[17]

This principle of narrow EPA review has been upheld by the U.S. Court of Appeals for the District of Columbia Circuit.[18] Thus, EPA's consideration of all the evidence submitted concerning an authorization decision is circumscribed by its relevance to those questions that may be considered under section 209(e)(2)(A).

### B. Deference to California

In previous waiver and authorization decisions, EPA has recognized that the intent of Congress in creating a limited review based on specifically listed criteria was to ensure that the Federal government did not second-guess state policy choices. As the Agency explained in a prior waiver decision: "It is worth noting . . . I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator . . . Since a balancing of risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I

believe I am required to give very substantial deference to California's judgments on this score." [19] Similarly, EPA has stated that the text, structure, and history of the California waiver provision clearly indicate both a Congressional intent and appropriate EPA practice of leaving the decision on "ambiguous and controversial matters of public policy" to California's judgment.[20] This interpretation is supported by relevant discussion in the House Committee Report for the 1977 Amendments to the CAA. Congress had the opportunity through the 1977 Amendments to restrict the preexisting waiver provision but elected instead to expand California's flexibility to adopt a complete program of motor vehicle emission controls. The report explains that the amendment is intended to ratify and strengthen the preexisting California waiver provision and to affirm the underlying intent of that provision, that is, to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.[21]

### C. Burden and Standard of Proof

In *MEMA I* the Court stated that the Administrator's role in a CAA section 209 proceeding is to "consider all evidence that passes the threshold test of materiality and . . . thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver." [22] The Court in *MEMA I* considered the standard of proof under CAA section 209 for the two findings related to granting a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) protectiveness in the aggregate and (2) consistency with section 202(a) findings. The Court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved. We need not decide how this standard operates in every waiver decision." [23] The Court upheld the Administrator's position that, to deny a waiver, there must be 'clear and compelling evidence'

to show that proposed procedures undermine the protectiveness of California's standards.[24] The Court noted that this standard of proof also accords with the Congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare.[25] With respect to the consistency finding, the Court did not articulate a standard of proof applicable to all proceedings but found that the opponents of the waiver were unable to meet their burden of proof even if the standard were a mere preponderance of the evidence.

Although *MEMA I* did not explicitly consider the standard of proof under CAA section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the Court's analysis would not apply with equal force to such determinations. EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of 'compelling and extraordinary' conditions and whether the standards are technologically feasible—Congress intended that the standards of EPA review of the State decision to be a narrow one." [26] Opponents of the waiver or authorization bear the burden of showing that the criteria for a denial of California's waiver or authorization request have been met. As found in *MEMA I*, this obligation rests firmly with opponents of the waiver or authorization in a CAA section 209 proceeding:

The language of the statute and its legislative history indicate that California's regulations, and California's determinations that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied.[27]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the information in the record in coming to the waiver or authorization decision. As the Court in *MEMA I* stated: "here, too, if the Administrator ignores evidence demonstrating that the waiver should

---

[16] 59 FR at 36983, note 12.

[17] "Waiver of Application of Clean Air Act to California State Standards," 36 FR 17458 (Aug. 31, 1971). Note that the more stringent standard expressed here, in 1971, was superseded by the 1977 amendments to section 209, which established that California must determine that its standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. In the 1990 amendments to section 209, Congress established section 209(e) and similar language in section 209(e)(1)(i) pertaining to California's nonroad emission standards which California must determine to be, in the aggregate, at least as protective of public health and welfare as applicable federal standards.

[18] *See, e.g., MEMA I.*

[19] *See,* "California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption," 40 FR 23102, 23103 (May 28, 1975).

[20] *Id.* at 23103–04.

[21] *MEMA I,* 627 F.2d 1095 1110 (D.C. Cir. 1979) ((citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)).

[22] *MEMA I,* 627 F.2d at 1122.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] 80 FR 76468, 76471 (December 9, 2015).

[27] *MEMA I,* 627 F.2d at 1121.

not be granted, or if he seeks to overcome that evidence with unsupported assumptions of his own, he runs the risk of having his waiver decision set aside as 'arbitrary and capricious.'"[28] Therefore, the Administrator's burden is to act "reasonably."[29]

*D. EPA's Administrative Process in Consideration of California's Request*

On March 17, 2023, EPA issued a notice for comment regarding CARB's authorization request for the 2020 At-Berth Amendments.[30] The notice requested the public provide EPA with comment on issues relevant to EPA's consideration of the request along with an opportunity to request a public hearing. EPA did not receive a request for a public hearing. Consequently, EPA did not hold a public hearing. The written comment period remained open until May 1, 2023.[31] EPA's decision in this notice only pertains to the authorization request related to the 2020 At-Berth Amendments.[32]

EPA requested comment on the 2020 At-Berth Amendments, and whether they meet the criteria for a full authorization. Specifically, EPA requested public comment on: (a) whether CARB's determination that its standards, in the aggregate, are at least as protective as applicable federal standards is arbitrary and capricious, (b) whether California needs such standards to meet compelling and extraordinary conditions, and (c) whether California's standards and accompanying enforcement procedures are consistent with section 209 of the Act.[33]

EPA received comment from several parties that opposed EPA granting an authorization to CARB for the 2020 At-

Berth Amendments.[34] EPA also received comment from several parties that supported EPA granting an authorization to CARB for the 2020 At-Berth Amendments.[35] EPA will address these comments below.

**III. Discussion**

Our analysis of the 2020 At-Berth Amendments in the context of the three authorization criteria is set forth below.

*A. First Authorization Criterion*

CAA section 209(e)(2)(A)(i) of the CAA instructs that EPA cannot grant an authorization if the Agency finds that California was arbitrary and capricious in its determination that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.

CARB states that as with standards for new on-road motor vehicles and engines, California evaluates the protectiveness of its nonroad standards "in the aggregate," assessing whether the State's standards, as a whole regulatory program (a whole nonroad emissions program), are at least as protective as EPA's standards.[36] CARB notes that this protectiveness assessment also takes place against the backdrop of prior nonroad authorizations granted for which California determined, and EPA affirmed, that California's existing nonroad emissions program is at least as protective as EPA's.[37]

In adopting the 2020 At-Berth Amendments, CARB's Board approved Resolution 20–22, in which it expressly declared, "the Board hereby determines that the regulations adopted herein will not cause California's off-road engine emission standards, in the aggregate, to be less protective of public health and welfare as applicable federal standards."[38] CARB further stated that there is no basis for EPA to find the Board's determination is arbitrary and capricious since EPA is not authorized to regulate "in-use" nonroad engines under the CAA and is thus precluded from developing any comparable requirements for this category of sources.[39] CARB noted that the 2020 At-Berth Amendments are projected to achieve 3.5 tons per day (tpd) of $NO_X$ in the South Coast (and 7.1 tpd statewide) in 2037 and is one of the control measures committed to in California's 2022 State SIP Strategy to help the South Coast reach attainment with the 2037 ozone standard. In addition, CARB noted that its 2020 At-Berth Amendments are projected to achieve cumulative total reductions from 2021 to 2032 of 17,500 tons of $NO_X$, 370 tons of $PM_{2.5}$, 870 tons of ROG; and 356,000 metric tons of carbon dioxide equivalent ($CO_2e$).[40]

No evidence was submitted to support an argument that the stringency of CARB's At-Berth Regulation is numerically less stringent than the applicable EPA standard (in this case EPA does not have the authority to regulate in-use OGVs within its regulatory authority set forth in section 213 of the CAA, therefore there are no applicable federal standards to compare with CARB's standards). Therefore, we cannot find that California's 2020 At-Berth Amendments undermine California's previous determination that its nonroad standards and accompanying enforcement procedures, in the aggregate, are at least as protective of public health and welfare as applicable Federal standards or that CARB's protectiveness determination submitted as part of its authorization request is arbitrary and capricious.

[28] *Id.* at 1126.

[29] *Id.*

[30] *See* "California State Nonroad Engine Pollution Control Standards; Ocean-Going Vessels At-Berth and Commercial Harbor Craft; Requests for Authorization; Opportunity for Public Hearing and Comment" 88 FR 16439 (March 17, 2023).

[31] EPA's March 17, 2023, Federal Register notice also included notice of an opportunity for public hearing and written comment on a separate authorization request from California regarding amendments to its Commercial Harbor Craft (CHC) regulation. EPA did receive a request for public hearing for the CHC authorization request and announced a hearing date and extended comment period associated with that request, see 88 FR 25636, April 27, 2023. EPA's actions regarding the CHC authorization request did not affect EPA's consideration of CARB's 2020 At-Berth Amendments request and EPA did not extend the written comment period for the At-Berth request.

[32] EPA's March 17, 2023, notice indicated that EPA will separately and independently evaluate the 2020 At-Berth Amendments and the 2022 CHC amendments and will issue separate final decisions for each. 88 FR at 16442, note 12.

[33] *Id.*

[34] Pacific Merchant Shipping Association (PMSA), EPA–HQ–OAR–0152–0062; Western States Petroleum Association (WSPA), EPA–HQ–OAR–2023–0152–0022; Maersk, EPA–HQ–OAR–0152–0021; and, Pasha Hawaii Holdings (Pasha Hawaii), EPA–HQ–OAR–2023–0152–0054.

[35] EPA received one comment submitted jointly (Earthjustice), EPA–HQ–OAR–2023–0152–0041, that included: BREATHE Southern California, California Environmental Voters, California Nurses for Environmental Health and Justice, Center for Biological Diversity, Center for Community Action and Environmental Justice, Central Valley Air Quality Coalition, Climate Solutions, Coalition for Clean Air, Earthjustice, East Yard Communities for Environmental Justice, Environmental Defense Fund, Friends of the Earth, Little Manila Rising, Natural Resources Defense Council, Ocean Conservancy, Pacific environment, Regional Asthma Management and Prevention, San Pedro & Peninsula Homeowners Coalition, Sierra Club, Sunflower Alliance, Washington Physicians for Social Responsibility, and the West Long Beach Association. These same commenters submitted an additional comment after the close of the comment period (Earthjustice Additional Comment), EPA–HQ–OAR–2023–0152–0063. EPA also received comment from the American Lung Association (ALA), EPA–HQ–OAR–2023–0152–0001, and the West Berkeley Alliance for Clean Air and Safe Jobs, EPA–HQ–OAR–2023–0152–0046 and the Ocean Conservancy, and other individual comments found at EPA–HQ–OAR–2023–0152.

