<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION, | ) ) ) | |
| *Petitioner*, | ) ) | Case No.  25-1080 |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) | |
| *Respondent*. | ) ) | |
| ———————————————— | ) | |

**CONSOLIDATED RESPONSE OF WESTERN STATES PETROLEUM
ASSOCIATION IN SUPPORT OF RESPONDENT'S MOTION TO HOLD
THIS CASE IN ABEYANCE AND IN OPPOSITION TO RESPONDENT'S
AND PROPOSED INTERVENOR'S MOTIONS TO DISMISS**

Petitioner Western States Petroleum Association ("WSPA") seeks review of

Respondent the United States Environmental Protection Agency's ("EPA")

decision granting California's request for authorization of amendments to

California's Ocean-Going Vessels At-Berth regulation ("At-Berth Amendments").[1]

On February 28, 2025, WSPA separately filed an administrative petition for

reconsideration with the EPA pursuant to 42 U.S.C. § 7607(d), which remains

---

[1] "*California State Nonroad Engine Pollution Control Standards; Ocean- Going
Vessels At-Berth; Notice of Decision*," published at 88 Fed. Reg. 72,461 (Oct. 20,
2023) (the "Authorization").

pending before the agency.  While WSPA's administrative petition is ongoing, EPA seeks to hold this case in abeyance.  WSPA agrees that holding this case in abeyance pending the outcome of WSPA's administrative petition to EPA is in the parties' interest and will conserve the parties' and the Court's resources.

However, WSPA opposes Movant-Intervenor State of California by and through the California Air Resources Board's ("CARB")[2] motion to dismiss, and also opposes Respondent EPA's "alternative" motion to dismiss, and provides the following opposition to both motions:

## CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS

Respondent EPA (in the alternative) and Movant-Intervenor CARB (together, "Movants") seek dismissal of WSPA's Petition on the ground that the Petition is time-barred under 42 U.S.C. § 7607(b)(1).  *See* ECF Nos. 2111035 ("EPA Motion"); 2111066 ("CARB Motion").  WSPA provides a consolidated opposition to both motions (together, "Motions to Dismiss") because they raise similar, duplicative arguments.  *See* CARB Motion at 2 ("California is aligned with EPA on the alternative relief it seeks in its own motion [to dismiss].").

The Motions to Dismiss should be denied.[3]  As discussed further herein, WSPA's Petition is based solely on new "grounds arising after" the sixtieth day

---

[2] As of the date of this filing, CARB's motion to intervene remains pending.

[3] EPA's motion is styled as a "Motion to Hold Case in Abeyance or Alternatively to Dismiss."  WSPA does not oppose EPA's motion to hold the case in abeyance to

4928-5842-3863

following EPA's October 2023 Authorization.  WSPA's Petition was filed within

60 days after WSPA was capable of confirming those new grounds and is therefore

timely under 42 U.S.C. § 7607(b)(1).  As discussed below, a Motion to Dismiss is

not the appropriate procedural mechanism for this Court to entertain CARB's (and

in the alternative, EPA's) factual dispute over the timing of WSPA's confirmation

of the lack of compliant emissions control barges for tanker vessels.

## BACKGROUND

### I.    WSPA'S PETITION FOR REVIEW AND THE CHALLENGED AUTHORIZATION

WSPA timely filed its Petition for Review on March 5, 2025, to challenge

EPA's Authorization of California's At-Berth Amendments compliance deadlines.

WSPA filed its Petition less than 60 days after the first date – *i.e.*, January 9, 2025

– that received direct confirmation of the lack of commercially available tanker

control barges necessary for tankers to meet the regulatory deadline (*i.e.*, January

1, 2025).  *See* Declaration of Catherine Reheis-Boyd, ¶¶ 16-17 (attached hereto as

Exhibit A) ("Reheis-Boyd Decl.").

In relevant part, the At-Berth Amendments mandated an infeasible timeline

---

allow EPA to reconsider relevant portions of the challenged Authorization.
Indeed, such reconsideration should occur.  WSPA opposes only EPA's
"alternative" Motion to Dismiss WSPA's Petition for Review, to the extent this
Court is willing to entertain that "alternative" motion separate and apart from the
motion to hold in abeyance.

4928-5842-3863

to require "auxiliary engine emission reduction requirements" for "tanker vessels (also emission reduction requirements to tanker vessel auxiliary boilers) while docked or 'berthed' at specified marine terminals and ports in California." *See* 88 Fed. Reg. at 72,462. Specifically, the Amendments require tankers at berth to use one of two emissions control strategies: either shore-based electricity to power ship systems, or CARB-approved emissions capture-and-control systems to reduce emissions *by January 1, 2025,* for tankers visiting the Ports of Los Angeles and Long Beach, and *by January 1, 2027,* for tankers visiting other regulated terminals.[4] However, in its rulemaking, CARB agreed that use of shore power would not be a compliance option of choice for tankers in the wake of serious safety and cost concerns expressed by stakeholders. *See, e.g.*, Exhibit B (excerpts from CARB's Initial Statement of Reasons), at ES-25 to 26, ES-30, I-31, III-19.

In October 2023, when EPA adopted the Authorization, its action was based in significant part on its reliance on and acceptance of CARB's representation that, although capture-and-control systems for tankers did not exist at that time (October 2023), such systems *would* be tested, certified, manufactured and commercially available for use by the entire California tanker fleet by January 1, 2025. *See* 88 Fed. Reg. at 72,470-71, 72,474. Thus, based on the plain language of the At-Berth

---

[4] *See* Cal. Code Regs. tit. 17, §§ 93130.3(a), 93130.5, 93130.7(b).