[36] CARB At-Berth Authorization Request at 21.

[37] *Id.* EPA notes that its recently granted nonroad authorization confirmed the approach of determining whether CARB's nonroad amendments

undermine California's previous determination that its standards and accompanying enforcement procedures, in the aggregate, are at least as protective of public health and welfare as applicable federal standards. 88 FR 24411, 24414 (April 20, 2023).

[38] CARB, Resolution 20–22 (quoted in CARB At-Berth Authorization Request at 22).

[39] CARB At-Berth Authorization Request at 22, *citing* CAA section 213 (EPA's authority to set nonroad emission standards for new nonroad engines and vehicles) and *Engine Manufacturers Association* v. *EPA*, 88 F.3d 1075 (D.C. Cir 1996) (*EMA*).

[40] CARB At-Berth Authorization Request at 3–5.

Thus, we cannot deny CARB's request for authorization of its Amendments based on this criterion.

One commenter asserted that California's justification for its protectiveness finding must fail because "CARB purports that EPA need not look at the proposed regulation to determine 'protectiveness', rather that California must merely be at least as protective as the federal standards." [41] This commenter asserted that Congress could not have meant that CARB can adopt any regulations it proposes without some review by EPA and that EPA must delve into the regulation CARB is currently submitting rather than a general statement that CARB views its program as a whole more protective than applicable federal standards. This commenter also asserted that CARB "confuses" the issue by "creating a sub-categorization" of nonroad engines and that there is no such distinction in the CAA and is contrary to the intent of the CAA. [42]

EPA notes that its historical practice, followed here, is to examine the specific standards that CARB has submitted for authorization and to compare the stringency of such standards to the relevant federal standards. If CARB's standards are more stringent than the relevant federal standards, then the first authorization criterion is satisfied. In addition, in the event that it appears that a specific California standard may be less stringent than an applicable federal standard, then EPA will evaluate whether California's standards as a whole are 'in the aggregate' as protective of public health and welfare as applicable federal standards for nonroad vehicles and engines. [43] In that circumstance, even if the standards in question are less stringent than the relevant federal standards, so long as California's nonroad standards, in the aggregate, are more stringent than the federal standards, the first authorization criteria is satisfied.

In this instance there are no EPA standards that apply to OGVs that are no longer new. [44] CARB's At-Berth Regulation applies to OGVs that are not in a "new" status but rather OGVs that are non-new or "in-use" as CARB applies this concept. CARB is not creating this concept of "in-use" nor is it inconsistent with the CAA. EPA notes that this commenter also does not account for the language in section 209(e) and related case law. For example, based on the Court decision in *EMA*, EPA implemented regulations for section 209(e) of the CAA that clarify that states and localities may not regulate (are preempted from regulating) the emissions on in-use nonroad engines and vehicles but that California may seek an authorization to enforce such regulations. [45]

EPA also received comment that suggested CARB's projected emission reductions associated with the control of emissions from tankers were inaccurate. [46] This commenter noted what it believed to be a discrepancy between, on the one hand, CARB's rulemaking record where emission reduction estimates were based on capture and control technologies (not shore power) in order to control boiler emissions from tankers, and on the other, more recent statements from CARB indicating a belief shore power may provide a viable alternative. The commenter noted that CARB is incorrectly representing an overstated reduction in tanker emissions that was based on capture on control technology. [47]

As noted above, EPA's scope of review of CARB's authorization request is narrow and is limited to the criteria in section 209(e)(2)(A). While EPA appreciates this commenter's concern for the accuracy in the emission reduction estimates, neither this commenter nor any other has submitted information, data, or arguments as to why claimed inaccuracies would render CARB's standards, whether alone or in the aggregate, to be less protective than applicable federal standards. Any emission reductions from California's regulation of in-use nonroad vehicles or engines, including those from tankers, would support a finding that the State's standards are as protective as the federal, and this would be true whether the State's standards are considered in the aggregate or individually.

EPA notes that this comment was not tied to any of the three authorization criteria. To the extent the commenter may also believe that potential inaccuracies indicate a lack of a need for the 2020 At-Berth Amendments under the second authorization criterion, for the reasons noted further below, California continues to experience compelling and extraordinary conditions, and thus California has demonstrated a need for its nonroad emission program (include the At-Berth Regulations) regardless of the actual or precise emission reductions from the control of emissions from tankers.

Accordingly, for the reasons noted above, EPA cannot find that CARB's protectiveness finding is arbitrary and capricious, nor can we deny CARB's request for authorization of its 2020 At-Berth Amendments based on this criterion.

## *B. Second Authorization Criterion*

Under section 209(e)(2)(A)(ii) of the Act, EPA must grant an authorization for California nonroad vehicle and engines standards and accompanying enforcement procedures unless EPA finds that California "does not need such State standards to meet compelling and extraordinary conditions." EPA has traditionally interpreted this provision, consistent with its interpretation of similar language in section 209(b)(1)(B), as requiring consideration of whether conditions in California justify the need for a separate nonroad vehicle and engine program to meet compelling and extraordinary conditions, and not whether any given standard or set of standards is necessary to meet such conditions. [48]

Congress has not disturbed this reading of section 209(b)(1)(B), and 209(e)(2)(A)(ii), as calling for EPA review of conditions in California rather than the standards being considered for waiver or authorization. With two exceptions, EPA has consistently interpreted this provision as requiring the Agency to consider whether California needs a separate motor vehicle emission program (or nonroad program) rather than the specific

---

[41] Maersk at 4–5 (note, this commenter did not number the pages in their comment).

[42] *Id.*

[43] EPA also evaluates the first authorization criterion by assessing the numerical stringency of CARB's standard compared to applicable Federal standards. Section 209(b)(2) supports this approach.

[44] CAA section 216 defines "new", in part, as "the equitable or legal title to which has never been transferred to the ultimate purchaser."

[45] The genesis of the dispute of the scope of implied preemption in section 209(e)(2) originated from EPA's final 1994 rule that limited preemption to "new" nonroad sources and did not cover "non-new" or in-use sources. *See EMA* at 1082 (citing EPA's rule at 59 FR 3699, 36971–73 (1994)). The *EMA* Court explained that EPA has sole authority over the classes of new nonroad sources defined in section 209(e)(1). In addition, EPA and California have joint authority over all other new nonroad sources. *Id.* at 1090. The Court then examined whether all states have independent authority to regulate non-new sources or whether California has sole authority over such sources (with other states permitted to opt into California regulations). The Court held that the implied preemption of section 209(e)(2) extends beyond emission standards for new nonroad sources and includes non-new sources. *Id.* at 1094. EPA's regulations that implement the holding in *EMA* are at 40 CFR 1074.10(b) and Appendix A.

[46] WSPA at 6–7. As noted below, the commenter failed to adequately allege that this comment is related to any of the three authorization criteria. Therefore this comment is not an adequate basis for denying the authorization. Nonetheless, EPA has in its discretion addressed this comment in relation to the first and second authorization criteria.

[47] *Id.*

[48] *See e.g.,* 82 FR 6525 (January 19, 2017); 78 FR 58090 (September 20, 2013).

standards in the request at issue to meet compelling and extraordinary conditions. Congress intended to allow California to address its extraordinary environmental conditions and foster its role as a laboratory for motor vehicle emissions control. The Agency's longstanding practice therefore has been to evaluate CARB's requests with the broadest possible discretion to allow California to select the means it determines best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and the importance of California's ability to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[49] EPA notes that "the statute does not provide for any probing substantive review of the California standards by federal officials." [50] As a general matter, EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[51]

In a departure from its long-standing interpretation, EPA has on two separate instances limited its interpretation of this provision to California motor vehicle standards that are designed to address local or regional air pollution problems.[52] In both instances EPA determined that the traditional interpretation was not appropriate for standards designed to address a global air pollution problem and its effects and that it was appropriate to address such standards separately from the remainder of the program (what became known as the "alternative interpretation").[53]

However, shortly after both instances, EPA explained that the reinterpretation of the second waiver prong in this manner is flawed and the alternative interpretation is inappropriate, finding that the traditional interpretation—in which EPA reviews the need for California's motor vehicle program as a whole—is the best interpretation.[54]

CARB noted that California, particularly in the South Coast and San Joaquin Valley Air Basins, "continues to experience some of the worst air quality in the nation, and the South Coast and San Joaquin Valley Air Basins, in particular, continue to be in extreme non-attainment with national ambient air quality standards for ozone and serious non-attainment with national ambient air quality standards for particulate matter." [55] CARB identified OGVs regulated by the At-Berth Regulation as significant sources of harmful air pollutants, and the need for CARB to achieve reductions of NOₓ and PM to attain the national ambient air quality standards (NAAQS) for ozone and PM.[56] In addition, the CARB Board noted the public health and air quality benefits beyond those achieved by the 2007 At-Berth Regulation and the benefits that would accrue to coastal and port communities.[57] EPA received

comment that noted the April 2023 American Lung Associated Report which ranks cities and counties based on ozone and particle pollution, states that sixteen of the 25 most ozone-polluted regions in the nation are located in California.[58] This commenter noted that many of the most-polluted regions in California, and indeed the nation, house major ports and are home to millions who are most susceptible to developing illnesses from breathing unhealthy levels of air pollution, including children, the elderly, and people with underlying health conditions.[59]

EPA also received comment that questioned whether CARB had adequately demonstrated the need for the At-Berth Regulations based on CARB's basis, in part, that the regulations were needed to address NAAQS issues in the South Coast and San Joaquin Valley Air Basins, and that CARB does not explain how the regulations are needed in other parts of the state.[60] This commenter also suggested that California relied on past findings and the regulation of motor vehicles (as opposed to nonroad engines and vehicles) as the basis for the need for its standards. This commenter also argued that because section 209(e)(2)(B)(i) allows other states to adopt and enforce California's emission standards, EPA has a greater duty to examine the California regulations, including the need for them.