4928-5842-3863

Amendments, evidence of the infeasibility of tanker fleet compliance by January 1, 2025, could not be ascertained before that date.

Because CARB does not provide real-time public notice of the receipt of requests for Executive Orders ("EOs") approving new emissions control systems, it was impossible for WSPA to confirm on January 1, 2025, through CARB's publicly available website, whether an EO request had even been received by CARB prior to January 1, 2025, for a compliant emissions control system for tankers. Reheis-Boyd Decl., ¶ 13.

Thus, in the days immediately following January 1, 2025, WSPA Members were required to exercise reasonable due diligence to obtain confirming evidence from tanker emission control technology vendors as to whether compliant, CARB-approved emissions control barges usable by tankers had become commercially available by January 1, 2025, and were ready to implement, or whether vendors had even submitted a request to CARB for an EO approving such a system. *Id.*, ¶ 14.

On January 5, 2025, in discussions with emissions technology vendor Stax, WSPA members became aware that Stax had not yet produced a CARB-approved tanker emissions control barge system for commercial use, but was still gathering field data to prepare its request to CARB for an EO authorizing a proposed tanker emissions control barge system. *Id.*, ¶ 15. Similarly, on January 9, 2025, certain

4928-5842-3863

WSPA members verified that Clean Air Engineering – Maritime, Inc. ("CAEM") also had not yet submitted a request to CARB for an EO authorizing a proposed tanker emissions control barge system. *Id.*, ¶ 16.

This evidence now documented that CARB's representations to EPA in October 2023 about the availability of CARB-compliant emissions controls for tankers by the regulatory deadline were proven incorrect. *Id.*, ¶ 17. This significant new evidence of CARB's incorrect representation did not arise until *after* the Authorization was issued. *See* 42 U.S.C § 7607(c). Indeed, even as of today, no capture-and-control system has yet been certified by CARB for use on tankers, let alone made commercially available for the entire tanker fleet. Reheis-Boyd Decl., ¶ 17.

## ARGUMENT

## I.    LEGAL STANDARD

CARB moved to dismiss the Petition pursuant to Federal Rule of Appellate Procedure ("FRAP") 27. CARB Motion at 2. Both EPA and CARB assert solely that this Court lacks jurisdiction because the Petition is untimely, notwithstanding WSPA's allegation of facts arising only after EPA issued the 2023 Authorization. *Id.* at 5-6; EPA Motion at 6.

The Federal Clean Air Act provides that petitions for review of EPA actions brought under 42 U.S.C. Section 7607(b) (such as the Authorization) must be filed

within 60 days of the date of the regulation's promulgation, unless the challenge

"is based solely on grounds arising after such sixtieth day," in which case such a

petition must "be filed within sixty days after such grounds arise." 42 U.S.C.

§ 7607(b)(1). This "after-arising" exception enables a party to rely on an

intervening factual or legal development to bring a claim that it "could not have

raised" during the initial sixty-day window. *Honeywell Int'l, Inc. v. EPA*, 705 F.3d

470, 473 (D.C. Cir. 2013); *see also Sierra Club de Puerto Rico v. EPA*, 815 F.3d

22, 26-28 (D.C. Cir. 2016).

Here, the "after-arising grounds" are factual in nature – *i.e.*, WSPA's

confirmation by January 9, 2025, that no emissions control barge was available

from either vendor developing the technology for tankers after the applicable

regulatory deadline had passed. Reheis-Boyd Decl., ¶¶ 15-16. Movants are free to

dispute WSPA's factual allegations, but the pleading stage is not the proper time

for resolution of such factual issues.

In reviewing motions to dismiss for subject matter jurisdiction, "this court

accepts as true all of the factual allegations contained in the complaint and draws

all inferences in favor of the nonmoving party." *City of Harper Woods Emps.' Ret.

Sys. v. Olver,* 589 F.3d 1292, 1298 (D.C. Cir. 2009) (citation omitted); *see also*

*American Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).[5]  A motion

to dismiss should be granted only if it appears that the plaintiffs can prove no set of

facts in support of their claim that would entitle them to relief.  *See Swierkiewicz v.*

*Sorema, N.A.,* 534 U.S. 506, 514 (2002).  Furthermore, this Court has found that

ruling on a motion to dismiss for lack of jurisdiction "may be improper before the

plaintiff has had a chance to discover the facts necessary to establish jurisdiction."

*Herbert v. National Academy of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992)

(citation omitted).

Here, WSPA's challenge to the Authorization arises from facts – *i.e.*, the

confirmed infeasibility of the January 1, 2025, tanker compliance deadline – that

could not possibly have arisen until after the regulatory deadline had already

passed.  As the attached Declaration attests, WSPA was required to exercise some

due diligence to determine whether it had a ripe "after arising" claim, including

communicating with the only vendors developing the required control technology

to determine if a compliant tanker control barge was indeed available.  Reheis-

Boyd Decl., ¶¶ 13-17.  By January 9, 2025, WSPA's members were able to acquire

information confirming the lack of an available tanker control barge from either

---

[5] While the Federal Rules of Appellate Procedure do not provide an express
standard for reviewing motions to dismiss, the standard in Federal Rule of Civil
Procedure 12(b)(1) for motions to dismiss for lack of subject-matter jurisdiction
applies to this Court's review.

4928-5842-3863

vendor developing the technology – well within 60 days of filing its petition on

March 5, 2025. *Id.*, ¶¶ 16-17.