Based on a review of the authorization record, the opponents have not demonstrated that California no longer has a need for its nonroad emission program, including its At-Berth regulations. California continues to experience some of the worst air quality in the country (measured by the NAAQS status of number of areas within California) and its port and coastal communities continue to experience serious public health and welfare impacts. In addition to the Port of Long

⁴⁹ *See, e.g.,* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy).

⁵⁰ *Ford Motor* v. *EPA,* 606 F.2d 1293, 1300 (D.C. Cir. 1979).

⁵¹ 74 FR at 32763; 76 FR 34693; 79 FR 46256; 81 FR 95982; 88 FR 20688.

⁵² 73 FR 12156 (March 8, 2008); 84 FR 51310 (September 27, 2019).

⁵³ In SAFE 1, EPA withdrew a portion of the waiver it had previously granted for California's Advanced Clean Cars (ACC) program—specifically, the waiver for California's zero emission vehicle (ZEV) mandate and the GHG emission standards within California's ACC program. EPA based its action, in part, on its determination that California did not need these emission standards to meet compelling and extraordinary conditions, within the meaning of section 209(b)(1)(B) of the CAA. That determination was in turn based on EPA's adoption of a new, GHG-pollutant specific interpretation of section 209(b)(1)(B). In any event, EPA expressly stated that its new interpretation of section 209(b)(1)(B) only applied to waiver requests for GHG emission reducing standards, SAFE 1 at 51341, n. 263. Therefore, even if EPA still

maintained the SAFE 1 interpretation (which EPA does not agree with for the reasons explained in the SAFE 1 Reconsideration Decision (87 FR 14332 (March 14, 2022)), EPA's traditional interpretation would still apply to this nonroad authorization request given all of the standards at issue are, in whole or in part, related to the reduction of criteria pollutant emissions. CARB notes that in addition to the cumulative tons of NOₓ and PM₂.₅ between 2021 and 2032, the 2020 At-Berth Amendments are also projected to reduce 356,000 metric tons of carbon dioxide equivalent (CO2e) (CARB At-Berth Authorization Request at 4–5). Therefore, to the extent the alternative interpretation of the second authorization criteria were to apply (*i.e.,* an assessment of the need for individual standards), EPA agrees with CARB that the OGV regulation will assist California in the substantial challenges in facing national and state ambient air quality standards for ozone and particulate matter. (CARB At-Berth Authorization Request at 25–26).

⁵⁴ 74 FR 32744 (July 8, 2009); SAFE 1 Reconsideration Decision at 14333–34, 14352–55, 14358–62.

⁵⁵ CARB At-Berth Authorization Request at 23.

⁵⁶ *Id.* at 24–28.

⁵⁷ *See* CARB Board Resolution 20–22. ("WHEREAS, the Regulation is designed to achieve added public health and air quality benefits that result from emissions reductions of oxides of nitrogen (NOₓ), particulate matter 2.5 (PM₂.₅); reactive organic gas (ROG), GHG emissions, black carbon, diesel particulate matter (DPM) and other toxic air contaminants, beyond those realized by the 2007 At-Berth ATCM; . . . The Regulated California Waters, which include California ports and independent marine terminals, feature meteorological, wind, and atmospheric conditions peculiar to the local waters of California, and such conditions make it likely that emissions of DPM, PM₂.₅, ROG, and NOₓ occurring within these waters and ports are transported to coastal communities and adversely affect human health and welfare and

the environment in such communities, thereby calling for special precautions to reduce these emissions; The emissions from diesel auxiliary engines used on ocean-going vessels and boilers used on tanker vessels with steam driven boilers while at berth contribute to regional air quality problems and to potential risk of cancer and non-cancer health effects for residents living in communities near California's major ports and independent marine terminals; Upon implementation, the Regulation approved herein would reduce emissions of DPM, ROG, GHG and NOₓ from diesel auxiliary engines used on ocean-going vessels and PM₂.₅, ROG, and NOₓ from boilers on tanker vessels with steam driven pumps while at berth and will reduce emissions of carbon dioxide, a GHG . . .").

⁵⁸ Earth Justice at 2.

⁵⁹ *Id.*

⁶⁰ Maersk at 7.

Beach and the Port of Los Angeles covered by the 2007 At-Berth Regulation, the 2020 At-Berth Amendments include the ports of Oakland, San Francisco, San Diego, Richmond, Stockton, Rodeo Area Marine Oil Terminals, and Hueneme with their own NAAQS attainment challenges as well as local public health impacts associated with port activities.[61] The record here, as presented by CARB, is plainly based on the compelling and extraordinary conditions in California generally as opposed to discrete regions and the corresponding need for CARB's nonroad emission program.[62]

Contrary to comments received, CARB's submission and EPA's evaluation of the second authorization criterion at section 209(e)(2)(A)(ii) is not based on CARB's findings associated with the need for its motor vehicle emission program under section 209(b)(1)(B). CARB's Board Resolution and its authorization request plainly sets forth its basis to demonstrate the need for its nonroad emission program to meet compelling and extraordinary conditions under the second authorization criterion. Further, EPA does not evaluate the record before it under section 209(e)(2)(A), including whether there is a need for "such standards" to meet compelling and extraordinary conditions in California, based on the ability or possibility of other States to adopt California standards.[63]

CARB has repeatedly demonstrated the need for its nonroad engines and vehicles emissions program to address compelling and extraordinary conditions throughout the state of California, including in its nonattainment areas as well as in local and port communities affected by the 2020 At-Berth Amendments. The opponents of the waiver have not adequately demonstrated that that California does not need its nonroad emissions program to meet compelling and extraordinary conditions. Therefore, I determine that I cannot deny the authorization requests under section 209(e)(2)(A)(ii).

*C. Third Waiver Criterion*

Section 209(e)(2)(A)(iii) of the Act instructs that EPA cannot grant an authorization if California's standards and enforcement procedures are not consistent with "this section." The 1994 rule sets forth, among other things, regulations providing the criteria, as found in section 209(e)(2)(A), which EPA must consider before granting any California authorization request for new nonroad engine or vehicle emission standards.[64] EPA has historically interpreted the section 209(e)(2)(A)(iii) "consistency" inquiry to require, at minimum, that California standards and enforcement procedures be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) (as EPA has interpreted that subsection in the context of section 209(b) motor vehicle waivers).[65]

1. Consistency With CAA Section 209(a)

To be consistent with CAA section 209(a), California's 2020 At-Berth Amendments must not apply to new motor vehicles or new motor vehicle engines. This is the case. California's 2020 At-Berth Amendments expressly apply only to nonroad engines and do not apply to motor vehicles or engines

used in motor vehicles as defined by CAA section 216(2).[66] We did not receive any comments on California's consistency with CAA section 209(a). Therefore, EPA cannot deny California's request on the basis that California's 2020 At-Berth Amendments are not consistent with CAA section 209(a).

2. Consistency With CAA Section 209(e)(1)

To be consistent with CAA section 209(e)(1), California's 2020 At-Berth Amendments must not affect new farm or construction equipment or vehicles that are below 175 horsepower, or new locomotives or new engines used in locomotives. CARB notes that its 2020 At-Berth Amendments do not affect such permanently preempted vehicles or engines. EPA did not receive any comments regarding California's consistency with section 209(e)(1). Therefore, EPA cannot deny California's request on the basis that California's 2020 At-Berth Amendments are not consistent with section 209(e)(1).

3. Consistency With CAA Section 209(b)(1)(C)

a. Historical Context

The requirement that California's standards be consistent with CAA section 209(b)(1)(C) effectively requires consistency with section 202(a). EPA has interpreted consistency with section 202(a) using a two-pronged test: (1) whether there is sufficient lead time to permit the development of technology necessary to meet the standards and other requirements, giving appropriate consideration to the cost of compliance in the time frame provided, and (2) whether the California and Federal test procedures are sufficiently compatible to permit manufacturers to meet both the state and Federal test requirements with one test vehicle or engine.[67] We often refer to the first element by the shorthand of technological feasibility (or technological infeasibility). The scope of EPA's review of whether California's action is consistent with CAA section 202(a) is narrow. The determination is limited to whether those opposed to the authorization have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the Federal test procedures.[68]

---

[61] *See* Ocean Conservancy, Earth-Justice, and American Lung Association. EPA also notes that the climate changes impacts in California (including those on local public health and welfare), and the connection to and purpose of CARB's OGV At-Berth regulation and reductions of CO2e emissions.

[62] The commenter provided no legal calculation for interpreting the statute to require that "compelling and extraordinary conditions" exist in every part, or even in a predominance of geographic areas within California. In addition, California is responsible, in part, for developing State Implementation Plan (SIP) measures to address nonattainment and maintenance and EPA sees no basis to deny an authorization for regulations designed at the state level at a number of ports and that address emission sources that create both local and regional air quality problems.

[63] EPA has on several occasions noted, responding to assertions that California's standards must be evaluated in the context of actions that have been or could be taken by states adopting California standards, that the plain text of section 209 as well as the legislative history of the section limit EPA's consideration of the California standards to the state of California and do not extend to other states. *See e.g.,* 78 FR 2112, 2132 (January 9, 2013). Similarly, "[t]he law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not

legally pertinent to my decision under section 209, so long as the *California requirement is consistent with section 202(a)* and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California. The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California." (emphasis added), 78 FR at 2115.