In any event, this is an inherently factual matter that cannot be resolved at

the pleading stage and requires further factual development. *See Supermail Cargo,*

*Inc. v. U.S.*, 68 F.3d 1204, 1207 ("[A] complaint cannot be dismissed unless it

appears beyond doubt that the plaintiff can prove no set of facts that would

establish the timeliness of the claim"); *see also Grand Lodge of Frat. Order of*

*Police v. Ashcroft*, 185 F.Supp.2d 9, 14 (D.D.C. 2001) (in deciding motion to

dismiss for lack of subject matter jurisdiction, courts "may consider such materials

outside the pleadings as it deems appropriate to resolve the question whether it has

jurisdiction in the case" (citing *Herbert, supra*, 974 F.2d at 197)). Here, the

timeliness of the Petition, and when the "after-arising" grounds arose under 42

U.S.C. § 7607(b)(1), are disputed factual matters. Accordingly, Petitioner requests

that the Court deny the Motions to Dismiss and allow further factual development

on these issues after the matter is held in abeyance, if such motion is granted.

## II.     WSPA'S PETITION IS TIMELY

### A.     THE PETITION IS BASED ON GROUNDS "ARISING AFTER" EPA'S AUTHORIZATION

WSPA's Petition in this matter is timely because it is based on "grounds

arising after" the 60-day deadline – namely, the fact that compliance with the

Amendments is now technologically infeasible for tankers, a fact which could not

9

have been known with certainty until after January 1, 2025.

A petition for review of a final action by EPA is timely if it is filed:

"within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, *except that if such petition is based solely on grounds arising after such sixtieth day*, then any petition for review under this subsection *shall be filed within sixty days after such grounds arise*." 42 U.S.C. § 7607(b)(1) (emphasis added).

Therefore, "challenges 'based solely on grounds arising after' the expiration of the 60-day period are permitted so long as they are filed within 60 days of the new grounds." *Honeywell Intern., Inc. v. EPA*, 705 F.3d 470, 472-473 (D.C. Cir. 2013).[6] Such "arising-after" grounds can include "the occurrence of an event that ripens a claim." *American Road & Transportation Builders Assn. v. EPA*, 588 F.3d 1109, 1113 (D.C. Cir. 2009); *see also Motor & Equip. Mfrs. Ass'n. v. Nichols*, 142 F.3d 449, 461 (D.C. Cir. 1998) ("A time limitation on petitions for judicial review… can run only against challenges ripe for review") (citation omitted); *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 129-130 (D.C. Cir. 2012), *rev'd. in part on other grounds sub nom. Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014) (the "exception" for after-arising grounds "encompasses the occurrence of an event that ripens a claim"). Where the "after-arising" exception applies, "it permits the petitioner to contend not only that

---

[6] The term "grounds" in section 7607(b)(1) is not defined in the statute, but has been interpreted to mean "a sufficient legal basis for granting the relief sought." *State of Utah v. EPA*, 750 F.3d 1182, 1184 (10th Cir. 2014).

10

changed circumstances warrant amending an existing regulation but also that the regulation was unlawful as originally promulgated." *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 646 (D.C. Cir. 2019).

A petition based on the after-arising provision ripens when "subsequent factual or legal development create[s] new legal consequences for petitioners." *Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22, 28 (D.C. Cir. 2016). A "subsequent factual or legal development" can include new information relating to technological advancement, or lack thereof, that renders EPA's original decision arbitrary or irrational. For example, in *Group Against Smog & Pollution, Inc. v. EPA*, 665 F.2d 1284, 1290-1291 (D.C. Cir. 1981), this Court held that a petition challenging EPA's refusal to regulate fugitive emissions from certain furnaces used in steel production was timely because "considerable evidence" showed "that the technology of capturing and controlling secondary emissions had advanced" since the agency's prior refusal, such that "[t]he validity of that decision is now disputed." *Id.* at 1290. The Court concluded that "petitioners' failure to mount a judicial challenge to the exclusion of fugitive emissions from coverage by the regulations when originally promulgated did not preclude them from later seeking judicial review of the agency's subsequent refusal to revise the standard ***on the basis of new information***." *Id.* at 1291-1292 (emphasis added).

11

Here, of course, the opposite is true – the technology to capture tanker emissions *has not* advanced – but the legal reasoning is the same: WSPA is not precluded from seeking judicial review of EPA's Authorization based on new information directly pertaining to the technological feasibility of complying with the regulation as approved by EPA.

Similarly, in *American Petroleum Institute v. EPA*, 706 F.3d 474 (D.C. Cir. 2013), this Court held that a challenge to EPA's 2012 projection of cellulosic biofuel volumes under its Renewable Fuel Standards regulations was timely where the attack was based on EPA's inability to predict or forecast future events, which became apparent only when its earlier prediction did not come true. The Court found that "[petitioner's] challenge to the 2012 RFS Rule rests significantly on the complete failure of EPA's prediction for 2011: 6.6 million gallons, as against zero in reality." *Id*. at 477.[7]

That is the case here. In approving the Authorization, EPA was required to find that compliance with the At-Berth Amendments was technologically feasible

---

[7] *Cf. Union Elec. Co. v. EPA*, 427 U.S. 246, 255 (1976) (petitioner could not attack EPA's approval of a State Implementation Plan after the then-applicable 30-day statutory period on grounds that compliance with the plan was "economically or technologically infeasible," because EPA could not consider such grounds when approving the plan in the first instance). Here, by contrast, EPA *is required* to consider technological feasibility in determining whether to authorize California nonroad engine pollution control standards. *See* fn. 8, *infra*.