[64] *See* 40 CFR part 1074.

[65] 59 FR at 36982–83.

[66] The regulated engines are not "self-propelled vehicles designed for transporting persons or property on a street or highway." CAA section 216(2).

[67] *See* 61 FR 53371, 53372 (Oct. 11, 1996).

[68] *MEMA I,* 627, F.2d at 1126.

Under section 209(b)(1)(C), EPA must grant California's waiver (and authorization) request unless the Agency finds that California standards and accompanying enforcement procedures are "not consistent" with section 202(a) of the Act. Section 202(a)(1) grants EPA authority to regulate motor vehicle emissions generally and the accompanying section 202(a)(2) specifies that those standards are to "take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." Thus, no specific lead time requirement applies to standards promulgated under section 202(a)(1).

EPA has long limited its evaluation of whether California's standards are consistent with section 202(a) to determining if: (1) There is inadequate lead time to permit the development of the necessary technology giving appropriate consideration to the cost of compliance within that time period; or whether (2) California and Federal test procedures are incompatible so that a single vehicle could not be subjected to both tests. EPA has also explained that "the import of section 209(b) is not that California and Federal standards be identical, but that the Administrator not grant a waiver of Federal preemption where compliance with the California standards is not technologically feasible within available lead time." Further, EPA's review is limited to the record on feasibility of the technology. Therefore, EPA's review is narrow and does not extend to, for example, whether the regulations under review are the most effective, whether the technology incentivized by California's regulations are the best policy choice, or whether better choices should be evaluated. The Administrator has thus long explained that "questions concerning the effectiveness of the available technology are also within the category outside my permissible scope of inquiry," under section 209(b)(1)(C).

California's accompanying enforcement procedures would also be inconsistent with section 202(a) if the Federal and California test procedures conflicted, *i.e.,* if manufacturers would be unable to meet both the California and Federal test requirements with the same test vehicle.

In determining whether there is inadequate lead time to permit the development of technology, EPA considers whether adequate technology is presently available or already in existence and in use. If technology is not presently available, EPA will consider whether California has provided adequate lead time for the development and application of necessary technology prior to the effective date of the standards for which a waiver is being sought.

Additionally, the D.C. Circuit has held that "[i]n the waiver context, section 202(a) relates in relevant part to technological feasibility and to federal certification requirements. The technological feasibility component of section 202(a) obligates California to allow sufficient lead time to permit manufacturers to develop and apply the necessary technology. The federal certification component ensures that the Federal and California test procedures do not impose inconsistent certification requirements. Neither the Court nor the agency has ever interpreted compliance with section 202(a) to require more."[69] Regarding the technology costs portion of the technology feasibility analysis, when cost is at issue EPA evaluates the cost of developing and implementing control technology in the actual time provided by the applicable California regulations. The D.C. Circuit has stated that compliance cost "relates to the timing of a particular emission control regulation."[70] The Court, in *MEMA I,* opined that section 202's cost of compliance concern, juxtaposed as it is with the requirement that the Administrator provide the requisite lead time to allow technological developments, refers to the economic costs of motor vehicle emission standards and accompanying enforcement procedures. *See* S. Rep. No. 192, 89th Cong., 1st Sess. 5–8 (1965); H.R. Rep. No. 728 90th Cong., 1st Sess. 23 (1967), reprinted in U.S. Code Cong. & Admin. News 1967, p. 1938. It relates to the timing of a particular emission control regulation rather than to its social implications.[71]

Regarding the burden of proof under the third prong, EPA has previously stated that its inquiry is limited to evaluating whether those opposed to the waiver have met their burden of showing either: (1) that California's standards are technologically infeasible, including whether they do not provide for adequate lead time giving due consideration to costs, or (2) that California's test procedures impose requirements inconsistent with the Federal test procedure.

### b. CARB's At-Berth Authorization Request Discussion of Section 209(b)(1)(C)

CARB noted at the outset of its technological feasibility and lead time discussion that the 2020 At-Berth Amendments present "no issues regarding technical feasibility based on the existing technologies in place, the work already underway to expand emissions control technologies to new vessel types, and the compliance flexibilities that are built into the Regulation."[72]

In the context of its discussion of several compliance options or pathways, CARB noted that shore power itself continues to be technologically feasible. For example, CARB noted that grid-supplied shore power is a technically feasible control technology that is currently being widely used in California to reduce emissions from container, refrigerated cargo, and cruise vessels for compliance with the 2007 At-Berth Regulation.[73] In addition, with regard to newly regulated vessels (ro-ros and tankers), CARB stated that shore power is in use for ro-ro vessels in Northern Europe and there is one instance of a tanker terminal using shore power for a limited group of tanker vessels in California at the Port of Long Beach.[74] Finally, with regard to shore power, CARB noted that some degree of retrofitting of certain vessels to use the technology is needed but that technology presently exists.[75]

Another technology that CARB found to be effective for compliance and technically feasible is capture and control.[76] CARB identified capture and control technologies that would not require retrofits to vessels or terminals (if using a barge-based system) as well as land-based capture and control systems that may require some modifications to the terminals, and stated the possible need for modification was factored into compliance timelines.[77]

CARB noted that operators of these vessel fleets have already installed shore power infrastructure has already been installed on a large majority of contain, reefer, and cruise vessel fleets subject to the 2007 At-Berth Regulation. As such,

---

[69] *Motor Equipment Manufacturers Association* v. *Nicols* (*MEMA III*) 143 F.3d 449 (D.C. Cir 1998).
[70] *MEMA I* at 1119.
[71] *Id.*

[72] CARB At-Berth Authorization Request at 30.
[73] *Id.* citing CARB's Initial Statement of Reasons (ISOR) at p, III–10–13.
[74] *Id.* Citing the ISOR at III–14–15 and III–18–19.
[75] *Id.*
[76] *Id.* CARB noted that the first capture and control system for vessels under the At-Berth program was granted a CARB Executive Order in 2015, and, like shore power, the technology is currently in use by container vessels for compliance with the 2007 Regulation.
[77] *Id.* at 31.

CARB expressed that newly regulated ports or terminals (under the 2020 At-Berth Amendments) receiving container, reefer, or cruise vessels are not expected to be subject to control requirements beyond what is already covered under the existing regulation and that has been demonstrated to be feasible. "Because of the widespread investment in shore power for compliance with the 2007 At Berth Regulation, the majority of container, reefer, and cruise vessel fleets calling California are expected to continue using shore power to comply with the new Regulation." CARB also noted that the plans submitted to CARB by those regulated ports and terminals receiving regulated container, reefer, and cruise vessels further support this finding.[78]

With regard to ro-ro and tanker vessels, which were not regulated under the 2007 At-Berth Regulation, CARB noted that both shore power and capture and control technologies are technically feasible for controlling emissions from these vessel types and are already in use at some locations. "Ro-ro vessels typically have similar power needs at berth as container and reefer vessels and, as such, are expected to be able to utilize shore power equipment or a capture and control system (barge- or land-based) that is similar in design and capacity to those currently used by container and reefer vessels." Some modifications may be necessary to ensure the technology can serve the emissions reduction needs of a ro-ro vessel, but technology manufacturers have advised CARB staff that those adjustments can be readily made within the regulatory timeframes provided for ro-ro vessel compliance."[79]

Tanker vessels, generally have greater power loads at berth than container, reefer, and ro-ro vessels. CARB noted that shore power and/or capture and control systems are also anticipated to be the primary methods for reducing emissions from tankers at berth. For example, CARB noted that shore power is already in use at one tanker terminal at the Port of Long Beach (Pier T) and capture and control systems are being considered by both technology manufacturers and tanker industry members as a potential solution for compliance with the At Berth Regulation.[80] CARB acknowledged that "Some additional modifications to the existing capture and control system may be necessary for use on tanker vessels due to their larger power loads needed at berth and safety concerns resulting from the flammable cargos often transported by tanker vessels. These modifications include, but are not limited to, putting spuds on capture and control barges that allow them to anchor a safe distance away from the vessel (providing easy break-away capabilities in the event of an emergency situation) or developing land-based systems with centralized treatment systems with additional piping and cranes at the dock designed to safely carry hot exhaust away from the vessel for after-treatment."[81]

In addition to CARB's own technology assessments, CARB noted its discussions with technology manufacturers who expressed confidence in their ability to adapt existing capture and control technologies for safe use on tanker vessels. CARB also noted the first demonstration project to develop a capture and control system for tankers underway that is expected to reach completion by the end of 2023, well ahead of the first tanker vessel compliance date (January 2025).[82]

CARB also noted that it had reviewed planning documents of ports and terminals that host ro-ro and tanker vessels and found that those plans generally align with the assumptions made in support of the 2020 At-Berth Amendment, with "the majority of ro-ro and tanker terminal plans indicating that regulated entities intend to use shore power or capture and control technologies to comply with the At Berth Regulation."[83] CARB noted that the At-Berth Amendments were tuned to provide "a staggered implementation schedule to reduce the burden on emissions control technology providers and contractors that specialize in wharf improvements, as bringing all tanker terminals and ro-ro terminals in at the same time could stress the ability of the existing equipment manufacturers to design, build, and deploy their systems, and could result in backorders and delays."[84] The 2020 At-Berth Amendments require previously regulated ocean-going vessels to now comply at the newly regulated ports and terminals by January 1, 2023. The 2020 At-Berth Amendments require also require all ro-ro vessels visiting all regulated ports and terminals (including those ports and terminals covered by CARB's original regulation as well as ports and terminals newly regulated by the new At-Berth Amendments to comply by January 1, 2025; for tankers that visit the ports of Los Angeles or Long Beach by January 1, 2025, and for all other ports and terminals by January 1, 2027.