4928-5842-3863

by the January 1, 2025, compliance deadline.[8]  During the rulemaking process, CARB represented to EPA and the public that, even though the capture-and-control technology retrofitted for tankers did not exist, compliance with the Amendments by using stack-capture systems for tankers would be possible by January 1, 2025.  *See* 88 Fed. Reg. at 72,469.  But January 1, 2025, came and went, and WSPA then was required to locate evidence to document the lack of any commercially available capture-and-control systems for tankers.  Through the exercise of due diligence, WSPA was able to gather adequate evidence of this by January 9, 2025 – well within the 60-day window from its March 5, 2025, date of filing.  *See* Reheis-Boyd Decl., ¶¶ 14-17.

As of the date of this filing, to WSPA's knowledge not a single capture-and-control system has been approved by CARB, manufactured, made commercially available or delivered for tanker applications.  In other words, by January 9, 2025, WSPA was able to document that by the regulatory deadline there were no

---

[8] *See* 42 U.S.C. § 7543(e)(2); 88 Fed. Reg. at 72468 (requiring EPA to consider technological feasibility, i.e., "whether there is sufficient lead time to permit the development of technology necessary to meet the standards and other requirements, giving appropriate consideration to the cost of compliance in the time frame provided…").  To determine technological feasibility, EPA is required to consider "whether adequate technology is presently available or already in existence and in use" and "[i]f technology is not presently available, EPA will consider whether California has provided adequate lead time for the development and application of necessary technology prior to the effective date of the standards for which a waiver is being sought."  88 Fed. Reg. at 72,469.

4928-5842-3863

available control systems allowing tankers to have timely complied with the At-Berth Amendments.

**B.    THIS NEW INFORMATION COULD NOT HAVE BEEN KNOWN PRIOR TO JANUARY 2025**

Although it is *now* clear that it is not possible for tankers to comply with the January 1, 2025 deadline, by definition, this fact could not have been proven with evidence at the time EPA approved the Authorization in October 2023.  At that time, EPA relied on CARB's representations that tanker control barges would be ready for Port tanker fleet compliance by January 1, 2025.  It could not possibly have been documented at the time of EPA's Authorization in October 2023 that CARB's representation about the timing of future technology availability on January 1, 2025, would turn out to be incorrect and that tanker compliance would not be feasible by that regulatory deadline.

As of the date of this filing, no compliant tanker system has been approved or made commercially available for the tanker fleet, and it is now clear that compliance by January 1, 2025, was indeed technologically infeasible.  These new facts constitute a "subsequent factual or legal development creating new legal consequences for petitioners."  *Sierra Club de Puerto Rico*, *supra*, 815 F.3d at 28. As described above, these are factual issues that should not be decided on a motion to dismiss but require the Court to consider further factual development.

14

Because the Petition is based on facts arising after EPA's approval of CARB's At-Berth Amendments that could not have been known with finality at the time EPA issued the Authorization, and because Petitioner filed its Petition within 60 days of the time the infeasibility of the compliance date could be confirmed with evidence from the vendor, the Petition is timely.[9]

---

[9] Although WSPA insists that its petition is timely as filed, it is worth noting that WSPA attempted to file the petition with the Court on March 3, 2025, and delivered its complete filing and service package to a DC-based filing vendor on the morning of March 3, 2025.  Declaration of Michael S. McDonough ("McDonough Decl."), ¶ 6 (attached as Exhibit C). That vendor did not inform counsel for WSPA until late on March 4, 2025, that it had not filed the petition as directed, and then only completed filing with this Court on March 5, 2025.  *Id*., ¶¶ 7-8.  However, because WSPA was required to have an evidentiary basis in order to have a ripe claim under 42 U.S.C. § 7607(d) and file its petition, its discovery of that evidence on January 9, 2025, through the exercise of reasonable diligence, makes this petition timely nonetheless.

15

# CONCLUSION

For the foregoing reasons, CARB's (and EPA's, in the alternative) Motions
to Dismiss should be denied.

Respectfully submitted,

/s/ *Michael S. McDonough*

Michael S. McDonough
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
725 South Figueroa Street, Suite 3600
Los Angeles, CA 90017
(213) 488-7100
michael.mcdonough@pillsburylaw.com

Matthew W. Morrison
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036-3006
(202) 663-8036
matthew.morrison@pillsburylaw.com

Margaret Rosegay
Stacey Wright
Eric Moorman
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
Four Embarcadero Center, 22nd Floor
Post Office Box 2824
San Francisco, CA 94126-2824
(415) 983-1000
margaret.rosegay@pillsburylaw.com
stacey.wright@pillsburylaw.com
eric.moorman@pillsburylaw.com

*Counsel for Petitioner Western States
Petroleum Association*

16

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Fed. R. App. P. 27(d)(2) because it contains 3,412 words, excluding any accompanying documents authorized by Fed. R. App. R. 27(a)(2)(B).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Michael S. McDonough*
MICHAEL S. MCDONOUGH

17

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2025, I electronically filed the foregoing pleading with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, which will accomplish service to participants in this case that are, as required, registered CM/ECF users.

/s/ *Michael S. McDonough*
MICHAEL S. MCDONOUGH

18

# EXHIBIT A

## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION, | ) ) ) | |
| *Petitioner*, | ) ) ) | Case No. 25-1080 |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) | |
| *Respondent*. | ) ) | |

## EXHIBIT A

## DECLARATION OF CATHERINE REHEIS-BOYD IN SUPPORT OF OPPOSITION TO RESPONDENT'S AND PROPOSED INTERVENOR'S MOTIONS TO DISMISS

CATHERINE REHEIS-BOYD, being duly sworn, deposes and states:

1.      I am the President of the Western States Petroleum Association, the Petitioner in this action, and I am authorized to execute this declaration on behalf of Western States Petroleum Association and its members.