CARB concluded that "there should be no question that sufficient pathways exist for regulated ro-ro and tanker vessels to comply with the Regulation's requirements by the required implementation dates given that the technology to comply . . . exists, given that the Regulation provides several years of lead time for equipment adaption, permitting, and adaptation; . . ."[85]

In addition to CARB's assessments and expectations highlighted above, CARB noted a number of flexibilities built into the At-Berth regulations to accommodate varying project timelines in the event of delays. Examples of such flexibilities include providing each regulated vessel fleet and terminal with a limited number of exemptions each year and an option to remediate emissions if equipment or construction delays occur.[86]

Another compliance pathway available to vessel operators, terminal operators, CAECS operators, as well as port operators is a "remediation fund" that under certain circumstances allows regulated entities to reach compliance by monetary payments. The fund supports projects that reduce equivalent emissions in the same port communities impacted by the uncontrolled emissions.[87]

CARB also noted an additional compliance pathway under an "Innovative Concepts Compliance Option" added at the request of the tanker industry. This allows a terminal needing extra time to design, certify, and build an emissions control system to reduce equivalent emissions at their terminal from a different unregulated emissions source.[88]

Turning to the question of costs, including the economic cost of developing and implementing requisite

---

[78] *Id.* CARB also noted that in addition to the availability and feasibility of shore power there is existing "barge-capture and control technology" for use on container vehicles, that such CAECS type technology can be used for any container vessel visiting a regulated California terminal, and that therefore there should be no question that regulated container, reefer, and cruise vessels will be able to comply with the 2020 At-Berth Amendments by the initial compliance date of January 1, 2023.

[79] *Id.* at 32.

[80] *Id.*

[81] *Id.*

[82] *Id.* at 32–33.

[83] *Id.* at 33.

[84] *Id.*

[85] *Id.*

[86] *Id. See also* CARB's FAQ at *https://ww2.arb.ca.gov/sites/default/files/2021-11/TTD21-272%20At%20Berth%20FAQs.pdf.*

[87] *Id.* at 16–17. According to CARB, this compliance pathway is available under circumstances where equipment repairs or maintenance, delays in connecting a control strategy, and certain other circumstances are identified, and a terminal plan is submitted to and approved by CARB.

[88] *Id.* at 33.

technology to meet the 2020 At-Berth Amendments, the At-Berth Authorization Request included CARB's assessment of costs and savings for regulated entities associated with every element of the Regulation.[89]

CARB noted that "A key element in considering the cost of compliance is to estimate the costs passed on by ports to terminal operators, by terminal operators to the vessel fleet operators, and by vessel fleet operators to their customers and consumers." [90] CARB noted that the costs to directly regulated parties will vary considerably depending on the compliance pathway(s) selected (*i.e.,* shore power or a capture and control system) and may include one-time equipment capital and installation costs and recurring costs for maintenance, labor, air pollution control services (rental of capture and control barge-based systems), fuel, electricity, and administrative costs, depending on the emission control strategy used for compliance. CARB noted that it broke the estimated costs down for regulated entities per year as part of the Standardized Regulatory Impact Assessment (SRIA) completed during the rulemaking process.[91]

CARB stated that direct costs to comply will largely be borne by ports, terminal operators, and fleet owners and operators, though the industry may choose to pass on costs to consumers without incurring significant economic disruption or impact on business competitiveness. Therefore, CARB subsequently estimated these indirect costs to consumers by calculating cost ratios in metrics of increased cost per 20-foot equivalent unit (TEU) of cargo for container and reefer vessels, increased cost per cruise vessel passenger, increased cost per automobile imported into or exported from California, and increased cost per gallon of gasoline, diesel fuel, jet fuel, and other crude products produced in California.[92] CARB stated these

calculations further support its conclusion, pointing to the historical deference EPA provides to California's policy judgments, including judgments on costs, that the 2020 At-Berth Amendments are feasible within the lead time provided and giving appropriate consideration of costs.[93]

The remaining element of the consistency with section 202(a) requirement is whether the At-Berth regulations raises issues regarding the incompatibility of California and federal test procedures. CARB noted that in fact, it does not adopt or create any new test procedures. "The regulation incorporates by reference a number of standards and test methods, . . ., to allow operators to submit engine test data already measured pursuant to federal regulations and the international treaty, respectively. There is no requirement for engine manufacturers or fleet owners to certify engines beyond federal and state certification testing for new engines. Additionally, there are no conflicts between federal and California test procedures for verification testing for diesel emission control strategies in that there is no comparable mandatory federal program." [94]

### c. Comments Received

As noted in the "Other Issues" section below, EPA received comment that recommended that the Agency not act upon CARB's authorization request until a state appeals court in California ruled on an appeal from a lower Superior Court of California decision filed on March 1, 2023.[95] EPA addresses the issue of whether it is necessary or appropriate to delay its authorization decision pending a court decision in the "Other Issues" section. However, the underlying superior court decision issued on January 18, 2023, is informative as it relates to the technological feasibility of the 2020 At-Berth Amendments.[96] The Superior Court's judgment includes an analysis of the regulation's feasibility and safety and whether CARB violated its own statutory duties by failing to demonstrate substantial evidence of feasibility and safety.[97] The Court noted that CARB may properly rely on

"reasonably foreseeable technological advances" and noted the multiple compliance options to meet the emission reduction requirements and that, while other options are available, shore power and capture and control technologies will result in the necessary reductions.[98] The Court also addressed a number of arguments from WSPA (the state court petitioner) that are similar to the comments that WSPA submitted to the record of EPA's authorization review. For example, the Court rejected WSPA's argument that CARB erred in its determination that shore power is feasible for diesel-electric tankers, finding sufficient record support for concluding shore power is among the feasible strategies for reducing auxiliary engine emissions from tanker vessels. Likewise, the Court noted CARB's regulatory accommodation of power boilers that are not configured to run on electricity.[99] With regard to lead time, the Court upheld CARB's demonstration that the timing of the regulation is feasible,[100] noting CARB's record evidence including statements from two technology providers that capture and control technologies could be commercially available sufficiently in advance of the 2025 and 2027 compliance dates.[101]

EPA believes it appropriate to address a threshold lead time issue raised by a commenter at the outset.[102] This commenter raised two separate arguments regarding lead time and pertaining to EPA's review of CARB's regulation, suggesting that two years must be provided from the date of EPA's authorization decision and the first date of regulatory implementation by CARB. First, the commenter stated that section 209(e)(2)(A) provides that EPA shall "authorize California to *adopt and enforce standards.*" Second, the commenter stated that section 209(e)(2)(B)(ii) also requires that "California and such state adopt such standards at least 2 years before commencement of the period for which

---

[89] EPA notes that its review of the authorization record, as it relates to cost, is more limited than what CARB laid out in the authorization request and mirrors that the Court addressed in *MEMA I* explained. In *MEMA I,* the Court addressed the cost of compliance issue at some length in reviewing a waiver decision. According to the Court: Section 202's cost of compliance concern, juxtaposed as it is with the requirement that the Administrator provide the requisite lead time to allow technological developments, refers to the economic costs of motor vehicle emission standards and accompanying enforcement procedures to the regulated entities themselves (not including indirect costs on society). Such costs relate to the timing of a particular emission control regulation rather than to its social implications.

[90] *Id.* at 35.

[91] *Id.*

[92] *Id.* These costs translate into an approximate increase in the per unit cost of: Container/Reefer:

$1.14 per Twenty-foot Equivalent Unit (TEU); · Cruise: $4.65 per passenger; · Ro-ro: $7.66 per automobile; and Tanker: <$0.01 per gallon of finished product.

[93] *Id.* at 35–36.

[94] *Id.*

[95] WSPA at 7.

[96] *Western States Petroleum Association* v *California Air Resources Board, (WSPA* v *CARB),* issued by the Superior Court of California County of Los Angeles on January 18, 2023, judgment filed on March 1, 2023, Case No. 20STCP03138.

[97] *Id.* at 6 of 22.

[98] *Id.* 8, 9 of 22. The Court explained that CARB has demonstrated that both shore power and capture and control technology are "available."

[99] *Id.* at 9, 10 of 22. If a tanker uses shore power in lieu of its auxiliary engine, the At-Berth regulation does not require the tanker to curb emissions from its boiler.

[100] *Id.* at 11. "That is, Petitioner argues the total development time required for the technology— together with the time needed for construction of the necessary supporting complex infrastructure at tanker terminals—'could range' from 10 to 15 years after adoption of the Regulation."

[101] *Id.* EPA is not aware of any information from the commenters in EPA's record for the authorization request to refute these technology assessments and projections.