2.      I am familiar with the pleadings and proceedings herein and declare that the information stated herein is true of my own knowledge, except as to matters stated on information and belief, and as to those matters I believe them to be true. If called as a witness, I could and would testify competently thereto under

1

oath.

3.     I submit this Declaration in opposition to Movant-Intervenor California Air Resources Board's ("CARB") Motion to Dismiss for Lack of Jurisdiction, and in opposition to Respondent United States Environmental Protection Agency's ("EPA") self-styled "Alternative" Motion to Dismiss (together, "Motions to Dismiss" or "Motions").

4.     In this matter, WSPA has filed a petition for review ("Petition") of Respondent EPA's decision granting California's request for authorization ("Authorization") of amendments to California's Ocean-Going Vessels At-Berth regulation ("At-Berth Amendments").[1]  WSPA separately filed an administrative petition for reconsideration with the EPA pursuant to 42 U.S.C. § 7607(d), which remains pending before EPA.

5.     As discussed in WSPA's Opposition to the Motions ("Opposition"), the At-Berth Amendments imposed a regulatory deadline of January 1, 2025, for petroleum tanker and tanker terminal owners and operators to adopt a CARB Approved Emission Control Strategy ("CAECS") as defined in the At-Berth Amendments.

6.     In relevant part, the At-Berth Amendments mandated an aggressive –

---

[1] "*California State Nonroad Engine Pollution Control Standards; Ocean- Going Vessels At-Berth; Notice of Decision,*" published at 88 Fed. Reg. 72,461 (Oct. 20, 2023) (the "Authorization").

4914-0317-2410

and, as it turned out, infeasible – timeline to require "auxiliary engine emission reduction requirements" for "tanker vessels (also emission reduction requirements to tanker vessel auxiliary boilers) while docked or 'berthed' at specified marine terminals and ports in California." *See* 88 Fed. Reg. 72,461, 72,462 (Oct. 20, 2023).

7.      Specifically, the Amendments require tankers at berth to use one of two emissions control strategies:  either shore-based electricity to power ship systems, or CARB-approved emissions capture-and-control systems to reduce emissions by January 1, 2025, for tankers visiting the Ports of Los Angeles and Long Beach, and by January 1, 2027, for tankers visiting other regulated terminals.

8.      In its rulemaking on the At-Berth Amendments, CARB agreed that use of shore power would not be a compliance option of choice for tankers due to serious safety and cost concerns expressed by stakeholders, and thereafter conducted its entire air quality emissions analysis for the At-Berth Amendments assuming that tankers would exclusively use emissions control technology to comply with the At-Berth Amendments.

9.      On October 20, 2023, EPA issued the Authorization granting California's request for authorization of the At-Berth Amendments.  88 Fed. Reg. 72,461 (Oct. 20, 2023).  Its action was based in significant part on its reliance on and acceptance of CARB's representation that, although capture-and-control

3

systems for tankers did not exist at that time (October 2023), such systems *would* be tested, certified, manufactured and commercially available for use by the entire California tanker fleet by January 1, 2025.  *See* 88 Fed. Reg. at 72,470-71, 72,474.

10.     Since CARB's adoption of the At-Berth Amendments in November 2020, WSPA Members have been diligently communicating with emissions control system vendors to determine whether and when an emissions control system for tankers that meets the requirements of the At-Berth Amendments might be developed, approved by CARB, and made commercially available for use at the Ports of Los Angeles and Long Beach ("Ports").

11.     In that time period, WSPA Members have learned that only two vendors – Stax and Clean Air Engineering – Maritime, Inc. ("CAEM") – are attempting to design and produce emissions control barges for tankers that would meet the requirements of the At-Berth Amendments.

12.     In conversations with vendors in the fourth quarter of 2024, WSPA Members were informed that the vendors were in the process of preparing Executive Order ("EO") requests to CARB, but at that time were given no target date on which the vendors were expected to submit those requests to CARB for approval.

13.     Because CARB does not provide real-time public notice of the receipt of requests for EOs approving new emissions control systems, it was impossible

4914-0317-2410

for WSPA to confirm on January 1, 2025, through CARB's publicly available website whether an EO request had even been received by CARB prior to January 1, 2025, for a compliant emissions control system for tankers.

14.     Thus, in the days immediately following January 1, 2025, WSPA Members exercised reasonable due diligence to obtain confirming evidence from tanker emission control technology vendors as to whether compliant, CARB-approved emissions control barges usable by tankers had become commercially available by January 1, 2025, and were ready to implement, or whether vendors had even submitted a request to CARB for an EO approving such a system.

15.     On January 5, 2025, in discussions with Stax, certain WSPA Members became aware that Stax had not yet produced a CARB-approved tanker emissions control barge system for commercial use, but was still gathering field data to prepare its request to CARB for an EO authorizing a proposed tanker emissions control barge system.

16.     On January 9, 2025, certain WSPA Members met with CAEM to discuss the status of its tanker emissions control technology, and learned at that time that CAEM also had not yet submitted a request to CARB for an EO authorizing a proposed tanker emissions control barge system.

17.     These conversations now confirmed for WSPA that a compliant emissions control barge had indeed not been authorized by CARB for either

5

vendor by the regulatory deadline, and to this day emissions control barges still are not yet available for commercial implementation.

18.    On March 5, 2025, WSPA timely filed its Petition with this Court challenging EPA's decision (the "Authorization") granting California's request for authorization of amendments to the At-Berth Amendments, based on the confirmation by January 9, 2025, that, in fact, no tanker emissions control system was available or even approved by CARB by the regulatory deadline.  This was a fact that necessarily could only have arisen and been verified *after* EPA's original October 2023 Authorization.