[102] PMSA at 5–6.

the standards take effect."[103] EPA notes that the preamble to its regulation that implements section 209(e), as well as its waiver and authorization practice, clarifies that the two-year lead time requirement in section 209(e)(2)(B)(ii), which on its face applies to states adopting California's nonroad emission standards, does not apply to California.[104] EPA also notes that CARB is able to adopt its regulations before an EPA authorization and California enforcement may begin when EPA issues the authorization. Further, lead time is measured by the date of adoption of applicable emission standards in California, and not by any subsequent action by EPA.[105]

EPA notes that CARB issued an "Enforcement Notice" on March 30,2023, that pertains to how CARB plans to implement the OGV regulation including reporting and other requirements in calendar year 2023 and once EPA issues its authorization.[106]

With regard to the implementation timeline for the 2020 At-Berth Amendments, in addition to the two-year lead time issue addressed above, EPA received comment that stated that insufficient lead time exists to develop and modify technologies, permit, and construct needed infrastructure.[107] CARB noted during its rulemaking that the construction of emission control systems for vessels, especially for tankers and ro-ro vessels, may require years to complete but may vary substantially from project to project.[108] CARB identified recent advancements in technology, as well as statements by technology providers regarding anticipated further advancements, in support of its conclusion that technology should reasonably be available to meet to compliance obligation timelines. CARB also noted the alternative compliance strategy of the "Innovate Concept Compliance Option" and the remediation fund for construction projects as providing additional pathways to compliance if situations arise in which technological challenges are a barrier.[109]

EPA received comments regarding the Remediation Fund that was created by the 2020 At-Berth Amendments.[110] One commenter noted broad industry support for the Remediation Fund conceptually but observed that CARB had not yet implemented the provision.[111] Another commenter stated that the use of the Remediation Fund does not obviate the need for timelines adequate to permit the development of requisite technology. Further, this commenter noted that if the Remediation Fund were sufficient to demonstrate technological feasibility for purposes of an EPA authorization, the logical extension would be that the Clean Air Act authorizes the creation of a carbon tax as an emission standard. In response, EPA notes that CARB derives its regulatory authority to control the emissions from OGVs not from section 202 but from its own police power and state law authorities. Further, to the extent EPA's waiver and authorization criteria include consideration of whether CARB's standards are consistent with section 202(a), this has only led EPA to consider whether CARB's standards are technologically feasible, within the lead time provided and considering costs.[112] EPA understands the concerns expressed by the commenter that technological feasibility should be assessed against technologies that will be available within the lead time provided as opposed to demonstrating compliance (and feasibility) through the use of a remediation fund. As noted above, EPA believes that CARB had identified the necessary technologies that can be used to meet the regulatory obligations in the lead time provided. EPA concludes that, regardless of the remediation fund, CARB's standards are technologically feasible. While the third authorization criterion is satisfied without the fund, the fund is an additional compliance flexibility which regulated entities may in their discretion use to comply with the 2020 At-Berth Amendments.[113] The opponents of the authorization have not demonstrated that the fund requires regulated entities to incur excessive costs or that the fund otherwise does not provide a reasonable, additional pathway toward compliance.[114]

EPA received several comments regarding the feasibility of the 2020 At-Berth Amendments as applied to tankers and ro-ros.[115] Commenters noted that there are no international design and safety standards for shore power, including issues pertaining to the ability of tankers to use shore power and the lack of a standard voltage for ro-ro vessels. With regard to tankers, commenters noted that there are currently no feasible alternatives to shore power and no practical pathways without shore power and that innovative concepts are not developed at this time. Commenters also noted that there no CARB approved emission control systems (CAECS) at this time.

CARB addressed the concerns raised by the commenters during its rulemaking for the 2020 At-Berth Amendments. With regard to shore power for tankers, CARB acknowledged that while there is only one example of shore power for a tanker vessel and that not every tanker and tanker berth in California would be able to use shore power in the same way, the one example (T121) does demonstrate that shore power is a feasible strategy for reducing auxiliary engine emissions from tanker vessels.[116] In addition, and

[103] Id.

[104] The nonroad authorization criteria are plainly spelled out in section 209(e)(2)(A) where only California is noted. Section (e)(2)(B), begins with "Any State other than California . . ." and there is no indication that 209(e)(2)(B) imposes requirements on California. EPA's regulations that implement section 209(e) spells out the criteria for granting authorization in 40 CFR 1074.105 (which mirrors the language in section 209(e2)(A) of the CAA, and EPA separately spells out the requirements for other states to adopt California's standards in 40 CFR 1074.110 (which mirrors the language in section 209(e)(2)(B)). Further, the requirement in section 209(e)(2)(A)(iii) (consistent with section 209) has, consistent with the 1994 rule, been interpreted as requiring consistency with CAA sections 209(a), 209(e)(1), and 209(b)(1)(C). EPA has stated that consistency with section 209(b)(1)(C) means that EPA will interpret the criterion the same way EPA has interpreted this criterion in prior motor vehicle waiver decisions, i.e., by determining whether there is inadequate lead time to permit the development of technology necessary to meet these requirements, giving appropriate consideration to the cost of compliance within that time frame. EPA is not reopening the interpretations provided in the 1994 rulemaking in this authorization decision. 59 FR 36969, 36982–36983 (July 20, 1994).

[105] 88 FR 24411, 24415 (April 20, 2023). See also 59 FR 36969, 36981–36982 (EPA addressed the issue of whether CARB may adopt a regulation before it has received an authorization and EPA determined CARB may do so), EPA is not reopening the position taken in the 1994 rulemaking in this authorization decision.

[106] https://ww2.arb.ca.gov/sites/default/files/2023-03/At%20Berth%20Enforcement%20Notice%20-%20March%2030%202023.pdf.

[107] WSPA at 5.

[108] CARB FSOR at 57–58. CARB noted that it considered several projects and found that even construction that involved substantial new infrastructure at tanker terminals would require only five to seven years to complete.

[109] Id. at 58.See also CARB's ISOR at III–19–22, and WSPA v CARB explained above.

[110] Maersk at 10; PMSA at 17–18.

[111] Maersk at 10, this commenter also noted that CARB was restricting the fund inappropriately and noted other concerns.

[112] See 88 FR 20688 (April 6, 2023).

[113] EPA does not conduct a policy review of how CARB chooses to enforce its standards, but EPA does assess the costs of the standards and the compliance pathways provided to the regulated parties. See Engine Manufacturers Association v South Coast Air Quality District, 541 U.S. 246 (2004). This distinction of standards on the one hand and the methods of standards enforcement on the other is significant. As noted, EPA only reviews the methods or enforcement procedures in terms of the three authorization criteria. Additional questions regarding the propriety of the State's measures is outside the scope of EPA's authorization review under section 209(e).

[114] EPA's expectation is that CARB will reasonably implement the program, but EPA's role is not generally one of oversight of CARB's standards once EPA has finalized its adjudicatory decision and issued an authorization.

[115] PMSA at 7–17, Maersk, WSPA.

[116] CARB FSOR at 259.

as noted previously, the regulation provides allowances for boiler emissions and the tanker only needs to reduce auxiliary engine emissions.[117] CARB also addressed the viability of capture and control systems for tankers during its rulemaking and within its authorization request.[118] Both within CARB's authorization request and its rulemaking documents it was acknowledged that the 2020 At-Berth Amendments were technology forcing and may require a number of compliance pathways. CARB also noted the incentive funding available for emissions reduction technologies.[119]

With regard to safety-related issues that could be created by complying with the 2020 At-Berth Amendments, CARB noted that "Through regular conversations with the tanker industry, staff is aware of many of the claims raised by these comments regarding land-based emissions capture systems, especially concerning the lack of space, structural stability, fire/explosion safety, and electrical safety of these systems. CARB agrees that any emission control system needs to be safe, and therefore must address identified safety concerns. Staff does not believe that technical issues, such as static discharge, are unsurmountable. Tanker vessels already have strategies in place to introduce inert gas into tanks during the offloading process. Furthermore, capture systems are substantially decoupled from a tanker vessel, directing the exhaust gas from engines and boilers taken from a vessel's stack onto a barge- or land-based system for treatment." [120] CARB also responded to the concerns expressed by one commenter regarding the inability of steamships to turn off their boilers due to thermal dynamics which require marine propulsion engines to stay hot as well as the inability of some steamships which have been retrofitted to run on liquified natural gas (LNG) to turn off their generators as this would result the inability to control tank pressure.[121] CARB has indicated that LNG ships can receive approval to operate under the 2020 At Berth Requirements as a CARB Approved Emissions Control System ("CAECS") upon submission of adequate testing data demonstrating compliance with the 2020 At-Berth Amendments. Also, additional technological improvements and developments may occur for capture and control technologies for these LNG steamships. Finally, in the event that such LNG vessels are demonstrating efforts toward capture and control technologies but are faced with development and supply issues they can be eligible for the remediation fund.

CARB also addressed the feasibility of capture and control systems. "Capture and control systems have already been used on many other OGV categories, and in other industries. Many of the hurdles identified by the tanker industry are already known and understood by developers who believe they can be addressed. Although it is true there has not yet been a capture and control system tested and approved for tanker vessels, due to the lack of any emissions control requirements until the approval of this Regulation, technology providers have informed CARB that alternate control technology, as proven on other vessel categories, can be adapted to tanker vessels." [122] CARB also explained the rationale behind CARB's assumption that tanker vessels will utilize land-based capture and control systems in staff's analyses was largely due to a lack of collective interest expressed by the tanker industry in regards to the development of shore power for tanker vessels. According to CARB, "capture and control systems can also treat boiler emissions. This provides an advantage for controlling tanker emissions, as shore power cannot reduce boiler emissions because boilers on OGVs are, in general, not electric powered. Retrofitting to electric boilers would be impractical, requiring large auxiliary engines, and replacement electric boilers. This is unlikely to successfully accomplish because of space and operational constraints with vessels designs that are generally not flexible enough to undergo such a redesign and would add substantial costs on top of the costs already considered. The additional time allowed for implementation of tanker vessel control requirements (2025 and 2027) will also provide the opportunity for the development, construction and deployment of safe land-based control systems to use on tanker vessels, in addition to developing and deploying safety protocols and establishing operational requirements. However, that does not preclude a tanker vessel from selecting other options for compliance, including a barge-based capture and control system, where feasible." [123]

CARB noted that the Innovative Concept compliance option described in section 93130.17 provides flexibility by allowing vessels or terminal operators additional time to identify opportunities for implementing a compliance strategy that reduces vessel emissions while at berth. Approved Innovative Concept projects are valid for up to 5 years and can be renewed for another compliance period of up to 5 years as long as the qualifications in the Regulation are maintained (see section 93130.17(a)(7)). Innovative Concept project applicants can apply for renewal indefinitely as long as the project continues to meet the qualifications listed in the Regulation. "As such, the Innovative Concept pathway can be utilized as a terminal's main pathway to compliance or as a bridge to reduce emissions while longer term project installations are taking place." [124]

Lastly, CARB noted that the localized health benefits achieved by the 2020 At-Berth Amendments cannot wait for an international body to set a shore power standard, and that this circumstance also existed in 2007 time period when shore power was first applied to other vessels with a positive resolution before such standards were set. CARB noted its expectation that vessel operators and terminals will work together to utilize shore power systems that work best for all parties while the international shore power standard is being established. If not, CARB noted the flexibilities provided within the regulation.[125]

---

[117] *Id. See also* CARB ISOR at III–18–19 and *WSPA v CARB* at 11–12.