19.    Conversations between Members and vendors over the potential availability of an emissions control system compliant with the At-Berth Amendments contain sensitive trade secret and business confidential information, which would cause some Members potential competitive harm if shared publicly with attribution to a particular Member.

20.    Accordingly, this Declaration is intended to relate the substance of Members' conversations with vendors about the status of the tanker emissions control barge technology without attribution to any particular Member or Members.

6

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of April, 2025, in Sacramento, California.

_____

Catherine Reheis-Boyd

4914-0317-2410

# EXHIBIT B

State of California
AIR RESOURCES BOARD

**PUBLIC HEARING TO CONSIDER THE PROPOSED CONTROL MEASURE
FOR OCEAN-GOING VESSELS AT BERTH**

# STAFF REPORT: INITIAL STATEMENT OF REASONS

**DATE OF RELEASE:  OCTOBER 15, 2019
SCHEDULED FOR CONSIDERATION:  DECEMBER 5, 2019**

Location:

**DeFremery Park Recreation Center
1651 Adeline Street
Oakland, California 94607**

This report has been reviewed by the staff of the California Air Resources Board and approved for publication.  Approval does not signify that the contents necessarily reflect the views and policies of the California Air Resources Board, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

technologies to marine ocean-going vessel engines.[44]  Although there are currently no onboard emissions control strategies verified by CARB for marine ocean-going applications, CARB staff believes they could be developed more widely on a global scale in the coming years as international air quality regulations tighten.

Interest in alternative fuels, such as liquid natural gas, methanol, biofuels, or hydrogen, and alternative power sources, such as batteries and fuel cells, is growing in the maritime sector as a way to reduce emissions from ocean-going vessels.[45]  Vessels may be able to utilize some of these alternative fuels and power sources and/or onboard emissions controls as part of a strategy to reduce emissions at berth, but further testing is needed to prove the actual level of emissions reductions of each pollutant when using these strategies alone or in combination.

CARB approval is necessary for using any emissions control strategy that is not already approved by CARB for use with the Existing Regulation, including new capture and control systems, onboard technologies, or alternative fuels.

### 16. What emissions control technologies already exist at California ports to reduce emissions from ocean-going vessel?

Shore power equipment and infrastructure is already installed on the majority of container, reefer, and cruise vessels visiting California and at the terminals and ports they visit in order to comply with the Existing Regulation.  Shore power is generally the most cost effective option for container, reefer, and cruise vessels, as these vessels typically make regular calls to the same ports in California.  Ro-ro and tanker vessels could use shore power, but numerous vessel operators and industry representatives for these vessel types have stated during public workshops and meetings with CARB staff that capture and control systems are more attractive than shore power.  This is largely because shore power requires an infrastructure change to the vessel, and there are far fewer vessels in the ro-ro and tanker categories that make regular or frequent calls to California.[46]

For non-shore power emissions control options ("alternative emissions control strategies"), there are two barge-based capture and control systems (the METS-1[47] and AMECS[48] systems) currently in operation, one at POLA and one at POLB, respectively. These systems are approved by CARB for use on container vessels, and are approved by CARB for use in compliance with the Existing Regulation.  There is also a

---

[44] California Air Resources Board, Draft Technology Assessment: Ocean-Going Vessels, pg. 68, May 2018, https://ww3.arb.ca.gov/msprog/tech/techreport/ogv_tech_report.pdf.
[45] DNV-GL, Alternative Fuels: The Options, October 9, 2018, https://www.dnvgl.com/expert-story/maritime-impact/alternative-fuels.html.
[46] World Shipping Council, Comment Letter to CARB: Suggestions on Possible California At-Berth Regulation Allowances, Incentives or Operational Considerations, dated July 26, 2018.
[47] Maritime Emissions Treatment System, Clean Air Engineering, accessed September 8, 2019, http://caemaritime.com/.
[48] Advanced Maritime Emissions Control System (AMECS), Advanced Environmental Group, accessed September 8, 2019, http://advancedemissioncontrol.com/

AR0019591

land-based capture and control system in demonstration at POLA.  Based on conversations with industry, CARB staff anticipate this type of land-based capture and control system to be the compliance option of choice for tanker vessels, which are anticipated to require wharf infrastructure improvements.  To accommodate future innovations, CARB staff propose to allow the use of alternative control technologies and provide a process to approve the technologies if they meet the required emissions reductions of the Proposed Regulation.

### 17. Do alternative emissions control technologies achieve the same emissions reduction benefits as shore power?

Shore power is the gold standard in air pollution control at berth because it eliminates all on site auxiliary engine emissions from a vessel at berth, including cancer-causing DPM emissions.  Additionally, there are GHG emission benefits with shore power because auxiliary engines are not operating and instead the vessel's onboard power needs are met by lower carbon grid electricity.  At present, there is not a single alternative emissions control technology that achieves the same emissions reductions as shore power; however, CARB staff believe a strategy of multiple control technologies could be developed for a vessel to achieve emissions reductions similar to shore power.

Capture and control systems are an effective option to reduce emissions of DPM, PM2.5, NOx, ROG, and black carbon, and would be required to achieve at least an 80 percent reduction of all these pollutants to received CARB approval.  CARB staff do not expect capture and control systems to reduce or affect GHG emissions from the vessel's auxiliary engines.  To minimize GHG increases of a capture and control system while positioning, operating, and treating the auxiliary engine and/or boiler exhaust of a vessel at berth, CARB staff propose to require the strategies to not increase GHG emissions by more than if the strategy were powered by the California electricity grid.  Capture and control systems could utilize renewable fuels to reduce their carbon footprint.  Advancements in battery and fuel cell technologies also indicate these technologies could be adapted for use on capture and control systems to reduce their GHG impact.[49,50]  Overall, the Proposed Regulation would result in decreased GHG emissions since reductions vessels complying with shore power will more than offset any small increases from capture and control systems.