[118] CARB ISOR at III–19–22. CARB assumed land-based capture and control systems that would be more complex than the existing system in demonstration at the Port of Los Angeles. As noted previously, CARB conducted conversations with both the tanker industry and capture and control manufacturers. "A land-based capture and control system for tanker vessels would likely consist of a large, centralized exhaust gas treatment system on-shore, with ducting on the wharf connecting to a positioning boom located on the berth or nearby platform constructed to house the positioning boom. Existing capture and control systems would also need to be scaled up from the existing systems in order to handle the higher exhaust flow from tanker vessels, as tanker vessels have a higher combined power demand for both auxiliary engines and boilers at berth when compared to other all other vessel categories except cruise vessels."

[119] CARB FSOR at 342.

[120] *Id.*

[121] Pasha Hawaii.

[122] CARB noted that "Technology providers have used capture and control technology for regulatory compliance on container vessels and have used it on bulk and ro-ro vessels. CARB believes that the technology to control emissions on tanker vessels is similar in many aspects to the systems currently in existence and can be reasonably adapted to tankers given the time provided to the tanker industry. There are no restrictions in the Regulation that would prevent tanker vessels from utilizing other forms of emissions control technologies, including shore power or barge-based capture and control systems." CARB ISOR at Chapter III–19 through 22.

[123] *See* FSOR at 548.

[124] *See* FSOR at 547–549; ISOR at III–16; CEQA Responses, Master Response 4 at 17–24.

[125] *See* CARB FSOR at 78–79, 99–100.

**d. California's 2020 At-Berth Regulations Are Consistent With Section 202(a)**

As explained above, EPA has historically applied a consistency test under section 202(a) that calls for the Administrator to first review whether adequate technology already exists, and if it does not, whether there is adequate time to develop and apply the technology before the standards go into effect. After a review of the record, information, and comments received in this proceeding, EPA has determined that the opponents of the authorization request for CARB's regulations have not demonstrated that these regulations are inconsistent with section 202(a). As noted above, CARB's authorization request indicated that control technology either presently exists or is in use, that the previously regulated OGV types are reasonably projected to comply with the newly regulated ports and terminal, and that several years remain until the 2027 compliance date for the new regulated terminals. For new vessel categories, the opponents of the authorization request have not carried their burden of demonstrating that there is insufficient lead time for regulated ro-ro and tanker vessels to meet their compliance dates. CARB has identified a number of existing technologies that can be used to comply with the regulations and has noted that the Regulation provides ample lead time for equipment adaptation, permitting, and installation. Therefore, because CARB has identified a number of existing technologies and a reasonable projection of the development and modification of technologies within the lead time provided, and because opponents of the authorization have not demonstrated why such projections are unreasonable, the opponents of the authorization have not met their burden of proof to demonstrate technological infeasibility. Independent of EPA's assessment of CARB's identification of technologies and reasonable technology projections, CARB has also demonstrated a number of technology-based alternative compliance pathways in order to demonstrate the feasibility of the 2020 At-Berth Amendments and opponents have not demonstrated why such pathways are unreasonable given the amount of lead time. As noted above, the findings of the California State Superior Court in *WSPA* v. *CARB* adds further support to EPA's assessment of feasibility.

In addition, the Regulation provides flexibilities to account for unanticipated delays. These include a limited number of exemptions for regulated vessel fleets and terminals, and an option to remediate emissions if equipment or construction delays occur. These exemptions as well as the remediation fund are also available if there are delays with the operation of CAECS or physical or operational constraints that have been identified in port and terminal compliance plans and under certain conditions.

Flexibility also exists in the Innovative Concepts Compliance Option that allows regulated entities to reduce emissions from other sources in and around the port if it achieves equal emissions benefits as reducing emissions from vessels at berth.

The opponents of the authorization have not demonstrated why the regulatory compliance options, considered either separately or together, render the At-Berth Regulation infeasible or inconsistent with section 202(a).

Therefore, based on the record before us, EPA cannot find that the opponents of the 2020 At-Berth Amendments authorization have met their requisite burden of proof to demonstrate that such requirements are inconsistent with section 202(a). Thus, EPA cannot deny CARB's 2020 At-Berth Amendments authorization request on this basis and therefore I cannot deny the authorization request based on the third authorization criterion.

**IV. Other Issues**

EPA has long construed section 209 as limiting the Agency's authority to deny California's requests for waivers and authorizations to their respective three listed criteria under section 209(b) and section 209(e)(2)(A). This narrow review approach is supported by decades of waiver and authorization practice and judicial precedent. In *MEMA I,* the D.C. Circuit held that the Agency's inquiry under section 209(b) is "modest in scope." [126] The D.C. Circuit further noted that "there is no such thing as a 'general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider.[127] In *MEMA II,* the D.C. Circuit again rejected an argument that EPA must consider a factor outside the 209(b) statutory criteria concluding that doing so would restrict California's ability to "exercise broad discretion." [128] EPA's duty, in the authorization context, is thus to grant California's authorization request unless one of the three listed criteria is met.

[126] *MEMA I* at 1105.
[127] *Id.* at 1116.
[128] *MEMA II* at 453.

"[S]ection 209(b) sets forth the only waiver standards with which California must comply . . . If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application." [129] EPA has therefore consistently declined to consider factors outside the three statutory criteria listed in section 209(b) and 209(e)(2)(A).

EPA received comment that the 2020 At-Berth Amendments improperly make entities other than OGV's, such as ports and terminals, responsible for any emission standards violations, even if this "third party" does not exercise control over the regulated OGVs.[130] This commenter argued that the Clean Air Act, including section 202(a) and 209, does not authorize EPA to impose penalties on third parties (EPA assumes the commenter means this to mean that the compliance path of the remediation fund is a "penalty"). Alternatively, this commenter stated that by making a facility directly liable for emissions from third-party nonroad vehicles, "CARB is inappropriately instituting an indirect source rule framework." [131] As such, this commenter claimed that CARB's regulations exceed the authority granted by sections 202(a) and 209 of the Clean Air.

CARB addressed this issue in its own rulemaking.[132] CARB noted PMSA's comment and its belief that while there is a role for enhanced marine terminal and port responsibility, such responsibility should be limited only to circumstances within the control of the port or marine terminal and should avoid the hallmarks of an Indirect Source Regulation. CARB also noted PMSA's comment that "An indirect source rule is a regulation which assigns a liability and responsibility to a facility to reduce indirect mobile source

[129] *Id.* at 463.
[130] PMSA at 3.CARB's regulations impose requirements both on terminal operators and ports that are designed to ensure emission reductions associated with OGVs at berth at their locations. As specified in 93130.09, operators of terminals that received 20 or more visits must ensure that the terminals are equipped with a CAECS that will enable vessels to comply with the At-Berth regulation while at berth and if the terminal operator in unable to do so it may use a terminal incident event, pay into the remediation fund, or use an approved Innovative Concept to comply (if the vessel informs the terminal that the regulation will be complied with by onboard technologies than the terminal operator has no further responsibility. Similarly, ports that receive 20 or more visits must meet 93130.13 requirements. This includes providing any equipment or infrastructure to to comply that is outside the terminal operators or vessel operators' contractual ability to provide. If the terminal operator and/or vessel operator elects to use CARB-approved emissions control equipment that does not need port assistance, then the port has no additional responsibility.
[131] *Id,* at 4.
[132] CARB FSOR at 130–131.

emissions which that facility does not control, when the mobile source can be directly regulated to reduce emissions through a traditional emissions standard, engine standard, or other in-use standard. We are concerned that many of these hallmarks are present in the proposed control measure when they were successfully avoided in the current regulation." [133]

CARB responded to these comments and noted it developed the At-Berth regulation under CARB's authorities for regulating air toxics, criteria pollutants, and GHG emissions. CARB noted that "The purpose of the Regulation is to achieve emissions reductions from each vessel visit. The compliance obligations under the Regulation involve minimizing emissions from each vessel visit through various potential actions specific to that vessel visit, and reporting information needed to substantiate the required actions for that visit. Unlike an indirect source rule, the Regulation does not "cap" emissions at an entire facility or otherwise seek to reduce emissions below a certain facility-wide level. While the Regulation does regulate ports and terminals, it does so only because regulating those entities has proven essential to ensuring each vessel visit is able to use an approved emission-reducing control technology." [134]

EPA first notes that it only received an authorization request from CARB pursuant to section 209(e) of the CAA. CARB sought no approval of the 2020 At-Berth Amendments under any other provision of the CAA, including as an ISR. EPA is therefore evaluating CARB's request solely within the confines of section 209. As noted above, EPA is confined to the authorization criteria in section 209(e)(2)(A). Therefore, EPA cannot deny CARB's request based on an argument that such standards are not subject to section 209. EPA notes that CARB has set a "standard" such as numerical emission levels or acceptable emission-control technologies for specific ocean-going vessels. The difference between such standards, that are preempted under section 209(e) as directed to reducing emissions from nonroad engines and vehicles, and how such standards are enforced is immaterial as to the threshold question as to whether such standards are subject to section 209. [135] Therefore, to the

extent that the At-Berth regulations are properly considered standards relating to the control of emissions from nonroad engines and vehicles and preempted under section 209(e) of the CAA (and EPA believes they are so preempted), CARB's policy choice of how it chooses to enforce such standards is not subject to EPA review other than whether such enforcement procedures meet the criteria of section 209(e). [136] In addition, the scope and type of enforcement procedures that CARB implements is subject to its state law authority. As such, sections 202 and 209 of the CAA do not create or constrain California's regulatory authority under its police power. The requirement that CARB's standards and accompanying enforcement procedures be consistent with section 202(a) only pertains to whether such requirements are technologically feasible, within the lead time given and considering costs and whether the California test procedures are inconsistent with federal test procedures.