Onboard technologies have been developed and installed on vessels.  These onboard systems often target one or two pollutants; for example, a cleaner tier engine on a vessel would address NOx emissions, but not PM or SOx emissions, while an exhaust scrubber might reduce SOx and PM emissions, but not NOx.

---

[49] Fehrenbacher, K., The future of ferries is electric, too, GreenBiz, June 5 2019, https://www.greenbiz.com/article/future-ferries-electric-too.
[50] Geuss, M., Group to fund and operate first hydrogen fuel ferry fleet in the US, ARS Technica, June 12, 2019, https://arstechnica.com/information-technology/2019/06/group-to-fund-and-operate-first-hydrogen-fuel-ferry-fleet-in-the-us/.

AR0019592

vessels have similar operational power requirements as container vessels, the existing capture and control systems are expected to be well suited to reduce emissions on a ro-ro vessel.  However, a development and construction period is needed for the manufacturers to produce and install these systems.  As such, CARB staff propose a period of four years from the effective date of the Proposed Regulation for ro-ro vessels to comply.

For tanker vessels, CARB staff assume the preferred approach to reducing emissions at berth will involve capture and control systems based on conversations with industry members and representatives.  Tanker vessel operators have expressed safety concerns with barge systems and indicate the method of capture and control would be land-based, which may require significant infrastructure improvements to the existing tanker terminals across the state.  Controlling the auxiliary engines and boilers at berth also mean that the existing capture and control systems will likely need to be able to handle a higher amount of exhaust gas, and as a result may need to be re-designed and scaled up accordingly.  Because of the extent of engineering and infrastructure work needed to adapt the existing technologies for use on tanker vessels, CARB staff propose a January 1, 2027, compliance date for tankers visiting regulated terminals at POLA and POLB, and a January 1, 2029 compliance date for the remainder of the tanker terminals across California.

### 22. Why is CARB staff proposing requirements for tanker vessels in two separate years?

CARB staff recognizes the need for relief from air pollution in all communities near tanker terminals and refineries, and share the desire to reduce tanker emissions as quickly as possible.  Staff held several meetings and conversations with equipment manufacturers and technology providers, community and industry members (including vessel and terminal operators), U.S. Coast Guard, CSLC, and harbor pilots in both Northern and Southern California to set a timeline that is both aggressive and technically feasible for implementation.

During these conversations, CARB staff learned that the process of improving infrastructure at the POLA and POLB was typically faster than in Northern California, due to additional permitting and conservation requirements placed on terminals in the San Francisco Bay.[56]  The terminal infrastructure in Northern California may require more complex infrastructure improvements as the Northern California marine oil terminals (also referred to as "long wharves" can stretch out over a mile into the San Francisco Bay and Carquinez Straits, and can be affected by harsher weather conditions and stronger currents than their Southern California counterparts. Figures ES-17 and ES-18 show an example of the two main tanker terminal types in California.

---

[56] Phone conversation with California State Lands Commission staff on March 27, 2019.

ES-30

AR0019596

sources by 2030, with a longer-term requirement of sourcing all State's electricity from carbon-free resources by 2045.[93] All CARB emissions estimates for the Proposed Regulation account for the GHG emissions generated to produce grid power.

Shore power is the gold standard in air pollution control because it eliminates all on-site emissions (of all auxiliary engine pollutants) from a vessel at berth, rather than controlling a portion of those emissions. It also offers the opportunity to significantly reduce GHG emissions because the California grid has a lower carbon footprint than burning liquid fuel onboard the vessel. However, it requires installation of electrical infrastructure both on the vessel and at the berth, as well as union labor to connect and disconnect the two.

Shore power cannot be used in place of boiler operations because boilers are not electrical systems. However, electrically-driven, on-shore pumps can be used to augment or replace boiler operations on tankers to move liquid product to or from a vessel.

CARB staff expects shore power to be the compliance option of choice at container, reefer, and cruise terminals under the Proposed Regulation. Since most vessels fleets have already invested in the vessel side infrastructure to comply with the Existing Regulation, the more they can connect (and save fuel that would otherwise be burned by running the auxiliary engines), the better the return on their investment. Ro-ro and tanker vessels could use shore power, but industry representatives have indicated to CARB staff that they are not prepared to make the vessel side investments because there are far fewer vessels that make regular or frequent calls to California (compared to container, reefer, and cruise vessels on regular or "liner" routes).[94]

### b) Capture and Control Systems

This approach involves a system on a movable barge to capture and control emissions (Figure I-22) from the auxiliary engines (which continue to operate for the full period at berth) and boilers. Once a vessel is at berth and ready to be worked, a tug moves the barge alongside the vessel, a small crane on the barge lifts a duct up and connects it to the top of the vessel's exhaust stack to "capture" the emissions. Then a small engine on the barge creates a vacuum to pull the vessel exhaust through the duct and route it down to pollution "control" technology on the barge. The control element of the system is very similar to control technology that has been in place for many years at stationary sources.

---

[93] CPUC, California Renewables Portfolio Standard (RPS), accessed September 8, 2019, https://www.cpuc.ca.gov/rps/.
[94] World Shipping Council, Comment Letter to CARB: Suggestions on Possible California At-Berth Regulation Allowances, Incentives or Operational Considerations, dated July 26, 2018.