Second, EPA notes that to the extent the requirements are not mobile source standards or not associated compliance or enforcement mechanisms to ensure the at-berth requirements are met, then such standards or mechanisms would not be considered preempted by section 209(e)(1) of the CAA and thus would not require an authorization by EPA before CARB enforce such standards. EPA does not consider the at-berth requirements, as they apply to terminals and ports, to be an indirect source review rule or some other type of rule under the Clean Air Act other than a mobile source requirement, but to the extent they are of a non-mobile source type then EPA notes that such rules are not subject to EPA's approval unless they are submitted as part of a SIP

premise that under section 209(e)(2) the existence of "standards" or "other requirements" is a question separate from how the standards or requirements are enforced. As we shall explain, however, NAHB's claim of preemption does not follow from its premise. Even if Rule 9510 establishes standards or requirements, those requirements do not relate to the control of emissions from construction equipment. In so holding, we think it crucial that the District adopted Rule 9510 under the Act's 'indirect source review program' "). Rule 9510 was subsequently approved by EPA as a California SIP revision (86 FR 33542 (March 21, 2018)). In this instance CARB did not adopt the OGV At-Berth regulations under a claim of indirect source authority and the emissions being addressed are those from the mobile sources directly. Therefore, EPA is evaluating CARB's 2020 At-Berth Amendments under section 209 of the CAA.

[136] Section 209(e)(2)(A)(iii) provides, for example, that "California's standards and accompanying enforcement procedures are not consistent with this section."

request. [137] Further, EPA notes that section 116 of the Clean Air Act sets forth, among other exceptions, that unless otherwise preempted by section 209 nothing precludes a State from adopting or enforcing any standard or limitation respecting emissions of air pollutants. [138]

As noted above, EPA received comment concerning the legality of the At-Berth tanker requirements due to a legal challenge the commenter brought in California state court and that the commenter continues to pursue. [139] This commenter recommended that EPA not act on CARB's authorization request pending the court's decision. EPA notes that its statutory duty under section 209 of the Clean Air Act is to confine its review to the criteria set forth for a waiver under section 209(b) or an authorization under section 209(e). [140] To the extent the commenter, as a petitioner in state court, is raising legal challenges to CARB's regulations that do not pertain to the section 209 criteria then the commenter is free to do so while EPA's administrative process is on-going and even after EPA's reaches its final authorization decision. [141] Regardless, EPA's issuance of an authorization under the terms of section 209(e) merely allows California to no longer be subject to the preemption provision, and in so doing effectively removes that barrier to the State's enforcement of its regulations upon EPA's issuance of the authorization. EPA's authorization does not preclude a court from otherwise finding its own violations of law or preventing CARB's enforcement of its regulations. Therefore, EPA believes it is not necessary to wait for a state's court action on the At-Berth Regulation or to deny or delay an authorization on this basis.

## IV. Decision

After evaluating CARB's amendments to its At-Berth regulations described above, EPA is granting CARB's

[137] To the extent that there is any other finding regarding the applicability of section 110 of the CAA or any other provision related to ISR, and that CARB's At-Berth Regulations are not "standards and other requirements relating to control of emissions from such vehicles or engines" (as found in the preemption provision in section 209(e)(2)(A) of the CAA) then there is no affirmative requirement that the regulation be submitted to EPA for approval.

[138] 42 U.S.C. 7416.

[139] WSPA at 7, *citing Western States Petroleum Ass'n v. California Air Resources Bd*, filed March 16, 2023.

[140] *See* MEMA I, MEMA II.

[141] For example, WSPA raises a number of issues under California state law (*e.g.* CEQA) that do not pertain to the Clean Air Act section 209(e) criteria and EPA takes no position regarding such issues.

[133] *Id.*

[134] CARB At-Berth Authorization Request at 3. FSOR at 93.

[135] *See Engine Manufacturers Association v. South Coast Air Quality Management District,* 541 U.S. 246 (2004). See also *National Association of Home Builders v. San Joaquin Valley,* 627 F.3d 730, 736 (9th Cir. 2010) ("We agree with NAHB's

authorization request for its 2020 At-Berth Amendments. Based on CARB's submissions, relevant adverse comment, and other comments in the record, EPA is granting an authorization under section 209(e)(2)(A) of the CAA for CARB's 2020 At-Berth Amendments. The opponents of the authorization request have not met their burden of proof to demonstrate or to adequately support an EPA finding that CARB and its 2020 At-Berth Amendments fail to meet the three authorization criteria in section 202(e)(2)(A)(i)–(iii) of the CAA.

*A. Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the United States Court of Appeals for the District of Columbia Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).

To the extent a court finds this final action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1) for several reasons.[142] This final action grants an authorization for amendments to California's At-Berth Regulations that were previously authorized by EPA. As such, this final action will affect any person who owns, operates, charters, or leases any United States or foreign-flag OGV that visits a California port, terminal, or berth; any person who owns, operates, or leases a port, terminal, or berth located where OGVs visit, or any person who owns, operates, or leases a CARB approved CAECS for OGV auxiliary engines or tanker auxiliary boilers. Furthermore, the At-

Berth Regulations, and the amendments to those regulations that are the subject of today's action, the 2020 At-Berth Amendments, are part of California's nonroad emissions program that, together with its on-highway emissions program, are regulatory programs that EPA may waive under CAA section 209. As required by statute, in evaluating the authorization criteria in this action, EPA considers not only the 2020 At-Berth Amendments in isolation, but in the context of the entire California nonroad emission program. See CAA section 209(e)(2)(A) (requiring that the protectiveness finding be made for California's standards "in the aggregate"). Moreover, EPA generally applies a consistent statutory interpretation and analytical framework in evaluating and deciding various authorization and waiver requests under CAA section 209. EPA also relies on the extensive body of D.C. Circuit case law developed by that Court since 1979 as it has reviewed and decided judicial challenges to these actions. As such, judicial review of any challenge to this action in the D.C. Circuit will centralize review of national issues in that Court and advance other Congressional principles underlying this CAA provision of avoiding piecemeal litigation, furthering judicial economy, and eliminating the risk of inconsistent judgments. For these reasons, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by June 20, 2023.

*B. Statutory and Executive Order Reviews*

As with past authorization and waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Further, the Congressional Review Act, 5 U.S.C. 801, *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does

not apply because this action is not a rule for purposes of 5 U.S.C. 804(3).

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2023–23261 Filed 10–19–23; 8:45 am]
**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**[EPA–HQ–OGC–2023–0510; FRL–11458–01–OGC]**

**Proposed Consent Decree, Clean Water Act Claim**

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Notice of proposed consent decree; request for public comment.

**SUMMARY:** In accordance with the Environmental Protection Agency (EPA) Administrator's March 18, 2022, memorandum regarding "Consent Decrees and Settlement Agreements to resolve Environmental Claims Against the Agency," notice is hereby given of a proposed consent decree in *Arizona Mining Reform Coalition et al.* v. *Guzman et al.* (D. Ariz. 2023). On September 27, 2023, the Arizona Mining Reform Coalition, the Center for Biological Diversity, Earthworks, the Concerned Citizens and Retired Miners Coalition, and the Grand Canyon Chapter of the Sierra Club (collectively, "Plaintiffs") filed a complaint against EPA in the United States District Court for the District of Arizona alleging that the Agency failed to perform a mandatory duty under the Clean Water Act (CWA) to establish Total Maximum Daily Loads (TMDLs) for copper and lead impairments for Queen Creek, Arizona. This complaint followed submission of a Notice of Intent to Sue on August 9, 2022. EPA seeks public input on a proposed consent decree prior to its final decision-making with regard to potential settlement of the litigation.

**DATES:** Written comments on the proposed consent decree must be received by November 20, 2023.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OGC–2023–0510 online at *https://www.regulations.gov* (EPA's preferred method). Follow the online instructions for submitting comments.

*Instructions:* All submissions received must include the Docket ID number for this action. Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For detailed instructions on sending

---

[142] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of Agency resources.

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

| | |
|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION, <br><br> Petitioners, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Respondent. | <br><br> Case No.: _____ |

---

## CERTIFICATE OF CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Western States Petroleum Association ("WSPA") provides the following corporate disclosure statement:

**Western States Petroleum Association** is a non-profit mutual benefit corporation, formed and existing under the laws of California, with no parent company, subsidiaries, or publicly held shareholders holding 10% or more of its stock.

Date: February 28, 2025

Respectfully submitted,

/s/ *Michael S. McDonough*

Michael S. McDonough
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
725 South Figueroa Street, Suite 3600
Los Angeles, CA 90017
(213) 488-7100
michael.mcdonough@pillsburylaw.com

Matthew W. Morrison
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036-3006
(202) 663-8036
matthew.morrison@pillsburylaw.com

Margaret Rosegay
Stacey Wright
Eric Moorman
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
Four Embarcadero Center, 22nd Floor
Post Office Box 2824
San Francisco, CA 94126-2824
(415) 983-1000
margaret.rosegay@pillsburylaw.com
stacey.wright@pillsburylaw.com
eric.moorman@pillsburylaw.com

*Counsel for Petitioner Western States
Petroleum Association*

4

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25, D.C. Circuit

Rules 15(a) and 25, and 40 C.F.R. § 23.12(a), I hereby certify that on February 28,

2025, I will cause copies of the foregoing Petition for Review and Certificate of

Corporate Disclosure to be served via FedEx overnight delivery upon the following:

The Honorable Lee Zeldin, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

The Honorable Pam Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

The Honorable Todd Kim
Assistant Attorney General
U.S. Department of Justice
Environmental and Natural Resources Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

/s/ *Michael S. McDonough*
Michael S. McDonough