I-31

electrical power while at dock instead of using auxiliary engines. Phases II and III included elements such as; new wharf construction and lengthening and the addition of 10 shore-side A-frame cranes which staff considers to be similar to the types of components that could be necessary for land-side capture and control systems for tanker vessels. Phase II and III began approximately in 2008 and was largely completed by 2013.[167]

Despite shore power being a proven technology to reduce emissions from tanker auxiliary engines at berth, a lack of global interest in the development of shore power for tanker vessels has led CARB staff to anticipate that compliance with the Proposed Regulation will likely involve capture and control systems at tanker terminals. Capture and control systems can also treat boiler emissions whereas shore power cannot be used to operate boilers in order to reduce emissions, as discussed in detail in Chapter I. As a result, for the purpose of this Staff Report, it is assumed that tankers will use land-based capture and control systems (as reflected in staff's Berth Analysis in Appendix E).

### c) Development of Capture and Control Systems for Tanker Vessels

Staff assumed the majority of tanker visits will use land-based capture and control systems based on industry feedback. As such, the proposed implementation dates for tanker vessels are reflective of the necessary amount of time needed to develop and install land-based capture and control systems and the associated infrastructure to support the system. However, that does not preclude a tanker vessel from selecting other options for compliance, including a barge-based capture and control system, where feasible.

CARB staff assumed a land-based capture and control systems for tanker vessels would be more complex than the existing system in demonstration at POLA. Based on conversations with the tanker industry and capture and control technology manufacturers, a land-based capture and control system for tanker vessels would likely consist of a large centralized exhaust gas treatment system on-shore, with ducting on the wharf connecting to a positioning boom located on the berth or nearby platform constructed to house the positioning boom. Existing capture and control systems would also need to be scaled up from the existing systems in order to handle the higher exhaust flow from tanker vessels, as tanker vessels have a higher combined power demand for both auxiliary engines and boilers at berth when compared to other all other vessel categories except cruise vessels, as shown in Table III-1.

### 1) Timeline for Building Supporting Wharf Infrastructure

In evaluating the application of land-based capture and control systems at tanker berths, infrastructure development stands out as the most time-consuming and

---

[167] Notice of Preparation (NOP) of a Draft Supplemental Environmental Impact Report and Public Scoping Meeting for the Berths 97-109 [China Shipping] Container Terminal Project, September 2015.

AR0019673

# EXHIBIT C

<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION, | ) ) ) | |
| *Petitioner*, | ) ) | Case No.  25-1080 |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) | |
| *Respondent*. | ) ) | |
| _____ | ) | |

**EXHIBIT C**

**DECLARATION OF MICHAEL S. McDONOUGH IN SUPPORT OF OPPOSITION TO RESPONDENT'S AND PROPOSED INTERVENOR'S MOTIONS TO DISMISS**

I, MICHAEL S. McDONOUGH, being duly sworn, deposes and states:

1.      I am an active member of the California State Bar and am a member of the bar of this Court.  I am a partner at the law firm of Pillsbury Winthrop Shaw Pittman LLP, counsel for petitioner Western States Petroleum Association ("WSPA") in the above-entitled action.  I make this declaration in support of WSPA's opposition to Respondent United States Environmental Protection Agency's ("EPA") and Movant-Intervenor California Air Resources Board's ("CARB") motion to dismiss this matter (collectively, "Motions").

1

2.     I am familiar with the pleadings and proceedings herein and declare that the information stated herein is true of my own knowledge, except as to matters stated on information and belief, and as to those matters I believe them to be true.  If called as a witness, I could and would testify competently thereto under oath.

3.     On Friday, February 28, 2025, I delivered to our office personnel WSPA's complete Petition for Review ("Petition") of EPA's decision granting California's request for authorization of amendments to California's Ocean-Going Vessels At-Berth regulation ("At-Berth Amendments"),[1] along with a Docketing Statement Form and Notice of Appearance as required by Court Rule.

4.     Our office then contacted a filing vendor with a branch office in the District of Columbia (First Legal) to immediately file the Petition with this Court. First Legal is a vendor our office has used for many years to handle filings to this Court and other courts in the DC area and nationally.

5.     Because of the need for a physical filing in our initial filing with the DC Circuit, the filing vendor informed us that they would not be able to file the Petition with the Court until March 3, 2025.

6.     At 8:43 a.m. PDT on Monday, March 3, 2025, our firm emailed the

---

[1] "*California State Nonroad Engine Pollution Control Standards; Ocean- Going Vessels At-Berth; Notice of Decision*," published at 88 Fed. Reg. 72,461 (Oct. 20, 2023) (the "Authorization").

2

filing vendor with specific instructions to file with this Court that same day, again attaching the Petition and supporting documents referenced above.  The vendor acknowledged receipt at 8:46 a.m. PDT.

7.    At around 4:00 p.m. PDT on Tuesday, March 4, 2025, the filing vendor contacted our office staff to advise that they had not yet filed the Petition but wanted additional information regarding our preferences for service copies for the filing.  Our office provided the information, informed the filing vendor that we had specifically requested filing on March 3, and demanded that they immediately file the Petition and supporting papers.

8.    The filing vendor advised that physical filing with the Court that day was no longer possible given the time and informed us that the Petition package would be filed the next day, on March 5, 2025.

9.    On March 5, 2025, at 12:33 p.m. PDT, we received confirmation from the filing vendor that the Petition and supporting paperwork had been filed with this Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of April, 2025, in Los Angeles, California.

_____
Michael S. McDonough

3