# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

WESTERN STATES PETROLEUM ASSOCIATION,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

Case No. 25-1080

## MOVANT-INTERVENOR STATE OF CALIFORNIA'S REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
Supervising Deputy Attorney General

CAITLAN MCLOON
M. ELAINE MECKENSTOCK
KRISTIN K. MCCARTHY
Deputy Attorneys General
 300 S. Spring Street, Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6273
 Fax: (916) 731-2128
 Kristin.McCarthy@doj.ca.gov
 *Attorneys for State of California*

**INTRODUCTION**

Petitioner Western States Petroleum Association (Petitioner or WSPA) seeks review of an EPA decision authorizing California's emissions control standards for certain ocean-going vessels at berth (At Berth Regulation) over a year after the 60-day statute of limitations expired. 42 U.S.C. § 7607(b)(1). While Petitioner correctly observes that an "after arising ground" can restart the 60-day period to file suit, it identifies no such valid ground. Petitioner points to the At Berth Regulation's January 1, 2025, compliance deadline and notes in a footnote that it "attempted" to file a petition for review within 60 days of that date, but acknowledges that it failed to do so. Petitioner's Opp. to MTD (Dkt. 2112745) ("Opp.") at 15 n.9. So Petitioner resorts to arguing that the clock did not actually start until January 9, 2025, the date it says it "received direct confirmation of the lack of commercially available tanker control barges" that could be used as just one of several options to comply with the regulation. Opp. at 3.

This is not a valid "after arising ground." Petitioner has disputed the feasibility of meeting the January 1, 2025 compliance deadline *for years*, in *three different forums*—two California courts, and during EPA's administrative process. There is nothing "new" about Petitioner's contention or about how the regulation applies to Petitioner's members. A statute of limitations that could be reset every

time a party "confirms" a point that it already believed, previously argued elsewhere, and could have timely raised, would be no limitations period at all.

In the face of an unequivocal jurisdictional bar on this untimely challenge, Petitioner tries to delay the inevitable dismissal by purporting a "factual dispute." But there is no factual dispute here—Petitioner's assertion of an "after arising ground" is invalid on its face. This Court regularly dismisses untimely petitions for review of agency action on preliminary motions to dismiss, to spare the Court and the parties the burden of full merits briefing. It should follow that approach here.

## ARGUMENT

### I. PETITIONER IDENTIFIES NO AFTER-ARISING GROUND THAT COULD SUPPORT JURISDICTION

Movant-Intervenor moved to dismiss this petition for review because it was filed over a year after the agency action, and well after the 60-day limitations period ran. 42 U.S.C. § 7607(b)(1). The Clean Air Act provides a limited exception to this strict 60-day statute of limitations when a petition "is based solely on grounds arising after such sixtieth day." *Id*. A "subsequent factual or legal development" can constitute an after-arising ground when that development "create[s] new legal consequences for petitioners." *Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22, 28 (D.C. Cir. 2016). When, for example, an agency action "had the effect of expanding [a pre-existing] program to never-regulated sources," the

3

previously unregulated entities could seek review within 60 days of the program's expansion—a result that makes sense, because those entities would not previously have been on notice or had reason to petition for review. *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 130 (D.C. Cir. 2012), *rev'd in part on other grounds sub nom. Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014). And when a decision of this Court required EPA to change how it operated a regulatory program, the party subject to that change had 60 days from that decision to seek review of the program. *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 473 (D.C. Cir. 2013).

Petitioner points to the January 1, 2025, compliance deadline for tanker vessels to control emissions while at berth in Southern California ports and terminals as a subsequent development. But Petitioner does not dispute that its challenge to that compliance deadline—even if it could constitute an "after arising ground"—would be untimely as well, because the petition was filed more than 60 days after January 1, 2025. So Petitioner goes one step further, arguing that it waited to sue until 60 days after its "confirmation" on January 9, 2025, that the technology needed to "capture-and-control" emissions from tankers was not available by the January 1, 2025 compliance deadline. Opp. at 11-12. This argument fails out of the gate, as the unavailability of this technology does not

create "new legal consequences" for Petitioner or its members. *Sierra Club*, 815 F.3d at 28.

For one, Petitioner's "members were subject to the [At Berth Regulation] on day one." *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1016 (D.C. Cir. 2016); *see also* Cal. Code Regs., tit. 17, § 93130.7(b) (establishing deadlines for tanker vessels). Thus, Petitioner was "well positioned to challenge the [authorization] on [technological infeasibility] grounds when it was first promulgated." *Id.* Indeed, Petitioner challenged the At Berth Regulation on these same grounds in a state court lawsuit filed in September *2020*. *See* Exhibit A at 10 (Opening Trial Court Brief, *WSPA v. CARB*, No. 20STCP03138 (L.A. Sup. Ct., Apr. 15, 2022)) ("WSPA and other parties provided significant evidence that such technologies were not feasible in [the 2025 and 2027] timeframes"); *see also* Appellant's Opening Brief, 108 Cal.App.5th 938 (2025) (No. B327663), 2023 WL 8360213, at *36 (Nov. 21, 2023) (similar). And Petitioner raised this same issue during the EPA administrative process for this authorization. *See* WSPA Comments on 2020 At Berth Authorization at 5 ("the timelines required to design, build, and permit any new feasible tanker control technology … do not allow compliance by the 2025

and 2027 deadlines.").[1]  Petitioner has no explanation for its failure to present this claim in a timely petition for review within 60 days of EPA's authorization.  *Id.*[2]

And second, the operation of the At Berth Regulation—requiring Petitioner's members to reduce tanker emissions to required levels—has remained unchanged since the authorization issued.  Petitioner's argument that one possible compliance pathway was not yet approved for commercial use by tankers on January 1, 2025, does not equate to "new legal consequences" for Petitioner or its members, because there are multiple compliance options for tanker vessels to meet the applicable emissions reduction requirements under the regulation.  Cal. Code Regs., tit. 17, §§ 93130.8, 93130.15, 93130.17 (detailing compliance options).  Indeed one such pathway—the remediation fund—is expressly available when a regulated party's intended compliance option is unavailable due to no fault of the regulated party.  *Id.* § 93130.15(b)(3).  EPA noted as much in its decision document granting the authorization.  88 Fed. Reg. 72,461, 72,470 (Oct. 20, 2023) (describing the "number of flexibilities" designed "to accommodate varying project timelines in

---

[1] Docket EPA-HQ-OAR-2023-0152 (2020 At Berth Amendments), May 1, 2023, https://www.regulations.gov/comment/EPA-HQ-OAR-2023-0152-0053.

[2] Having challenged the feasibility of this same compliance option in other litigation, Petitioner cannot even assert that this claim "was too speculative to confer jurisdiction on the court" in 2023.  *Nat'l Biodiesel Bd.*, 843 F.3d at 1016.

the event of delays" including the "remediation fund"); *id.* at 72,472 (similar).

Petitioner is and was well aware of these options for compliance.[3]

If a party that has always been subject to unchanged legal obligations—i.e., to reduce emissions to required levels—can establish an after-arising ground due to a delay in technological advancement relevant to just one of many compliance pathways, Congress's "concerns about preserving 'the consequences' of failing to bring a challenge within 60 days of a regulation's promulgation would be meaningless." *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456-57 (D.C. Cir. 2013); *see also Med. Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 426-27 (D.C. Cir. 2011) (declining to review an objection raised during the public comment period but not filed within 60 days of the rule).

In any event, the after-arising ground exception only "allows an intervening event to secure judicial review on the basis of defects extant at the time of the rulemaking," not a defect a petitioner claims developed later. *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 645 (D.C. Cir. 2019) ("a *later* development" does not "render[] unlawful an *earlier* [agency decision]"). Petitioner has not explained how alleged factual developments that occurred after EPA's decision could ripen a claim that—under "well-settled" law—must be "confined to the full

---

[3] WSPA Comments on 2020 At Berth Authorization, *supra* n.1, at 2, 5.

administrative record before the agency at the time the decision was made." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

The two cases Petitioner cites do nothing to establish jurisdiction. Opp. at 11-12. Contrary to Petitioner's assertion, *Group Against Smog & Pollution, Inc. v. EPA*, 665 F.2d 1284 (D.C. Cir. 1981), did not find an applicable after-arising ground; rather, it rested instead "on the theory that [an agency's] refusal to amend" a previous action "was itself a reviewable action triggering its own sixty-day filing window." *Alon Ref. Krotz Springs*, 936 F.3d at 646. Indeed, this Court has expressly recognized that *Group Against Smog* did not involve "a potential claim [that] had become newly justiciable." *Am. Rd. & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1114 (D.C. Cir. 2009).

And in *American Petroleum Institute v. EPA*, 706 F.3d 474 (D.C. Cir. 2013), the Court held that the re-use of a particular methodology in a new action could be challenged because "[t]he reasonableness of adopting a predictive methodology is not the same as the reasonableness of *maintaining* one in the face of experience." *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 477 (D.C. Cir. 2013). As in *Group Against Smog*, the Court had no occasion to consider an after-arising ground and certainly did not hold that a prediction that proved inaccurate was such a ground. Opp. at 12.

## II. EVEN IF THE "TECHNICAL INFEASIBILITY" OF ONE COMPLIANCE PATHWAY COULD CONSTITUTE AN AFTER-ARISING GROUND, SUCH GROUNDS AROSE WELL BEFORE JANUARY 9, 2025

Even if Petitioner had identified a valid "after-arising ground," it still failed to file its petition within 60 days of when that ground arose. Petitioner's asserted after-arising ground is the purported lack of certified "emissions control system[s] for tankers" as of the January 1, 2025, compliance deadline. Opp. at 5. Petitioner claims that because "certain WSPA members" "obtained confirming evidence" regarding the lack of compliant systems on January 9, 2025, when two vendors "verified" in conversation that they had not yet produced or sought approval for the emissions control systems, *id.* at 5-6, the statute of limitations runs from that date.

But the statute is clear that the jurisdictional limit runs from when the after arising ground *arose*, 42 U.S.C. § 7607(b)(1), and not when a party chose to compile evidence. The 60-day limit is "trigger[ed]" by "circumstances" that "significantly change[]the legal landscape," *Alon Ref. Krotz Springs*, 936 F.3d at 646, not by later efforts to gather evidence of such changed circumstances. Petitioner cannot take however much time it wants to "confirm" relevant facts, and then start the 60-day clock from the date they purport they received confirmation.

This Court has expressed skepticism that slowly accreted evidence can constitute an after-arising ground at all. Where alleged factual changes "accumulate progressively over time" as "conditions change," the "relevant filing

deadlines [] become practically unknowable" for the purposes of affixing a date certain to the alleged after-arising ground. *Alon Ref. Krotz Springs*, 936 F.3d at 645. Rather, an after-arising ground must be "easily dated" so that the "relevant filing deadlines are clear." *Id.* at 646. This case illustrates why "changes" of the sort Petitioner invokes—based on subjective understandings with dates that are hard to affix—are invalid.

But even assuming, arguendo, that Petitioner's claim did not ripen until the facts developed in such that a way that it became clear that this single compliance pathway would be unavailable, that event occurred well before January 9, 2025. For one, Petitioner was aware that "[a]ny stack-capture system for tankers would first have to be successfully feasibility- and safety-tested before proceeding further toward commercial availability," including "over 200 hours of use testing," all of which would need to have occurred "prior to the January 1, 2025" compliance deadline. Exhibit B (Petition for Reconsideration) at 18; Cal. Code Regs., tit. 17, § 93130.5 (providing CARB 90 days to approve or disapprove technology after receiving a completed application with the testing results). It is implausible that Petitioner and its members would not investigate whether this process had started—and thus whether they would be able to meet their regulatory compliance deadline using capture and control technologies—until the compliance deadline had already passed. And indeed, at least two of Petitioner's members applied to

use an alternate compliance option—the remediation fund—by December 2024.[4] Moreover, Petitioner stated in a letter to EPA seeking reconsideration of the authorization that "*as of January 1, 2025*, it was [] *known with certainty* . . . that tanker compliance remains infeasible." Ex. B at 18 (emphasis added).

The fact that the same information was available to Petitioner prior to January 9, 2025, forecloses this Court's jurisdiction. *Producers of Renewables United for Integrity Truth & Transparency v. EPA*, 778 F. App'x 1, 5-6 (D.C. Cir. 2019) (petition untimely when filed within 60 days of news article because "[a]ll this information was available to Petitioner more than 60 days before it sought our review"). In tacit acknowledgment that the relevant facts were at least "known with certainty" by January 1, 2025, Petitioner concedes that it *intended* to file this petition within 60-days of that date, but acknowledged that it failed to do so. Opp. at 15 n.9. As EPA noted in its separate motion to dismiss, this Court "has no authority to create equitable exceptions to jurisdictional requirements." Dkt. 2111035 at 6 (citing *Bowles v. Russell*, 551 U.S. 205, 214 (2007); *Strange ex rel. Strange v. Islamic Republic of Iran*, 964 F.3d 1190, 1198-202 (D.C. Cir. 2020); *Med. Waste Inst.*, 645 F.3d at 427 (a court is "powerless" to resolve a claim filed after a jurisdictional deadline)).

---

[4] *See* CARB letter granting Shell's December 2, 2024 request to use remediation fund, http://bit.ly/42FKHDp; same regarding Tesoro's December 20, 2024 request, https://bit.ly/3YYTC06.

### III. PETITIONER IDENTIFIES NO BASIS TO DELAY RULING ON THIS MOTION

Petitioner asks this Court to delay ruling on this motion on the ground that its claimed after-arising ground depends on facts that are "dispute[d]." Opp. at 3, 7. Petitioner argues that "the pleading stage is not the proper time for resolution of such factual issues," as "further factual development" is necessary. Opp. at 7-9. But the resolution of this motion does not turn on a factual dispute. And even if it did, Petitioner's argument is inapposite. In this review of a final action under the Clean Air Act, there is no "pleading stage," and no complaint containing allegations that this Court could accept as true. Petitioner does not identify when or how further factual development would occur in this administrative record case, much less why Petitioner requires more time to develop facts about when it purportedly "confirmed" a particular technology was unavailable. Those facts are already in Petitioner's possession and presumably presented in the declarations Petitioner has filed.

This Court regularly considers the untimeliness of petitions for review of agency action on motions to dismiss, and there is no reason to deviate from that practice here. *See, e.g.*, *Protect Our Aviation & Eagles, Inc. v. Whitaker*, No. 24-1037, 2024 WL 2239016, at *1 (D.C. Cir. May 16, 2024); *RMS of Georgia, LLC v. EPA*, No. 22-1025, 2023 WL 10553775, at *1 (D.C. Cir. July 7, 2023), *cert. denied sub nom. Williams v. Env't Prot. Agency*, 144 S. Ct. 2581 (2024).

## CONCLUSION

For the reasons discussed above, Petitioner has failed to articulate an after-arising ground, and as such its Petition for Review is time-barred. Thus, this Court lacks jurisdiction, and the petition must be dismissed.

Dated: May 1, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
Supervising Deputy Attorney General
CAITLAN MCLOON
M. ELAINE MECKENSTOCK
Deputy Attorneys General

*/s/ Kristin K. McCarthy*
KRISTIN K. MCCARTHY
Deputy Attorney General
  300 S. Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6273
  Fax: (916) 731-2128
  Email: Kristin.McCarthy@doj.ca.gov
*Attorneys for State of California*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 2,600 words.  I further certify that this motion complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using a proportionally spaced typeface (Times New Roman) in 14-point font.

Dated:     May 1, 2025

*/s/ Kristin K. McCarthy*
Kristin K. McCarthy
*Attorney for State of California*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2025 I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit using the Court's CM/ECF system.

I further certify that all parties are participating in the Court's CM/ECF

system and will be served electronically by that system.


Dated:     May 1, 2025

*/s/ Kristin K. McCarthy*
Kristin K. McCarthy
*Attorney for State of California*

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 04/15/2022 02:43 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Gonzalez,Deputy Clerk

1    PILLSBURY WINTHROP SHAW PITTMAN LLP
     MICHAEL S. MCDONOUGH (SBN 193684)
2    michael.mcdonough@pillsburylaw.com
     725 South Figueroa Street, Suite 3500
3    Los Angeles, CA 90017-5406
     Telephone:  (213) 488-7100
4    Facsimile:  (213) 629-1033

5

6    PILLSBURY WINTHROP SHAW PITTMAN LLP
     MARGARET ROSEGAY (SBN 96963)
7    STACEY C. WRIGHT (SBN 233414)
     Four Embarcadero Center, 22nd Floor
8    Post Office Box 2824
     San Francisco, CA  94126-2824
9    Telephone: (415) 983-1000
     Facsimile: (415) 983-1200
10

11   Attorneys for Petitioner and Plaintiff,
     WESTERN STATES PETROLEUM ASSOCIATION

12

13          SUPERIOR COURT OF THE STATE OF CALIFORNIA

14            IN AND FOR THE COUNTY OF LOS ANGELES

15

| | |
|---|---|
| 16   WESTERN STATES PETROLEUM ASSOCIATION, | Case No. 20STCP03138 |
| 17 | Assigned to Judge Mitchell L. Beckloff |
| 18      Petitioner and Plaintiff, | **PETITIONER WESTERN STATES PETROLEUM ASSOCIATION'S OPENING BRIEF** |
| 19      v. | |
| 20 | |
| 21   CALIFORNIA AIR RESOURCES BOARD; RICHARD COREY, in his official capacity | Trial date:  December 16, 2022 |
| 22   as Executive Officer of the California Air Resources Board; and DOES 1 through 10, | Time:  9:30 a.m. |
| 23   inclusive, | Dept.:  86 |
| 24      Respondents and Defendants. | Action Filed:  September 28, 2020 |

25

26

27

28

---

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................2

      A.   Basic Requirements of the Regulation ........................................2

      B.   Safety and Emissions Considerations Unique to Tanker Vessels ................3

      C.   Stakeholders Raise Concerns About the Feasibility and Safety of the
           Regulation As Applied to Tankers ...............................................4

      D.   CARB Relies on Outdated Emissions and Economic Assumptions ..............6

      E.   WSPA's Feasibility Study and Petition for Writ of Mandate ....................7

III.  STANDARD OF REVIEW .........................................................................8

IV.   ARGUMENT ........................................................................................10

      A.   CARB's Approval of the Regulation Without Substantial Evidence
           of its Feasibility or Safety Violated CARB's Statutory Duties .................10

           1.   No Substantial Evidence That Tankers Could Implement
                Required Emission Control Technology By the Regulation's
                Deadlines ....................................................................10

           2.   The Regulation is Not a Legal "Technology-Forcing"
                Regulation ...................................................................13

           3.   The "Interim Evaluation" and "Innovative Concepts"
                Provisions Do Not Provide Actual Alternatives to Infeasible
                Tanker Controls .............................................................14

      B.   CARB Projections of Tanker Emissions and Economic Activity
           Conflict With the Record and Significantly Overstate Tanker
           Emissions .......................................................................16

           1.   CARB Claimed COVID-19 Had Zero Impact on its
                Projections of Industry Growth, Vessel Activity and
                Emissions ....................................................................17

           2.   CARB Withheld from the Public Its Own Study Showing
                That Actual Tanker Emissions Were Far Less Than CARB
                Claimed .......................................................................19

      C.   CARB's Approvals Violated CEQA and Must be Overturned. ...................20

PETITIONER'S OPENING BRIEF

|   |   | 1. | The Final EA Improperly Deferred Analysis of the Regulation's Safety, Feasibility, and Environmental Impacts ......... 21 |
|   |   | 2. | CARB Failed to Conduct a Sufficient Cumulative Impacts Analysis .......................................................................... 23 |
|   |   | 3. | CARB Failed to Recirculate the EA After Adding Significant New Information ............................................................... 24 |
|   |   | 4. | The EA's Analysis of Alternatives Was Inadequate ........................ 24 |
|   | V. | CONCLUSION .................................................................................... 25 |

# TABLE OF AUTHORITIES

Page(s)

## Cases

*American Coatings Ass'n v. South Coast Air Quality Management Dist.*
(2012) 54 Cal.4th 446 .................................................................................. 13, 14

*Ass'n of Irritated Residents v. San Joaquin Valley Unified Air Pollution Control Dist.*
(2008) 168 Cal.App.4th 535 ................................................................................. 8

*Association of Irritated Residents v. County of Madera*
(2003) 107 Cal.App.4th 1383 .............................................................................. 9

*Bakersfield Citizens for Local Control v. City of Bakersfield*
(2004) 124 Cal.App.4th 1184 .............................................................................. 9

*Banning Ranch Conservancy v. City of Newport Beach*
(2017) 2 Cal.5th 918 .......................................................................................... 9

*Citizens to Preserve the Ojai v County of Ventura*
(1985) 176 Cal.App.3d 421 ............................................................................... 23

*Ebbetts Pass Forest Watch v Dept. of Forestry & Fire Protection*
(2008) 43 Cal.4th 936 ....................................................................................... 21

*John R. Lawson Rock & Oil v. State Air Res. Bd*
(2018) 20 Cal.App.5th 77 .................................................................................... 8

*POET, LLC v. State Air Res. Bd.*
(2013) 218 Cal.App.4th 681 .............................................................................. 20

*Sierra Club v. County of Fresno*
(2018) 6 Cal.5th 502 ................................................................................. 9, 20, 21

*Sims v. Dep't of Corrections and Rehab.*
(2013) 216 Cal.App.4th 1059 ............................................................................. 9

*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*
(2007) 40 Cal. 4th 412 ........................................................................... 21, 22, 24

## Statutes and Codes

California Government Code
    Section 11340, *et seq.* ..................................................................................... 8
    Section 11342.548 .......................................................................................... 17
    Section 11346.2(b)(5)(A) ................................................................................ 17
    Section 11346.3 .............................................................................................. 16
    Section 11346.3(c)(1) ..................................................................................... 17

PETITIONER'S OPENING BRIEF

Section 11346.36(b) ................................................................ 17
Section 11346.5 .................................................................... 16
Section 11346.5(a)(8) ............................................................ 17
Section 11347.3(a) ................................................................ 20
Section 11347.3(b) ................................................................ 20
Section 11347.3(d) ................................................................ 20
Section 11350(a) .................................................................... 8
Section 11350(b)(1) ................................................................. 8
Section 11350(b)(2) ......................................................... 17, 19

Code of Civil Procedure
Section 1085 .......................................................................... 8
Section 1085(a) ...................................................................... 8

Rules and Regulations

California Code of Regulations
Title 1, section 2000(g) ....................................................... 16
Title 14, section 15004(b)(2) ............................................... 21
Title 14, section 15088.5 ................................................ 21, 24
Title 14, section 15126 ........................................................ 21
Title 14, section 15126.6(d) ................................................ 25
Title 14, section 15130 ........................................................ 23
Title 14, section 15130(a)(1) ............................................... 23
Title 14, section 15130(b)(1) ............................................... 23
Title 14, section 15152(b) ................................................... 21
Title 14, section 15187(a) ................................................... 23
Title 14, section 15187(c) ................................................... 23
Title 14, section 15364 ........................................................ 25
Title 17, section 60004(b) ................................................... 21
Title 17, section 60004.2(a) ................................................ 21
Title 17, section 60004.2(a)(4) ............................................ 23
Title 17, section 60004.2(a)(5) ............................................ 25
Title 17, section 93118.3 ....................................................... 2
Title 17, section 93130.14(d) ............................................... 14
Title 17, section 93130.17 ................................................ 3, 15
Title 17, section 93130.17(a) ............................................... 15
Title 17, section 93130.17(f) ........................................... 15, 16
Title 17, section 93130.17(g) ............................................... 16
Title 17, section 93130.3(a)(2) .............................................. 2
Title 17, section 93130.5 ................................................ 2, 10
Title 17, section 93130.7(b) .................................................. 2
Title 2, section 2315 ........................................................... 12
Title 2, section 2340(c)(28) .................................................. 5
Title 2, section 2340(c)(29) ................................................. 12
Title 2, section 2341(a) ...................................................... 12
Title 2, section 2355(a) ...................................................... 12

PETITIONER'S OPENING BRIEF

Code of Federal Regulations
    Title 33, section 110.215(a)(2)(B)(iv) ............................................................. 4

<u>Other Authorities</u>

Kostka & Zischke, *Practice Under the California Environmental Quality Act* (2d ed. Cal. CEB 2021)
    Section 10.14 B ................................................................................. 21
    Section 10.19 3 ................................................................................ 23
    Section 13.44.1 ................................................................................ 23

PETITIONER'S OPENING BRIEF

# I.    **<u>INTRODUCTION</u>**

Petitioner Western States Petroleum Association ("WSPA") challenges regulatory amendments requiring WSPA's members to implement emissions control measures for docked oil tankers based on technology never implemented in tankers, that is not in active development for use in tankers, and would present significant safety concerns if it ever is developed for tankers. The amended regulation (the "Regulation"), adopted by Respondent California Air Resources Board ("CARB"), requires tankers at berth either to use shore-based electricity to power ship systems at berth or install emissions controls. CARB concedes that shore power is neither used by tankers globally nor reasonably foreseeable. And the undisputed record evidence shows that no safe emissions control technology has yet been achieved for tankers, nor is in development to be implemented by the Regulation's deadlines. Indeed, the record shows that existing emission control technology has only ever been successfully adopted for non-tanker vessels, and that any future tanker emissions control system would implicate serious concerns regarding compliance with global standards for safe management of tankers' explosive and flammable cargoes – with potentially catastrophic real-world consequences for attempting to shortcut those standards.

At every step in the development of the Regulation, CARB has dismissed this undisputed evidence, offering instead its bare, unrealistic hope that a tanker control technology will be invented, tested, certified under global safety standards, constructed on tankers, and accommodated by substantial new infrastructure at major ports by January 1, 2025 and at terminals by January 1, 2027. The record is replete with evidence of the major engineering, construction and capital investments required to implement even ***established*** technology at complex tanker ports and terminals, and that the required lead time for even those projects already exceeds the Regulation's deadlines. Indeed, given the absence of any proven tanker control technology, there is literally nothing yet to engineer or construct. CARB's answer has been to point to claimed "regulatory flexibility" provisions that do not delay any deadlines or give tankers an actual alternative to adopting infeasible technology.

California law allows agencies to adopt regulations encouraging development of

1   new technology where record evidence documents that the technology is either already in

2   development or will be developed by regulatory deadlines. Neither is the case here.

3   Instead, the Regulation here mandates obligations that are impossible for tankers or

4   terminals to meet in less than three years. In doing so, CARB has violated its legal duties to

5   ensure that regulations it adopts are safe and technologically feasible in the timeframes

6   mandated, to properly assess anticipated future emissions based on the evidence in the

7   record, and to consider all potential environmental impacts.  The Court should vacate the

8   Regulation and order CARB to return to the drawing board to consider tanker requirements

9   that are feasible and supported by actual substantial evidence in the record.

10  **II.      STATEMENT OF FACTS AND PROCEDURAL HISTORY**

11          **A.      Basic Requirements of the Regulation**

12          On August 27, 2020, CARB approved the Regulation via amendments to the

13  Airborne Toxic Control Measure ("ATCM") for Auxiliary Diesel Engines Operated on

14  Ocean-Going Vessels At-Berth in a California Port (17 Cal. Code Regs. ("C.C.R.")

15  § 93118.3). AR 335-344. The Regulation requires that regulated terminals, and tanker

16  vessels and other marine vessel categories visiting those regulated terminals, use either

17  shore power or another CARB-approved emissions control strategy that achieves at least an

18  80% reduction in emissions at berth during the visit. *Id*. §§ 93130.3(a)(2), 93130.5 The

19  Regulation requires reductions to be achieved by January 1, 2025 for tankers visiting the

20  Ports of Los Angeles and Long Beach (the "Ports"), and by January 1, 2027 for tankers

21  visiting all other terminals. *Id*. § 93130.7(b). Also, by December 1, 2022, CARB staff must

22  issue a public report discussing "the progress made in adopting control technologies for use

23  with tanker…vessels, as well as the status of landside infrastructure improvements that may

24  be needed to support emissions reductions at…tanker terminals." *Id*. § 93130.14(d). After

25  this "Interim Evaluation," "[i]f staff finds that the compliance deadlines for…tanker vessels

26  need to be adjusted…the report will include recommendations to initiate staff's

27  development of potential formal regulatory amendments." *Id*.

28          In response to stakeholder concerns about the potential infeasibility of these

PETITIONER'S OPENING BRIEF

1   requirements for tankers and certain other vessel types, CARB later added to the Regulation

2   an "Innovative Concepts" provision, giving CARB the discretion to approve an application

3   to temporarily delay the obligation to install shore power or at-berth emission controls so

4   long as overall emission reductions from the "Innovative Concept" were achieved earlier

5   than, and/or in at least equal amount to, reductions that would have been achieved at berth

6   from shore power or installation of emission controls. 17 C.C.R. § 93130.17.

7          Consideration of the Regulation began in August 2017 and involved public

8   workshops, releases of proposed regulatory language, and formal rulemaking documents,

9   including an October 15, 2019 Initial Statement of Reasons ("ISOR"), which also attached

10  a Standardized Regulatory Impact Assessment ("SRIA"), and an accompanying draft

11  Environmental Analysis ("Draft EA"); two sets of proposed changes released for public

12  review and comment on March 26, 2020 ("First 15-Day Changes") and July 10, 2020

13  ("Second 15-Day Changes"), respectively; a Final Environmental Analysis ("Final EA")

14  released on August 25, 2020; and a Final Statement of Reasons released on November 12,

15  2020 ("FSOR"). CARB also held public hearings on December 5, 2019, June 25, 2020 and

16  August 27, 2020, voting at the last hearing to approve the Regulation. AR 335-344.

17         **B.    Safety and Emissions Considerations Unique to Tanker Vessels**

18         In the universe of marine vessels, "[t]anker vessels have unique characteristics that

19  distinguish them from the other vessel types…includ[ing] a number of safety issues and

20  federal and international regulations that other vessel categories are not subject to due to the

21  hazardous nature of the cargo onboard most tanker vessels (including the need to be able to

22  break away from the berth within 30 minutes in the event of an emergency)." AR 19670.

23  California law and global tanker safety regulations mandate that tankers inject inert boiler

24  gases into cargo tanks containing flammable cargo in order to inert those spaces. Failure to

25  carefully implement such measures has resulted in multiple real-world tragedies involving

26  explosion, fire and loss of life. *See* AR 58743-58744, 66711-66712, 66900-66902.

27         As such, tankers also present unique considerations regarding emissions control.

28  Most tankers calling on California Ports and terminals utilize boilers while at dockside to

drive steam-powered pumps to offload crude and other liquid products; these pumps cannot be powered by shore-based electricity. AR 19627-19628. Moreover, it is undisputed that shore-based and barge-based emissions capture technologies – while feasible for other types of vessels – have never been safely implemented for tanker vessels. AR 50936. The infrastructure of tanker berths and terminals also differs fundamentally from those serving other vessels "as a direct result of safety issues," requiring rigorous safety studies before any new tanker shore-side or tanker connection infrastructure is constructed or certified to meet international standards. AR 19670, 19676.

C. **Stakeholders Raise Concerns About the Feasibility and Safety of the Regulation As Applied to Tankers**

Over the three years of CARB's consideration of the Regulation, WSPA and others raised feasibility and safety concerns regarding CARB's proposal to require emissions controls for tanker at berth – controls used on other types of vessels but never feasibly or safely adopted for tankers. *See, e.g.,* AR 29314-29316, 36470-36475, 38792-38794, 38896-38898. WSPA noted that no international or industry standards exist for safe operation of emissions control technology on tankers, nor have concepts for tanker emissions control systems undergone the required safety evaluations to assess potential fire and explosion risk associated with collection, pressurization and transportation of gases in a crowded terminal. AR 60231-32. Tanker crews also are not trained on how to safely operate emissions control systems not yet in existence on tankers, nor do California terminals have the legal authority to force third-party tanker crews to operate such unproven systems. AR 60232.

WSPA also commented that no safe tanker-terminal control interface has yet been invented, and that most marine terminals would be unable to safely install and operate the land-based emission control systems that might be required. AR 60231-32. Massive shore cranes would be needed to reach tanker vessel exhaust stacks sitting nearly 160 feet above the wharf, but these cranes are not designed with the emergency coupling required for all tanker vessels to comply with federal and California requirements to have the capability of breaking away from the berth within 30 minutes. *Id*; *see* 33 C.F.R. § 110.215(a)(2)(B)(iv)

1   (federal disconnection requirement); 2 C.C.R. § 2340(c)(28) (California). Indeed, no

2   emergency protocols exist at all for the type of connection the Regulation would mandate.

3   AR 60231. Such equipment is not designed with a working safety margin for vessel

4   movement and no ability to safely maintain connections at night or in adverse weather. *Id*.

5   These connections, necessary for any tanker emission control, change the fluid dynamics of

6   gas flow from the tanker stack and increase the risk of an unsafe combustion space.[1] *Id*.

7         WSPA commented that the record contained no evidence that tankers or tanker

8   terminals would be able to invent and implement tanker emission control technology by the

9   originally proposed compliance deadlines of 2027 and 2029, and that none of the current

10   examples of vessel emission control relied upon by CARB had been implemented to date or

11   were in development for tankers. AR 60230-60342. When CARB later *accelerated* those

12   proposed deadlines to 2025 and 2027, CARB cited no evidence that acceleration would be

13   feasible for tankers, conceding instead that "[t]his change is proposed in direct response to

14   CARB Board's request at its December 5, 2019 meeting to accelerate implementation dates

15   in order to achieve earlier public health benefits from the regulation." AR 48234. Finally,

16   WSPA and others also noted that the deadlines CARB set for tankers included no

17   consideration of the worldwide COVID pandemic starting in March 2020, despite the fact

18   that California's economy was already being significantly disrupted by it.[2] AR 62516-18.

19   For these and other reasons, WSPA and others urged CARB to conduct a feasibility study

20   to assess the viability and safety of installing emissions control systems on tankers before

21   imposing compliance deadlines to install such systems. AR 66900-66902.

22

---

23   [1] WSPA's comments included a letter from Woodbridge Marine, Inc., an independent
24     marine consultant firm, listing numerous additional safety and engineering concerns
     associated with application of the proposed Regulation to tankers. AR 60278-60282.

25   [2] Indeed, in the Second 15-Day Changes CARB extended compliance deadlines for
26     container, refrigerated cargo, passenger and ro-ro vessels "to give regulated entities
     additional time to prepare for compliance in light of the current economic downturn." AR
27     48541. But CARB denied tankers this same relief based on the unsupported claim that the
     tanker industry would only take "one to two years to recover" from the economic
28     downturn caused by the pandemic. AR 48550.

PETITIONER'S OPENING BRIEF

1    Throughout the rulemaking, CARB repeatedly refused to conduct such a tanker

2  feasibility study, incorrectly claiming that "shore power has also been demonstrated for

3  tankers at one terminal in the Port of L.A./Long Beach"[3] and that "[non-tanker control]

4  technologies can be adapted safely and quickly to the tanker industry." AR 58909-10. This

5  flatly contradicted the evidence CARB cited in the record for support. *See*, *e.g.*, AR 51094

6  (single diesel-electric tanker is "unique example" atypical of tanker fleet), AR 51092,

7  51383 (conceding that "it is true there has not yet been a capture and control system tested

8  and approved for tanker vessels").[4] CARB further conceded that before attempting to use

9  such systems on tanker vessels, "safety studies need to be performed to ensure all safety

10 considerations are met, given that the tanker vessels carry explosive cargos." AR 19676.

11 But rather than acknowledging its own legal requirement to ensure the safety and feasibility

12 of the Regulation before adopting it, CARB claimed that the burden to assess those things

13 fell to "the regulated entities themselves." AR 51530.

14    **D.    CARB Relies on Outdated Emissions and Economic Assumptions**

15    As the Rulemaking proceeded, CARB also continued to rely on outdated and

16 unreasonably optimistic assumptions of projected future tanker economic activity. On

17 January 16, 2019, CARB released its "2018/2019 Update to Inventory for Ocean-Going

18 Vessels: Methodology and Results" ("Inventory Update"), upon which it based its

19 assumptions of future tanker emissions. AR 30081-30150. The emissions factors CARB

20 used were based on rates from a nearly 20-year-old (2002) consultant report compiling data

21 on vessels that were *themselves* over 20 years old at the time of the report. AR 66715.

22 Moreover, the vessels at that time were still using heavy No. 6 fuel oil, which by 2018 had

23

24 [3] Acknowledging in the ISOR the lack of any global standard for tanker shore power
25   connections, CARB "assumed the majority of tanker visits will use land-based capture
     and control systems based on industry feedback" AR 19673.

26 [4] CARB staff also claimed that "technology manufacturers have assured CARB staff that
27   there are engineering solutions for both ro-ro and tanker vessels." AR 58517. The record
     contains no evidence that any "technology manufacturer" ever communicated to CARB
28   staff that these solutions currently exist and are in use at real-world tanker terminals.

PETITIONER'S OPENING BRIEF

1    been prohibited for a decade. *Id*. Those rates did not accurately reflect emissions from most

2    auxiliary engines in the modern tanker vessel fleet, which use the type of cleaner-burning,

3    low sulfur distillate fuels CARB has mandated since 2008. *Id*. CARB also continued to

4    assume that future tanker economic activity would remain unchanged from predictions it

5    made in October 2019, making no allowance for the impacts of the COVID pandemic on

6    tankers even as it made such allowances for other vessel classes.[5] AR 66714-66715.

7        **E.**    **<u>WSPA's Feasibility Study and Petition for Writ of Mandate</u>**

8        On September 28, 2020, WSPA filed its verified petition for writ of mandate and

9    complaint for declaratory and injunctive relief in this matter. While the petition was

10   pending, in response to CARB's refusal to conduct a feasibility study for the Regulation,

11   WSPA commissioned DNV USA, Inc., a leading expert in maritime risk and systems

12   management, to conduct a feasibility assessment and technical qualification process for

13   novel emissions control technologies for tanker vessels. In November 2021, DNV released

14   its final report,[6] *California Air Resources Board's (CARB) Ocean-Going Vessels at Berth*

15   *Regulation Emissions Control Technology Assessment for Tankers* (November 30, 2021)

16   ("2021 DNV Report"). The 2021 DNV Report – provided to CARB – concluded:

17   -   "Onshore power together with modifications for design of tankers need significant

18       development and risk mitigation before an industry-wide implementation for tankers

19       which operate world-wide."

20   -   "Capture and control technology for tankers does not currently exist. The systems

21       currently used for container vessels in Southern California are not designed to

22       withstand the variable conditions in Northern California including currents, winds,

23

---

24   [5] WSPA included an independent analysis by Capitol Matrix Consulting describing the
25       global economic impacts of COVID-19, and illustrating why CARB's projections of
         future vessel visits, emissions, and health benefits; the SRIA; and the updated analysis of
26       cost impacts were all now outdated. AR 62614-62621.

27   [6] *See* Petitioner's Motion to Augment Administrative Record and Consider Extra-Record
         Evidence, Declaration of Michael S. McDonough (filed March 15, 2022), Exhibit B
28       ("2021 DNV Report") and Exhibit C ("2021 DNV Report Summary").

PETITIONER'S OPENING BRIEF

1    tide, depth, etc."

2    • "The current regulatory timeline is insufficient to address and mitigate the

3    outstanding safety and operational risks, some of which introduce their own

4    unavoidable limitations and dependencies (e.g., regulatory permitting)."

5    2021 DNV Report at 3. Thus, as DNV concluded, "it is unlikely that any ports or marine oil

6    terminals will be able to comply with the 2021 At-berth Regulation timeline." *Id.* p. 6. Had

7    CARB conducted its own feasibility study, as it should have done, it is likely that such a

8    study would have reached similar conclusions.

9    **III.    STANDARD OF REVIEW**

10    Code of Civil Procedure ("CCP") Section 1085 provides in relevant part that "[a]

11    writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or

12    person, to compel the performance of an act which the law specially enjoins, as a duty

13    resulting from an office, trust, or station." CCP § 1085(a). In Section 1085 actions, the court

14    must "determine whether the agency's action was arbitrary, capricious, or without

15    evidentiary support, and/or whether it failed to conform to the law." *Ass'n of Irritated*

16    *Residents v. San Joaquin Valley Unified Air Pollution Control Dist*. (2008) 168 Cal.App.4th

17    535, 542 ("*AIR*"). In reviewing whether an agency's action conformed with law, "the

18    reviewing court exercises independent judgment." *AIR*, 168 Cal.App.4th at 542.

19    Adoption of regulations by California state agencies is governed by the

20    requirements of the Administrative Procedure Act ("APA"). *See* Cal. Gov. Code ("GC")

21    § 11340, *et seq*.; *see also* HSC § 39601(a) (APA governs CARB rulemaking). Regulations

22    "may be declared to be invalid for a substantial failure to comply with [the APA]," or if the

23    agency's determination that the regulation is reasonably necessary to effectuate the purpose

24    of the statute "is not supported by substantial evidence."  GC § 11350(a), (b)(1).  A

25    deferential standard of review "is not [applicable] in review of APA procedural compliance

26    issues." *John R. Lawson Rock & Oil v. State Air Res. Bd.* (2018) 20 Cal.App.5th 77, 113. In

27    such matters, "[the reviewing court] independently review[s] and interpret[s] the procedural

28    requirements of the APA." *Id.* (citation omitted). "[C]ourts reviewing regulations for

- 8 -

1  compliance with the APA owe no deference to the promulgating agency's opinion that it

2  complied with the prescriptions of the APA." *Sims v. Dep't of Corrections and Rehab.*

3  (2013) 216 Cal.App.4th 1059, 1071.

4       Judicial review of an agency's compliance with CEQA extends to whether there was

5  a prejudicial abuse of discretion – *i.e.*, if the agency fails to proceed "in a manner required

6  by law" or if the determination is not supported by substantial evidence. Pub. Res. Code

7  ("PRC") § 21168.5; *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511 ("*Sierra*

8  *Club*"). Whether the agency has followed applicable law is subject to independent judicial

9  review. *Sierra Club* at 512 (courts apply *de novo* review, "scrupulously enforcing all

10 legislatively mandated CEQA requirements"). Whether a CEQA document fails to address

11 an issue or omits relevant information is subject to *de novo* review. *Id*. at 514 ("[W]hether a

12 description of an environmental impact is insufficient because it lacks analysis or omits the

13 magnitude of the impact is not a substantial evidence question."); *Banning Ranch*

14 *Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 ("Whether an EIR has

15 omitted essential information is a procedural question subject to *de novo* review."). *De novo*

16 review also applies to mixed questions of law and fact requiring a determination whether

17 statutory criteria were satisfied – *i.e.*, adequacy of discussion of environmental impacts.

18 *Sierra Club* at 512. In contrast, substantial evidence review applies to an agency's factual

19 findings or where factual issues "predominate." *Id*.

20      A "prejudicial abuse of discretion" occurs if, as here, "the failure to include relevant

21 information precludes informed decisionmaking and informed public participation, thereby

22 thwarting the goals of the EIR process." *Association of Irritated Residents v. County of*

23 *Madera* (2003) 107 Cal.App.4th 1383, 1391. Such error is deemed prejudicial "regardless

24 whether a different outcome would have resulted if the public agency had complied with

25 the disclosure requirements." *Bakersfield Citizens for Local Control v. City of Bakersfield*

26 (2004) 124 Cal.App.4th 1184, 1198; PRC § 21005(a).

27

28

1 IV.    **ARGUMENT**

2      A.    **CARB's Approval of the Regulation Without Substantial Evidence of its**
        **Feasibility or Safety Violated CARB's Statutory Duties**

3
        1.    *No Substantial Evidence That Tankers Could Implement Required*
4              *Emission Control Technology By the Regulation's Deadlines*

5      Before adopting most types of regulations, CARB is required to document their

6 feasibility. For any ATCM, CARB must show that its measure will reduce emissions to

7 levels that are "achievable through application of best available control technology or a

8 more effective control method." HSC § 39666(c); *see also id.* § 38560 (greenhouse gas

9 regulations must be "technologically feasible"), § 43013(a) (mobile source emission

10 regulations must be "technologically feasible.").

11      The Regulation requires California marine vessels to use shore power or another

12 CARB-approved emissions control strategy to meet certain emissions standards. 17 C.C.R.

13 § 93130.5. But as to tanker vessels, CARB determined that a lack of global support for

14 tanker shore power standards makes the shore power option not reasonably foreseeable for

15 most tankers and "has led CARB staff to anticipate that compliance with the Proposed

16 Regulation will likely involve capture and control systems at tanker terminals." AR 19673.

17      As WSPA and others commented, the record contains no evidence (a) that either

18 shore power or emission control systems have been successfully implemented on tankers[7]

19 or tanker terminals/ports, or (b) that either technology could be implemented safely and

20 feasibly for tankers in the timeframes provided by the Regulation. WSPA and other parties

21 provided significant evidence that such technologies were *not* feasible in those timeframes.

22 *See, e.g.*, AR 60284-60289, 60230-60262, 62536-62539, 62514-62534, 66709-66717,

23 66899-66909. WSPA and others repeatedly urged CARB to at least perform a feasibility

24 _____

25 [7] CARB relies on a single "unique example" of a shore power for a diesel-electric tanker
    vessel as proof for its sweeping pronouncement that "shore power has been shown to be
26 feasible for tanker vessels." AR 51094, 51097. The record contains no evidence of shore
    power for tankers utilizing boilers, and CARB concedes that "[s]hore power . . . cannot be
27 used to power [tanker] boilers" – which make up nearly all at berth emissions from
    tankers – and "does not reduce tanker boiler emissions." AR 19589.

1    study to assess the viability of tanker emissions controls and terminal infrastructure before

2    adopting the Regulation. AR 51530. CARB refused, claiming that the burden to assess the

3    Regulation's safety and feasibility fell to "the regulated entities themselves." *Id*. This forced

4    WSPA to commission the feasibility study CARB would not, ultimately confirming that

5    tankers cannot safely or feasibly comply with the Regulation within the mandated

6    timeframes. *See* 2021 DNV Report and 2021 DNV Report Summary, *supra*.

7        Proper management of emissions from tanker boilers can be a matter of life or

8    death. Calibration of gases in tanker vessels' cargo spaces is critical to avoiding explosions,

9    fire and loss of human life. AR 58743-58744, 66711-66712, 66900-66902. So important are

10   these safety concerns that tankers are required to follow global safety standards set forth by

11   the International Maritime Organization ("IMO") and in the International Safety Guide for

12   Tankers and Terminals ("ISGOTT"), "widely recognized as the definitive best practice

13   guidance on tanker safety and pollution prevention." AR 66711-12. ISGOTT requires

14   significant due diligence before unproven new technologies are installed on tankers or at

15   tanker terminals. *Id*. These steps include technical review of novel technologies impacting

16   vessel, terminal or the sensitive connected interface between the two; preparation of formal

17   risk and impact assessment plans; a study of hazards presented by the new technology;

18   evaluation of consistency with other industry and classification society standards; and

19   analyses of tanker and terminal personnel safety.[8] *Id*.

20       The record reflects that CARB refused to evaluate ISGOTT or other international

21   technology and risk assessment requirements. AR 66711-12, 66900-66902. Instead, CARB

22

23

24   _____

25   [8] Tanker operators also rely on internationally recognized marine vessel classification
         societies like the American Bureau of Shipping ("ABS"), which has issued guidance on
26       the steps required to assess feasibility and safety of any new technology on marine vessels
         before implementation, including engineering evaluations and designs, risk assessments,
27       creation of a manufacturing plan, quality assurance requirements, functional and model
         testing, prototype validation, systems integration testing, and ABS review. AR 66712

28

PETITIONER'S OPENING BRIEF

1    dismissed the ISGOTT as "a guidance document . . . phrased in non-mandatory terms"[9] and

2    asserted without explanation that "its recommendations can be undertaken in the course of

3    implementing the Regulation."[10] AR 51478. Without reviewing these standards, CARB had

4    no basis to conclude that tanker control technology could nevertheless be developed,

5    assessed and implemented by the 2025 and 2027 deadlines provided in the Regulation.

6          The record also shows that, even assuming *arguendo* that a safe and feasible tanker

7    control technology *could* eventually be developed sometime in the future, the total

8    development time for the technology – together with the time needed for construction of the

9    necessary supporting complex infrastructure at tanker terminals -- could range from 10 to

10    15 years after adoption of the Regulation. *See* AR 60234. While conceding that

11    "construction of emission control systems for vessels, especially for tankers and ro-ro

12    vessels, may require years to complete," CARB simply asserted that construction timing

13    "may vary substantially from project to project," pointing to previous tanker terminal

14    infrastructure projects that "required five to seven years to complete." AR 50892. The

15    record reflects that none of those projects involved inventing, testing and installing a yet-

16    unproven control technology. If anything, such projects evidenced that tanker deadlines set

17    less than five to seven years in the future did not even provide adequate time for the

18    *construction* of control infrastructure and technology, let alone their *invention*.  As such,

19    CARB failed to document that, at least for tankers, the Regulation would be

20    "technologically feasible" or "achievable through application of best available control

21    technology or a more effective control method." HSC §§ 39666(c), 38560-38561, 43013(a).

22

---

23  [9] In fact, California regulations mandate compliance with ISGOTT provisions during all

24    tanker transfer operations.  *See* 2 C.C.R. §§ 2315, 2340(c)(29), 2341(a), 2355(a).

25  [10] CARB also complained that "[b]ecause the ISGOTT (6th ed.) is currently only available
    for purchase for 385 British pounds, CARB has not been able to analyze its contents in

26    detail." *Id.* The fact that obtaining the authoritative international book of standards on
    tanker, terminal and marine interface safety would have cost an agency with a multi-

27    billion-dollar budget a little more than $500 U.S. dollars does not excuse its decision not
    to review these standards in detail before mandating tankers adopt emissions control

28    technology by dates certain.

**2.** *The Regulation is Not a Legal "Technology-Forcing" Regulation*

2      CARB touts the Regulation as "technology forcing." AR 50934. The California

3   Supreme Court has defined the circumstances in which "technology-forcing" regulations

4   may survive mandamus challenges based on claimed infeasibility. In *American Coatings*

5   *Ass'n v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446 ("*ACA*"), the

6   Court considered an amended South Coast Air Quality Management District ("SCAQMD")

7   rule setting stringent volatile organic compound ("VOC") limits for certain architectural

8   coatings (*e.g.*, paints, primers, etc.). *ACA*, 54 Cal.4th at 456. Plaintiffs brought a mandamus

9   action alleging that the amended rule was technically infeasible. *Id.* at 459.

10      In that case, the record showed that high-performing, low-VOC coatings did indeed

11   exist to meet the requirements of the amended rule. *Id.* at 457. In fact, SCAQMD had done

12   significant research on the feasibility of the products it was mandating, including surveys of

13   product data sheets from manufacturers to assess whether there were coatings that could

14   feasibly meet the rule requirements. *Id.* SCAQMD "relied on several studies by outside

15   consultants conducted under the supervision of a technical advisory committee formed by

16   the District and comprised of representatives of the paint industry, academia, and regulatory

17   bodies." *Id.* SCAQMD "had also contracted for a two-year, real-time exposure study of

18   exterior coatings and coating systems," which found that compliant low-VOC coatings

19   could meet or exceed performance of noncompliant coatings. *Id.* Finally, SCAQMD

20   "conducted surveys of construction sites and facilities, and found that across a wide variety

21   of applications, the vast majority of coatings used on these sites complied with the interim

22   limits and that many coatings complied with the final limits." *Id.* While SCAQMD

23   conceded that new coatings would need to be formulated to comply with the rule, it cited

24   evidence in the record from industry that such new coatings commonly are developed

25   within three to seven years, and noted that the final compliance dates provided at least

26   seven years for development of new products. *Id.* Even after documenting all of this

27   evidence, SCAQMD accommodated feasibility concerns by changing the rule to delay

28   certain limits' effective dates and create some categories with higher limits. *Id.* at 458.

In upholding the SCAQMD rule as meeting statutory requirements to document the limits were "achievable," the Court cited record evidence that (a) some compliant low-VOC coatings were already available; (b) other compliant coatings were being developed; and (c) in this industry, new products were commonly developed in a three-to-seven-year window, which the rule's deadlines amply accommodated. *Id.* at 470-71. The Court held that this was sufficient "record evidence of then-current as well as reasonably foreseeable technology when the District adopted the [amended] limits." *Id.* at 471.

Here, CARB has provided no record evidence that compliant control technologies are presently available for tankers, that such technologies are in development for tankers, that there is a time period in which such technologies are commonly developed in the industry, or that invention of a yet-unproven technology for tankers will occur within the Regulation's deadlines. Thus, CARB's claim that the Regulation will be safe and feasible for tankers finds no actual evidentiary support in the record.

        **3.**     ***The "Interim Evaluation" and "Innovative Concepts" Provisions Do Not Provide Actual Alternatives to Infeasible Tanker Controls***

CARB has claimed that provisions requiring an "Interim Evaluation" of control technologies and allowing for approval of certain "Innovative Concepts" served to "provide[] several pathways toward compliance in the event that isolated projects are anticipated to extend longer that the 2025/2027 timeframes." AR 50893. Neither provision provides tankers an actual "alternative" to the infeasible emissions control mandates.

The Regulation requires CARB staff, by December 1, 2022, to produce for public review a report discussing "the progress made in adopting control technologies for use with tanker…vessels, as well as the status of landside infrastructure improvements that may be needed to support emissions reductions at…tanker terminals." 17 C.C.R. § 93130.14(d). After this "Interim Evaluation," "[i]f staff finds that the compliance deadlines for…tanker vessels need to be adjusted…the report will include recommendations to initiate staff's development of potential formal regulatory amendments." *Id.*

As WSPA commented (AR 62532-62533), California law required CARB to ensure

1    *before* the Regulation's adoption – not after – that for tankers the Regulation was

2    "technologically feasible" or "achievable through application of best available control

3    technology or a more effective control method." *See* HSC §§ 38560-38561, 38566,

4    39666(c), 43013(a). Even if the Interim Evaluation could somehow provide a *post hoc*

5    justification for an otherwise infeasible regulation, the Regulation imposes no mandate on

6    CARB to change the Regulation after the Interim Evaluation, providing tankers and

7    terminals no assurance of relief that they will be able to comply with the Regulation as the

8    regulatory compliance clock continues to tick.

9        CARB also claimed that the "Innovative Concepts" provision of the Regulation (17

10    C.C.R. § 93130.17) provided tanker vessels and terminals compliance "flexibility" by

11    allowing them to achieve emissions reductions in and around marine facilities equivalent to

12    the reductions that emissions controls would yield, "in lieu of meeting required emissions

13    reductions from a vessel." AR 50893. These provisions do not provide any "alternative" to

14    the Regulation's emission control requirements for tankers, but only a temporary delay of

15    the need to eventually install the mandated control technology. AR 62515.

16        The "Innovative Concepts" provisions rely entirely on CARB discretion and, like

17    the "Interim Evaluation" provisions, provide no relief from running deadlines to install at-

18    berth emission control systems. Parties seeking to utilize "Innovative Concepts" would

19    need to obtain and maintain CARB's approval for emissions reduction projects for a

20    maximum of two five-year terms. *See* 17 C.C.R. § 93130.17(a). Applicants must prove that

21    the project's emissions reductions will exceed the reductions that vessel emission controls

22    would yield, will occur in "adjacent" communities to the terminal or within three nautical

23    miles overwater, and will also be in excess of future "business-as-usual" emissions. *Id*. Any

24    "Innovative Concept" can be modified or revoked at CARB's sole discretion at any time if

25    CARB concludes that the emissions reductions in the project no longer meet any of these

26    criteria, or later become mandated by future regulation or local community emissions

27    reduction plans. *Id*. § 93130.17(f). If CARB revokes or declines to renew an "Innovative

28    Concept," or even determines that the "Innovative Concept" is "not ultimately implemented

1 in a manner enabling it to be used as a pathway for compliance with this Control Measure,"

2 applicants become subject to the Regulation's default emissions control deadlines – which

3 almost certainly would have already passed by that time. *See id.* § 93130.17(f), (g).

4 An "Innovative Concept" that can be revoked or denied in CARB's sole discretion

5 and that doesn't provide tankers any relief from the running deadlines for otherwise-

6 infeasible emissions controls is no compliance "alternative" at all, and fails to address the

7 central issue that these emissions control requirements are still not feasible for tankers.

8     **B.**     **CARB Projections of Tanker Emissions and Economic Activity Conflict With the Record and Significantly Overstate Tanker Emissions**

9 Before adopting the Regulation, CARB was required to assess and make public all

10 information "related to, but not limited to, air emissions, public health impacts, and

11 economic impacts" resulting from the Regulation. HSC § 39601.5(a). State laws generally

12 require CARB to use accurate emissions estimates based on the "best information

13 available." *Id.* § 39607.3(b). "Inaccurate [emissions] inventories that do not reflect the

14 actual emissions into the air can lead to misdirected air quality control measures, resulting

15 in delayed attainment of standards and unnecessary and significant costs." *Id.* § 39607.3(d).

16 For this Regulation, accurate projections of future economic activity also were

17 critical in CARB's emissions analysis, in that CARB based its projections of future

18 emissions from marine vessels and terminals on predictions of economic activity and

19 industry growth it made many years earlier. AR 20478-20490. In its economic assessment

20 for the Regulation, CARB was required to consider "the potential for adverse economic

21 impact on California business enterprises and individuals," and weigh the Regulation's

22 effects on "the ability of California businesses to compete with businesses in other states."

23 GC § 11346.3; *see also id.* § 11346.5. Because the Regulation was also a "major

24 regulation,"[11] CARB's economic analysis also was required to include a standardized

25

26 ────────────

27 [11] A "major regulation" is defined as one "that will have an economic impact on California business enterprises and individuals in an amount exceeding fifty million dollars ($50,000,000)." 1 C.C.R. 2000(g).

28

regulatory impact analysis ("SRIA") addressing how the Regulation would impact the creation of jobs and new businesses in the state, business competitiveness, investment in the state, incentives for innovation and any potential benefits to the health, safety and welfare of California residents. *Id*. §§ 11342.548, 11346.3(c)(1), 11346.36(b). Based on all of this information, CARB was required to include in the ISOR "[f]acts, evidence, documents, testimony, or other evidence on which the agency relies to support an initial determination that the action will not have a significant adverse economic impact on businesses" (*id*. § 11346.2(b)(5)(A)), and "make a declaration [of no significant impact] in the notice of proposed action" (*id*. § 11346.5(a)(8)). A regulation may be declared invalid if that declaration "is in conflict with substantial evidence in the record." GC § 11350(b)(2).

Here, CARB's projections of future tanker economic activity and emissions in California were based on outdated data, conflicted with more recent evidence of tanker activity and emissions, and were unreasonably optimistic, thereby yielding overblown projections of future tanker visits and accompanying projected tanker emissions (and thus, an exaggerated prediction of public health benefits from controlling tanker emissions). CARB's ISOR contained an economic assessment relying on California Department of Finance ("DOF") economic forecasts from Spring 2019. AR 29721, 29907. At that time, DOF projected sustained economic growth through 2022, including increases of 1% per year in employment, 4% per year in personal income and 2% per year in U.S. real gross domestic product. AR 62616. CARB also assumed an annual growth factor of 14% for tanker vessels, relying largely on the Federal Highway Administration's Freight Analysis Framework ("FAF") released in March 2017. *Id*.

1. ***CARB Claimed COVID-19 Had Zero Impact on its Projections of Industry Growth, Vessel Activity and Emissions***

Within five months of the ISOR's release, COVID-19 had developed into an unprecedented global pandemic. WSPA commented that CARB's existing economic analysis failed to account at all for the global and statewide impacts of the pandemic on tanker shipping and vessel visits. AR 62516-18. In those comments, WSPA included an

1  independent analysis by Capital Matrix Consulting ("CMC Report") finding that "every key

2  economic assumption in the CARB estimate of the proposed regulation has been

3  dramatically affected by the COVID-19 pandemic." AR 62616. The CMC Report noted that

4  the pandemic had caused sharp downturns in global oil markets and a surge in California

5  unemployment claims to 3.4 million. *Id*. According to the CMC Report:

6      Fuel prices, economic output, jobs, international trade and waterborne port activity
    will all be sharply lower than anticipated in any economic forecast made prior to

7      March of [2020]. Given the emerging expectation that recovery from the historic
    COVID-19-related downturn will be slow…we expect the economic measures will

8      remain below the levels assumed in the CARB projections for several years to
    come. This will, in turn, have impacts on CARB's estimates of (1) baseline

9      emissions, (2) emissions reduction and health-related savings resulting from the
    proposal, (3) costs and savings to the ports, terminals, and vessel operators, and

10     (4) broader economic impacts of the proposed regulation. (AR 62616.)

11     As the CMC Report noted, even DOF itself informed the state Legislature that it

12 now believed the state economy was suffering immediate effects from which it could take

13 years to recover. AR 62617. The CMC Report also noted that reduced industry activity

14 would make it much more difficult for regulated ports and marine terminals to recover the

15 costs of compliance with the Regulation from vessel operators, increasing the share of costs

16 that would be borne by Californians in the form of increased prices. AR 62618-62619.

17     CARB refused to revisit or amend the SRIA in light of the COVID-19 crisis, and

18 decided the crisis merited no changes at all to the predictions it made in October 2019 of

19 future economic and vessel activity, likely future emissions, or anticipated health outcomes.

20 AR 50897. According to CARB, "[b]ecause the current circumstances are unique from past

21 recession events, CARB staff expect there may be a reduction in emissions to continue over

22 the next few years from reduced vessel visit activity but outcomes are unknown. Therefore

23 we did not make changes to our inputs or methodologies at this time." AR 48550.

24 Meanwhile, the record was now replete with evidence that CARB's assumptions about the

25 economy, the tanker industry, future vessel visits and accompanying future vessel

26 emissions had been upended by the pandemic.

27     California law does not allow CARB to simply assign "zero impact" to an

28 unprecedented worldwide pandemic and the most significant economic collapse in decades

1 because "outcomes are unknown." AR 66906. CARB was not entitled to disregard this
2 evidence and approve a Regulation in direct conflict with that undisputed record evidence,
3 and that alone is reason to declare the Regulation invalid. *See* GC § 11350(b)(2).

### 2. *CARB Withheld from the Public Its Own Study Showing That Actual Tanker Emissions Were Far Less Than CARB Claimed*

CARB further violated its statutory duties by failing to disclose, prior to adopting the Regulation, the results of a CARB-sponsored study finding that modern tanker fleet emissions were orders of magnitude less than CARB's overblown projections. In 2019, CARB commissioned engineers at the University of California, Riverside, Bourns College of Engineering Center for Environmental Research and Technology ("CE-CERT") to conduct a study ("CE-CERT Report") to evaluate real-world emissions from a modern tanker ship auxiliary boiler in the process of offloading fuel at berth. AR 66786 -66845. CE-CERT conducted testing of the tanker boiler in October 2019, documenting that real-world tanker boiler PM2.5 and NOx emissions were significantly lower than CARB staff's assumptions in the ISOR. Based on empirical observation, CE-CERT observed tanker boiler PM2.5 emissions of 0.022 g/kg-fuel, which converts to a PM2.5 emission factor of 0.0066 g/kWh. The table below summarizes the differences in the emissions factors measured by CE-CERT and those used by CARB. AR 66716.

| Source | NOx (g/kWh) | PM2.5 (g/kWh) |
|---|---|---|
| CE-CERT | 0.858 | 0.0066 |
| CARB | 1.995 | 0.151 |
| Staff Emissions Overstated By | 233% | 2,288% |

The "draft final" version of the CE-CERT Report was dated March 2020 – roughly five months before CARB's final approval of the Regulation and eight months before release of the FSOR. AR 66715. Still, CARB never publicly disclosed the results of the Report as part of the Regulation rulemaking – information clearly relevant for the public to assess whether CARB's tanker emissions claims were accurate. AR 66715-66716. This alone was a violation of CARB's statutory duties to publicly disclose information in its

1   possession relevant to the rulemaking. *See* GC § 11347.3(a), (b), (d); see also *POET, LLC*

2   *v. State Air Res. Bd.* (2013) 218 Cal.App.4th 681 (remanding CARB regulation due to

3   failure to include in the rulemaking record four emails relevant to emissions assumptions).

4          The Report substantiated WSPA's numerous comments that staff's assumed tanker

5   emissions factors were based on outdated data from a 2002 report on vessels that were over

6   20 years old at *that* time, and using now-prohibited heavy fuel oil and not the cleaner

7   burning, low sulfur distillate fuels CARB has mandated since 2008. AR 66715. In contrast,

8   the CE-CERT Report was based on empirical data taken from a modern tanker calling on

9   California terminals and ports, providing a more representative and up-to-date picture of the

10  modern tanker fleet likely calling on California terminals and ports now and into the

11  future.[12] AR 66715.

12         In short, the CE-CERT Report – a study CARB *itself* commissioned – reflected

13  emissions performance on a tanker more closely resembling today's tanker fleet, using

14  today's mandated fuels. The emission factors used by CARB were based on now-defunct

15  tankers from more than 20 years ago, using a fuel that is prohibited today. The public was

16  legally entitled to have the CE-CERT Report prior to CARB's adoption of the Regulation.

17  CARB's failure to disclose it violated the APA and requires the Regulation to be remanded

18  for CARB to provide proper public notice and comment.

19         **C.      CARB's Approvals Violated CEQA and Must be Overturned**

20         The Court reviews CARB's CEQA compliance under the independent judgment

21  standard, "scrupulously enforcing" all legislative mandates. *Sierra Club,* 6 Cal.5th at 512-

22  514. CARB failed to comply with several mandates, including analysis of the Regulation's

23  serious safety risks and other foreseeable adverse significant impacts, cumulative impacts

24

25  _____

26  [12] CARB claimed that the CE-CERT results are "unlikely [to]…be broadly applicable to the
    wider tanker fleets, which are largely comprised of older boiler technologies." AR 51529.

27  On the contrary, the weight of evidence highly suggests that the results from the CE-
    CERT testing is a far closer representation of actual emissions from tanker boilers today

28  than the much older emission factors CARB staff used. AR 66983-66985.

1   from related projects, and alternatives. CARB also failed to recirculate the EA[13] after

2   significant new information was added and/or should have been added. These actions

3   violated CARB's nondiscretionary legal duties under CEQA, thus rendering certification of

4   the Final EA invalid. PRC § 21100; 14 C.C.R. §§ 15004(b)(2), 15088.5.

5           **1.    *The Final EA Improperly Deferred Analysis of the Regulation's
                     Safety, Feasibility, and Environmental Impacts***

6           By law, the EA must contain a "discussion and consideration of environmental

7   impacts, adverse or beneficial, and feasible mitigation measures." 17 C.C.R. § 60004.2(a);

8   *see also* 14 C.C.R. § 15126 (EA must analyze "[a]ll phases of a project"). The Final EA

9   sidesteps detailed discussion of environmental impacts, including tanker safety and

10  feasibility by addressing the Regulation as a general "broad regulatory program." AR

11  16880, 17529-17532. However, designating the EA as a "program EA" does not decrease

12  the level of analysis otherwise required. Kostka & Zischke, *Practice Under the California*

13  *Environmental Quality Act* (2d ed. Cal. CEB 2021), § 10.14 B. CEQA "does not excuse the

14  lead agency from adequately analyzing reasonably foreseeable significant environmental

15  effects of the project and does not justify deferring such analysis to a later tier EIR or

16  negative declaration." 14 C.C.R. § 15152(b).[14] CEQA is not satisfied by an EA that

17  "ignores or assumes a solution" to a problem or states that information "will be provided in

18  the future." *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho*

19  *Cordova* (2007) 40 Cal. 4th 412, 429, 431. Broad-scale and long-term safety and hazard

20  risks are not the type of information that can be deferred for future analysis. *See id*.

21

22  _____

23  [13] An "environmental impact analysis" ("EA") functions as a substitute for a traditional
    CEQA environmental impact report under CARB's certified regulatory program, but still

24  must comply with the substantive requirements of CEQA (17 C.C.R. § 60004(b)) and the
    same standard of review applies (*see Ebbetts Pass Forest Watch v Dept. of Forestry &*

25  *Fire Protection* (2008) 43 Cal.4th 936, 944).

26  [14] CARB deferred CEQA analysis to local agencies, stating that it "does not anticipate
    tiering from the EA." AR 17563. Nor was CEQA satisfied by CARB's approach to find

27  certain biological resources impacts significant "post-mitigation" (assuming future
    analysis and mitigation by other agencies) without *analyzing* those impacts. *See* AR

28  17532, AR 17547-17549; *Sierra Club* at 514.

1  (applying principles to future water sources).[15]

2      Here, the Final EA bypasses any serious discussion of the foreseeable feasibility and

3  safety risks of requiring operators of tankers – perhaps the most strictly regulated category

4  of marine vessels in the world – to invent and apply, by the Regulation's deadlines, a boiler

5  gas capture technology not proven safe or feasible on any tanker worldwide. Indeed, the EA

6  concedes that "[a]ccidents, (e.g., spills, fire, and explosions) could occur during [tankers']

7  transportation of these hazardous materials that involve terminal equipment or vessels at

8  berth." AR 16980. But then the EA simply *assumes* that all will be well, leaving for the

9  future the fundamental question of whether foreseeable safety and feasibility concerns are

10 so significant that the Regulation cannot be safely implemented for tankers by the

11 Regulation's deadlines. *See* AR 16981 ("it is anticipated that safety studies need to be

12 performed for tanker terminals prior to implementation of specific compliance responses to

13 ensure all safety considerations are met, given that the tanker vessels may carry flammable

14 or explosive cargos.").[16] CARB's programmatic EA improperly *assumed* the Regulation

15 will be implemented safely and failed to explain "the reasonably foreseeable methods by

16 which compliance with [a] rule or regulation will be achieved" and the resulting impacts,

17 mitigation measures and alternative means of compliance.  14 C.C.R. § 15187(a), (c).

18  _____

19  [15] CARB received 42 comment letters raising "significant environmental issues." AR
20  17527, *see* AR 17540 (ten categories of safety risks CARB did not evaluate or mitigate).

    [16] CARB conceded that "there currently are no capture and control projects for tankers," but
21  was purportedly "assured" by "technology manufacturers" marketing their products that
    "there are engineering solutions for tankers." AR 17541 (citing two letters for systems
22  used in container ships). CARB dismissed analysis of safety hazards because "it is not
23  CARB's responsibility to determine engineering solutions for inert gas systems, boiler
    pressure, and emergency disconnections." *Id.* However, CARB agreed with "several
24  commenters" that "additional safety measures" are needed and simply assumed that
    "safety practices" could operate at "an increased level" because industry had responded to
25  other regulatory mandates. *Id.*, AR 17545, 17567. This is unacceptable under CEQA.
    CARB improperly deferred any analysis to future project-specific "safety studies" prior to
26  implementation of a compliance response "to ensure all safety considerations are met."
27  AR 17542. CARB's conclusion that technology will be developed because safety studies
    and measures will be required (AR 17545) is a *non sequitur*. There is no technology
28  available that can ensure that "all safety considerations are met."

PETITIONER'S OPENING BRIEF

| | |
|---|---|
| 1 | **2.** ***CARB Failed to Conduct a Sufficient Cumulative Impacts Analysis*** |
| 2 | An EA must analyze cumulative impacts (17 C.C.R. § 60004.2(a)(4)) – impacts |
| 3 | "created as a result of the combination of the project evaluated…together with other |
| 4 | projects causing related impacts" (14 C.C.R. § 15130(a)(1)). An EA can use a summary of |
| 5 | "projections" in an adopted plan that "describes or evaluates conditions contributing to the |
| 6 | cumulative effect." *Id*. § 15130(b)(1). However, the analysis should include all sources of |
| 7 | related impacts, not simply similar projects (Kostka, *supra*, § 13.44.1), and must consider |
| 8 | projects outside the control of the agency (14 C.C.R. § 15130). A comprehensive analysis |
| 9 | of cumulative impacts is particularly important in a program EA. Kostka, *supra*, §10.19 3. |
| 10 | Here, the Final EA failed to properly analyze cumulative impacts of the Regulation |
| 11 | by relying on the summary of impacts done for CARB's 2016 State Implementation Plan |
| 12 | ("SIP") Strategy for reduction of air emissions (AR 17023-17027) because the Regulation's |
| 13 | "primary objective is to reduce emissions" (AR17575, 17608, rejecting analysis of |
| 14 | shoreline projects). However, that is not the correct standard. Not only was the information |
| 15 | outdated, but the SIP contained no analysis of impacts from other marine terminal |
| 16 | construction projects. Indeed, CARB itself noted that marine projects were the proper focus |
| 17 | of the cumulative impact analysis. *See* AR 48261 ("staff do not anticipate [acceleration of |
| 18 | tanker compliance deadlines] to have a large potential to cause cumulative impacts from |
| 19 | other marine-related construction associated with this regulation, as no other compliance |
| 20 | dates for ocean-going vessels or their related terminals are scheduled to go into effect |
| 21 | during the new implementation years."). Contrary to CARB's suggestion that upcoming |
| 22 | marine-related construction would not be significant, WSPA provided a list of such projects |
| 23 | in its August 27, 2020 comments to CARB. AR 66979-66982. CARB was required to |
| 24 | consider these and other coastal construction and marine infrastructure projects producing |
| 25 | related impacts, including to biological resources, in its cumulative impacts analysis. *See* |
| 26 | *Citizens to Preserve the Ojai v County of Ventura* (1985) 176 Cal.App.3d 421, 429 |
| 27 | (analysis must identify all projects causing related impacts in the affected area). |
| 28 | |

PETITIONER'S OPENING BRIEF

1

**3.** ***CARB Failed to Recirculate the EA After Adding Significant New Information***

2

CARB failed to recirculate the EA as required by 14 C.C.R. § 15088.5 after adding

3

significant new information, which deprived the public of a meaningful opportunity to

4

comment upon substantial adverse environmental effects, mitigation, and alternatives. First,

5

the Final EA added five pages concerning increased risks of tanker explosion and safety

6

risks, and safety measures required in the tanker industry, but *deleted* the Draft EA's

7

conclusion that the Regulation would not pose a significant risk. AR 16980-16984. CARB

8

concluded that such risks were potentially significant and unavoidable (AR 16985), but

9

failed to assess the risk (AR 51530, requiring ***stakeholders*** to conduct the analysis).

10

Second, the Final EA added the following single sentence: "[p]ile driving can cause

11

impacts on aquatic species, including acoustic impacts and individual mortality" (AR

12

16941) and declared such impacts to be "potentially significant and unavoidable" (AR

13

16944). However, no assessment of those impacts was prepared, and CARB failed to

14

recirculate the EA after disclosing this significant impact. *See, e.g., Vineyard Area Citizens,*

15

*supra,* 40 Cal.4th 412, 449 (recirculation required where agency added content on potential

16

impacts of groundwater extraction on salmon migration).[17]

17

CARB claimed incorrectly that "[n]one of the modifications to the proposed Draft

18

EA alter any of the conclusions reached in the EA or provide new information of

19

substantial importance relative to the EA." AR 16876. To compound these errors, CARB

20

released the Final EA for public review only two days before CARB's Board was slated to

21

consider final adoption of the proposed regulation, depriving the public of a meaningful

22

opportunity to comment on the significant new material. AR 16867.

23

**4.** ***The EA's Analysis of Alternatives Was Inadequate***

24

An EA must discuss alternatives which "could feasibly attain most of the project

25

26

———————————————

27

[17] The EA acknowledged potential impacts to biological resources (AR 461 [potential need for "wetlands permitting"], AR 465), but undertook no effort to analyze all project-related impacts, including impacts to marine species. AR 16900, 16905.

28

1 objectives but could avoid or substantially lessen any of the identified significant impacts."

2 17 C.C.R. § 60004.2(a)(5); 14 C.C.R. § 15126.6(d). Here, a key project objective was to

3 "[e]nsure all emission control technologies do not present any safety issues that cannot be

4 addressed with a safety exemption provision." AR 16886. To respond to safety and

5 feasibility issues, an industry coalition proposed feasibility and cost effectiveness studies as

6 an alternative to the Regulation. *See* AR 17067-17069. The Final EA rejected this

7 alternative, claiming that allowing additional time for such studies would be inconsistent

8 with CARB's timing objective. *Id*. This was not a valid basis to reject an alternative. 14

9 C.C.R. § 15364; AR 17046 (projects "for which significant adverse environmental impacts

10 have been identified…shall not be approved or adopted as proposed if there are feasible

11 mitigation measures or feasible alternatives available which would substantially reduce

12 such an adverse impact.")

13 **V.    CONCLUSION**

14      WSPA respectfully requests that the Court grant judgment in its favor and grant all

15 relief sought in the Petition and Complaint.

16 Dated:  April 15, 2022          PILLSBURY WINTHROP SHAW PITTMAN LLP
                               MICHAEL S. MCDONOUGH
17                                 725 South Figueroa Street, Suite 3500
                               Los Angeles, CA 90017-5406
18

19                                 */s/ Michael S. McDonough*
                               Michael S. McDonough
20                                 *Attorneys for Petitioner and Plaintiff,*
                               *Western States Petroleum Association*
21

22

23

24

25

26

27

28

1                                 PROOF OF SERVICE

2         I am employed in the City and County of San Francisco, State of California, in the office of a

3 member of the bar of this Court, at whose direction the service was made. I am over the age of

4 eighteen years, and not a party to the within action. My business address is Pillsbury Winthrop Shaw

5 Pittman LLP, 4 Embarcadero Center, 22nd Floor, San Francisco, CA 94111.

6         On April 15, 2022, I served the attached document(s) titled:

7 **PETITIONER WESTERN STATES PETROLEUM ASSOCIATION'S OPENING BRIEF**

8         on the parties in this action as follows:

| | |
|---|---|
| Gary Tavetian<br>California Office of the Attorney General<br>300 South Spring Street, Suite 1702<br>Los Angeles, California 90013<br>Email: Gary.Tavetian@doj.ca.gov<br><br>Jessica Barclay-Strobel<br>California Office of the Attorney General<br>300 South Spring Street, Suite 1702<br>Los Angeles, California 90013<br>Email: Jessica.BarclayStrobel@doj.ca.gov | *Attorneys for CALIFORNIA AIR RESOURCES BOARD and RICHARD COREY* |

16     **(BY EMAIL TRANSMISSION)** The above-referenced document was transmitted via electronic transmission to the persons at the electronic-email addresses indicated above.

19         I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th

20 day of April, 2022, at San Francisco, California.

*Tina Bishop*
_____
Tina Bishop

PROOF OF SERVICE

# EXHIBIT B



Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 3600  |  Los Angeles, CA 90017-5524  |  tel 213.488.7100  |  fax 213.629.1033

Michael S. McDonough
tel: 213.488.7555
michael.mcdonough@pillsburylaw.com

February 28, 2025

<u>Via Email</u>

The Honorable Lee Zeldin, Administrator
United States Environmental Protection Agency
Willliam Jefferson Clinton Building
1200 Pennsylvania Avenue, NW
Washington, DC  20460
Email:  Zeldin.lee@epa.gov [cc: California-Waivers-and-Authorizations@epa.gov]

     **Re:** **WSPA Petition for Reconsideration Regarding California State Nonroad Engine Pollution Control Standards; Ocean-Going Vessels At-Berth [Docket No. EPA-HQ-OAR-2023-0152]**

Pursuant to section 307(d) of the Clean Air Act, 42 U.S.C.§ 7607(d), the Western States Petroleum Association ("WSPA") respectfully submits the attached Petition for Reconsideration of EPA's final action on October 20, 2023, to grant California's request for EPA authorization of amendments to its Ocean-Going Vessels At-Berth regulation ("Regulations") (88 Fed. Reg. 72461 (Oct. 20, 2023)).  WSPA further requests that EPA promptly issue a stay under 42 U.S.C. § 7607(d)(7)(B) to suspend the portions of the Regulations applicable to tankers while EPA undertakes reconsideration of the authorization.

If you have any questions, please feel free to contact me.  Thank you for your consideration.

Very truly yours,

Michael S. McDonough
Pillsbury Winthrop Shaw Pittman LLP
Attorneys for Western States Petroleum Association

BEFORE THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

| | |
|---|---|
| In re: California's Request for Authorization Action Pursuant to Clean Air Act Section 209(e) for California's Control Measure for Ocean-Going Vessels At Berth | Docket No. EPA-HQ-OAR-2023-0152 |

## **PETITION FOR RECONSIDERATION AND STAY**

Based on new information of central relevance not available during the public comment period, Western States Petroleum Association ("WSPA") hereby petitions the United States Environmental Protection Agency ("EPA"), under section 307(d) of the Clean Air Act, 42 U.S.C. §7607(d), to convene a proceeding for the reconsideration of the authorization granted to the California Air Resources Board ("CARB") under section 209(e)(2) of the Clean Air Act ("CAA") to enforce regulations ("2020 Regulations" or "Regulations") that require certain emission control measures for oil tankers and certain other vessels calling at the Ports of Los Angeles and Long Beach beginning January 1, 2025.[1] WSPA further requests that EPA promptly issue a stay under 42 U.S.C. § 7607(d)(7)(B) to suspend the portions of the Regulations applicable to tankers while EPA undertakes reconsideration of the authorization.

The applicable deadline in the Regulations for petroleum tankers calling on the Ports of Long Beach and Los Angeles ("Ports tankers") has now passed, and it is now clear that compliance with the Regulations for tanker vessels by that regulatory deadline was not technologically feasible by that date. The Regulations require Ports tankers to achieve one of two impossible results while docked at berth: either employ shore power (which the current tanker fleet that calls on California ports is not designed to use) or use capture-and-control technology (which has not been

---

[1] *See* 88 Fed. Reg. 72461 (Oct. 20, 2023).

1

demonstrated for tanker applications or approved by CARB and is not commercially available for all tanker applications).  Indeed, to date no emissions control system for tankers has even been certified by CARB for commercial use to service the Ports tankers fleet.[2]  As of January 1, 2025, this lack of a commercially available CARB-certified tanker emission control system, together with inability of the Ports tanker fleet to use shore power at berth as of that date, has made it legally impossible for Ports tankers to comply with the Regulations. EPA should not permit CARB to enforce regulations that cannot be complied with.

WSPA is a California not-for-profit corporation and a long-standing trade association comprising energy companies that own and operate properties, facilities, and ocean-going vessels, in the petroleum industry, including in the State of California.  WSPA's principal offices are located at 1415 L Street, Suite 600, Sacramento, California., 95814.  WSPA's members include California operators of properties, facilities and vessels impacted by the Regulations.

### EXECUTIVE SUMMARY

On September 27, 2022, CARB requested that EPA authorize it to enforce amendments to California's Airborne Toxic Control Measure for Auxiliary Diesel Engines Operated on Ocean-Going Vessels At-Berth in a California Port.[3]  The amended 2020 Regulations require tankers at berth to use either shore-based electricity to power ship systems or another CARB Approved Emissions Control Strategy ("CAECS")—such as capture-and-control technology (also known as stack-capture technology)—to reduce emissions by approximately 80 percent of default emissions rates by January 1, 2025, for tankers visiting the Ports, and by January 1, 2027, for tankers visiting all other regulated terminals.[4]

---

[3] *See* EPA-HQ-OAR-2023-0152-0031, https://tinyurl.com/yt6te7ep.
[3] *See* EPA-HQ-OAR-2023-0152-0031, https://tinyurl.com/yt6te7ep.
[4] Cal. Code Regs. tit. 17, §§ 93130.3(a), 93130.5, 93130.7(b).

4917-8581-7634.v1

On October 20, 2023, EPA granted CARB's request for authorization based in part on EPA's finding that—although capture-and-control systems for tankers did not yet exist—they would be available by January 1, 2025.[5]  EPA made this finding based on CARB's representations that existing capture-and-control systems designed for other marine vessels would be modified for tankers, tested, certified, manufactured and available for use by the entire Ports tanker fleet, all before January 1, 2025.[6]

Today, it is clear that CARB's representations—and EPA's findings based on those representations—were not correct.  To date, no capture-and-control system has been certified by CARB for use on tankers – let alone made commercially available for the entire Ports tanker fleet.

Even if feasibility and safety testing were conducted today for a tanker control system, the January 1, 2025, compliance deadline has already come and gone, and any such testing would be only one step of an inherently multi-step and protracted process towards establishing technical feasibility.  Additional necessary steps include (1) completion of testing of the capture-and-control systems on tankers demonstrating that the system meets the regulatory requirements for the entire Ports tankers fleet; (2) CARB's review of test results and issuance of an Executive Order to certify the stack-capture system;[7] (3) the manufacture by vendors of a sufficient number of certified systems (which CARB estimates to be at least 30)[8] to allow compliance by all tanker and terminal operators; and (4) the training of appropriate personnel on how to operate and maneuver the equipment, safety procedures and emergency protocols, and issues unique to tanker and barge interface.  CARB represented in its authorization request to EPA that these steps would be

---

[5] *See* 88 Fed. Reg. at 72474.
[6] *Id.* at 72470–71.
[7] *See* Cal. Code Regs. Tit. 17, § 93130.5.
[8] *See* CARB Final Statement of Reasons (FSOR), p. 249
(https://ww3.arb.ca.gov/regact/2019/ogvatberth2019/fsor.pdf)

4917-8581-7634.v1

completed and systems would be commercially available before January 1, 2025. But as of January 1, 2025, it is now clear that this did not occur. To WSPA's knowledge, neither CARB nor the equipment vendors have even provided a timetable for these necessary events to occur for the tanker fleet. The lack of any approved tanker control technology solution, even now after CARB's compliance deadline for the Ports tankers has already passed, shows that it is unclear when implementation of barge-based capture and control for the Ports tankers will be feasible. This information became available only after EPA's original consideration of the authorization and it now justifies EPA's reconsideration and withdrawal of the authorization, which was based in substantial part on CARB's previous representation that such systems would be commercially available by January 1, 2025.

The other regulatory option for the Ports tanker fleet, using shore power at berth, is also not a feasible compliance pathway for all tankers and tanker terminals for multiple reasons. First, the majority of the terminal plans submitted for the Ports in Los Angeles and Long Beach confirm that stack capture is the mode of compliance that those terminals are pursuing. Second, even if tankers and facilities now decide to change to shore power to comply with the Regulations, the shore-power facilities and infrastructure necessary for the Ports tanker fleet to use shore power do not currently exist as of January 1, 2025, and could not be designed, permitted, and constructed for years to come. Finally, because there is no international mandate that requires all tankers to have shore-power connections to power the entire machinery onboard, there is no standardized and industry-approved design for shore-power connection on tankers.

EPA should therefore convene a proceeding to reconsider the authorization and stay the effect of the 2020 Regulations for tankers while it conducts that review.

4917-8581-7634.v1

# I.   BACKGROUND

## A.   CARB Amended the 2008 Regulations to Apply to Tankers at Berth.

Since 2008, California has regulated certain at berth marine-vessel emissions under the Airborne Toxic Control Measure ("ATCM") for Auxiliary Diesel Engines Operated on Ocean-Going Vessels At-Berth in a California Port (the "2008 Regulations").[9]   The 2008 Regulations required certain fleets of container, refrigerated cargo, and cruise vessels to reduce emissions of nitrogen oxides and diesel particulate matter at berth by either plugging into shore power or using another equally effective compliance strategy—for example, capture-and-control systems.[10]

On October 15, 2019, CARB proposed amendments to the 2008 Regulations that, among other things, brought petroleum tankers under the At-Berth Regulations for the first time.   In relevant part, the 2020 Regulations required tankers to use CARB-approved emissions reduction strategies – either shore power or CARB-approved emissions control systems – while at berth at California Ports and terminals.[11]   On August 27, 2020, CARB adopted the 2020 Regulations finalizing January 1, 2025, and January 1, 2027, as the compliance deadlines for Ports tankers and all other tankers, respectively.[12]

## B.   EPA Granted CARB's Authorization Request Relying on CARB's Representation That Tanker Control Systems Would be Commercially Available by January 1, 2025.

On September 27, 2022, CARB requested that EPA authorize it to enforce the 2020 Regulations.[13]   On March 17, 2023, EPA issued a notice for comment, and the written comment

---

[9] Cal. Code Regs. tit. 17, § 93118.3.
[10] Id.
[11] See CARB Initial Statement of Reasons ("ISOR"), p. ES-22 to ES-23 (https://ww3.arb.ca.gov/regact/2019/ogvatberth2019/isor.pdf).
[12] FSOR, p. 13.
[13] See EPA-HQ-OAR-2023-0152-0031, https://tinyurl.com/3zevmta7

4917-8581-7634.v1

period ran through May 1, 2023.[14]  No public hearing was held.[15]

On October 20, 2023, EPA issued a notice of decision and granted CARB's request for authorization.[16]  Specifically, EPA found that the Regulations met the three authorization criteria: (1) CARB's determination that the standards, in the aggregate, were at least as protective of public health and welfare as federal standards was not arbitrary and capricious; (2) California needed the standards to meet compelling and extraordinary conditions; and (3) California's standards and enforcement procedures are consistent with CAA section 209.[17]

EPA's decision necessarily relied on CARB's representations that compliance with the Regulations would be technologically feasible by the applicable deadline for the Ports tankers, *i.e.*, January 1, 2025.  CARB represented to EPA that technological feasibility presented no problems "based on the existing technologies in place" and "the work already underway to expand emissions control technologies to new vessel types."[18]

Specifically, CARB claimed that both shore power and capture-and-control technologies would be technologically feasible by the compliance deadlines to control emissions for newly regulated vessels, including tankers.[19]  As for capture-and-control technologies, EPA found that "CARB identified capture and control technologies that would not require retrofits to vessels or terminals (if using a barge-based system) as well as land-based capture and control systems that may require some modifications to the terminals, and stated the possible need for modification was factored into compliance timelines."[20]

CARB also stated that it spoke with emissions-control-system vendors who "expressed

---

[14] *See* 88 Fed. Reg. at 72465.
[15] *Id.*
[16] *See* 88 Fed. Reg. at 72462.
[17] *Id.* at 72463.
[18] *See id.* at 72469 (citing CARB At-Berth Authorization Req. at 30).
[19] *Id.*
[20] *Id.*

4917-8581-7634.v1

confidence in their ability to adapt existing capture and control technologies for safe use on tanker vessels."[21]  For example, CARB submitted a letter from Advanced Environmental Group, LLC, dated October 14, 2019, claiming that capture-and-control systems for oil tankers—although not in existence in 2019—would be available before the compliance deadlines.  In another communication, Advance Environmental Group shared a PowerPoint presentation "regarding our solution . . . to service Oil Tankers while at berth or at anchorages" and expressed no reservations that existing technology could be retrofitted for tankers.  These assurances from the emission control system vendors were made with very little knowledge by the vendors of the oil and gas industry and its safety standards.

Another entity—EnviroCare International—also recognized that barge- and land-based capture-and-control systems capable of treating emissions from tankers were not currently available, but assured CARB that "[t]here is no technical hurdle for us to *further develop* scrubber technologies to reduce exhaust gas emissions."  And when asked by CARB whether its capture-and-control technology could interface with tanker vessel exhaust stacks, a third manufacturer—Clean Air Engineering–Maritime—stated "[t]he systems required for tanker and cruise vessels will require an increase in size for which the designs are being developed."  But Clean Air Engineering–Maritime expressed no concern that existing systems could be modified for tankers by the compliance deadlines.  Again, this lack of concern was in light of their lack of knowledge at the time of oil and gas industry safety standards.

CARB also assured EPA that "the first demonstration project to develop a capture and control system for tankers [is] underway that is expected to reach completion by the end of 2023, well ahead of the first tanker vessel compliance dates (January 2025)."[22]  No such demonstration

---

[21] *Id.*
[22] 88 Fed. Reg. at 72470 (citing CARB At-Berth Authorization Req. at 32-33).

4917-8581-7634.v1

occurred in 2023.

CARB further claimed that "there should be no question that sufficient pathways exist for regulated ro-ro and tanker vessels to comply with the Regulation's requirements by the required implementation dates given that the technology to comply . . . exists [and] given that the Regulation provides several years of lead time for equipment adaption, permitting, and adaptation.'"[23] Thus, although CARB applied for authorization at a time when capture-and-control systems had never been proven for use on tankers, CARB confidently asserted to EPA that the technology would be available for use on tankers at berth before January 1, 2025.

WSPA and several other entities and individuals submitted comments objecting to CARB's authorization request on the grounds that compliance was not technologically feasible by CARB's mandated deadlines. Some examples of such comments include the following:

- Regarding shore power, one commenter noted that "there are no international design and safety standards for shore power, including issues pertaining to the ability of tankers to use shore power."[24] In a response to EPA, CARB agreed in part—acknowledging that "there is only one example of shore power for a tanker vessel and that not every tanker and tanker at berth in California would be able to use shore power in the same way."[25] Regarding capture-and-control technology, commenters noted that "there are currently no feasible alternatives to shore power and no practical pathways without shore power and that innovative concepts are not developed at this time."[26] CARB responded that "[c]apture and control systems have already been used on many other [ocean going vehicle] categories, and in

[23] *Id.*
[24] *Id.* at 72472.
[25] *Id.*
[26] *Id.*

4917-8581-7634.v1

other industries. Many of the hurdles identified by the tanker industry are already known and understood by developers who **believe** they can be addressed."[27]

- In response to the comment that no existing capture-and-control system had ever be implemented in a tanker application, CARB replied that, "[a]lthough it is true there has not yet been a capture and control system tested and approved for tanker vessels, due to the lack of any emissions control requirements until the approval of this Regulation, technology providers have informed CARB that alternate control technology, as proven on other vessel categories, can be adapted to tanker vessels."[28]

In sum, CARB's assertion was that, although capture-and-control technology did not yet exist for tankers, existing capture-and-control technology would be retrofitted to meet tanker needs by January 1, 2025. EPA relied on this assertion in granting its 2023 authorization for the Regulations.

The Remediation Fund was also discussed by CARB and commenters as an alternative compliance method, although EPA's authorization did not rely on the Remediation Fund as an alternative mode of compliance, concluding that, "regardless of the remediation fund," the 2020 Regulations could be complied with by January 1, 2025.[29] Commenters stated that the Remediation Fund "does not obviate the need for timelines adequate to permit the development of requisite technology" and that "if the Remediation Fund were sufficient to demonstrate technological feasibility for purposes of an EPA authorization, the logical extension would be that the Clean Air Act authorizes the creation of a carbon tax as an emission standard."[30] EPA stated

---

[27] *Id.* at 72473 (emphasis added).
[28] *Id.*
[29] *Id*. at 72472
[30] *Id.*

4917-8581-7634.v1

that it understood "the concerns expressed by the commenter that technological feasibility should be assessed against technologies that will be ***available within the lead time provided*** as opposed to demonstrating compliance (and feasibility) through the use of a remediation fund."[31]

EPA ultimately found that "opponents of the authorization request have not carried their burden of demonstrating that there is insufficient lead time for regulated ro-ro and tanker vessels to meet their compliance dates."[32]  Relying on CARB's claims of feasibility for Ports tankers by January 1, 2025, EPA stated:

> CARB has identified a number of existing technologies that can be used to comply with the regulations and has noted that the Regulation provides ample lead time for equipment adaptation, permitting, and installation. Therefore, because CARB has identified a number of existing technologies and a reasonable projection of the development and modification of technologies within the lead time provided, and because opponents of the authorization have not demonstrated why such projections are unreasonable, the opponents of the authorization have not met their burden of proof to demonstrate technological infeasibility.[33]

EPA granted CARB's authorization request on October 20, 2023.[34]

### C.    CARB Remained Steadfast That Compliance Was Technologically Feasible.

Following EPA's decision, CARB continued to assert that compliance with stack capture would be technologically feasible by the January 1, 2025 compliance deadline.  For example, in a March 2024 brief filed in the California Court of Appeal, CARB argued that "technology already used by other vessels can be safely adapted for tankers."[35]  *WSPA v. California Air Resources Board*, Cal. Ct. App., No. B327663, Respondent CARB's Brief, at pp. 39–42.  CARB reiterated its assurance that stack-capture technology would be available in sufficient numbers for tankers

---

[31] *Id.* (emphasis added).
[32] *Id.* at 72474.
[33] *Id.*
[34] *See id.* at 72461
[35]

4917-8581-7634.v1

by January 1, 2025.[36]

This pattern continued later during 2024. On August 2, 2024, CARB responded to questions from the Western States Petroleum Association (WSPA) by categorically re-affirming its belief that stack capture would be available for tanker compliance by January 1, 2025. CARB again claimed that "the technology for capture and control on tanker vessels exists today" and that "CARB anticipates that approval of an Executive Order for capture and control solutions from third party providers for tanker vessels will be available by January 1, 2025, or shortly thereafter." When asked why CARB was not using its authority to delay implementation of the rule until a tanker control application existed and was approved by CARB, CARB stated "[c]ompliance with the Regulation has always been, and continues to be, feasible."

And in an August 20, 2024 white paper, CARB once again insisted that, although "[c]apture and control systems are not yet approved on tankers," "[t]here is still time to complete testing and receive an executive order ahead of the compliance start date on January 1, 2025." CARB stated two companies were currently building stack-capture systems for tankers—Clean Air Engineering-Maritime and Stax Engineering. It expressed optimism that "[i]f CAECS approval is not achieved by January 1, 2025, [CARB] expect[s] it to occur soon thereafter." Today, now nearly two months beyond the regulatory deadline, CARB has yet to issue any CAECS approval for a tanker control system.

### D.   No Complete and Representative Test of Barge-Based Stack-Capture Equipment for Tankers Occurred By January 1, 2025, or To Date.

To date, WSPA is not aware of any vendor submittal of an application to CARB for approval of a tanker-ready capture and control system, CARB has not approved or certified any capture-and-control technology for tankers, and no certified capture-and-control technology for

---

[36] *Id.* at 43–45.

4917-8581-7634.v1

tankers is commercially available to meet the potential demand for all such barges in various terminals at the Ports, including any technology for barge- or land-based capture and control. None of these facts were before EPA at the time it granted authorization for the Regulations.

Even if CARB were to approve a tanker control system today, the January 1 deadline has passed and as described above, many additional steps still remain to be taken before compliance would be feasible for the tanker fleet. And it is important to note that not all tankers are created the same. To have technology available for the industry to comply with the Regulations, systems will need to be successfully tested and certified for different types of vessels. For example, tankers with auxiliary boilers generate significantly greater emissions than those without such boilers. And tankers of different sizes also generate different volumes of emissions from varying numbers of sources (stacks), with Panamax being the smallest, Aframax, larger than that, Suezmax, in turn even larger, and VCC, which is the largest. The volume of emissions also depends on whether the tanker uses steam driven or hydraulic/electric driven pumping cargo systems. To capture and treat larger volumes of emissions, stack-capture systems must have larger capture devices and treatment systems. As a result, testing a Panamax tanker without auxiliary boilers will not result in certification of a system that is capable, or can be certified and demonstrated as approved for use on larger tankers with boilers. And, to date, there is no barge that has been proven safe and certified to capture emissions from boilers installed onboard tankers. These are just a few examples of the myriad reasons why no tanker control system is even ready for CARB certification, let alone available for an entire fleet to implement. Again, EPA did not know for certain at the time of certification that these factors would prevent tanker fleet compliance by January 1, 2025, but was assured by CARB that the fleet would be able to comply by that date. That prediction obviously turned out not to be accurate, now throwing the tanker fleet into a state

4917-8581-7634.v1

uncertainty and concern regarding how to comply with the Regulations.

Stakeholders have noticed. On September 16, 2024, California Assembly Member Mike Gipson introduced a bill that would delay implementation of the 2020 Regulations due to the technological infeasibility of compliance on the timeframes required by the Regulations.[37] The bill would push the compliance deadlines for Ports tankers back by two years—to January 1, 2027 —and states the extension of time is necessary because the industry currently does not have the "capacity to comply with th[e] requirements," and that the state faces the threat of "disruptions to the supply of transportation fuels in the state" so long as tankers have no feasible compliance path.[38] But as of today's date, the bill has not moved beyond introduction.

### E.    WSPA's State Court Action

Shortly after CARB promulgated the 2020 Regulations, WSPA filed a complaint in California Superior Court challenging the Regulations under California state law and arguing, among other things, that the Regulations were technically infeasible for tankers by the mandated deadlines and that so-called "compliance alternatives" like the Remediation Fund could not be used as permanent substitutes for the requirement to install emissions controls or use shore power. That petition was denied and subsequently appealed. On February 13, 2025, the California Court of Appeal upheld the denial of the petition.[39] Because that case involved a facial challenge to the Regulations, the court considered only whether the record before CARB when it adopted the 2020 Regulations provided evidence of feasibility, not whether compliance in 2025 was actually feasible. The Court of Appeal also found that the Remediation Fund could act as a valid alternative compliance instrument – a conclusion that has no application to EPA's

---

[37] See *AB-8 Air Pollution: tanker vessels: at-berth requirements: delay*, https://tinyurl.com/27ezxnve.
[38] *Id.*
[39] See *Western States Petroleum Ass'n v. California Air Resources Bd.*, B327663, 2d App. Dist., Div. 7, filed Feb. 13, 2025.

4917-8581-7634.v1

Clean Air Act authorization of the 2020 Regulations.[40]

## II.    ISSUE MERITING RECONSIDERATION

EPA is required to establish technological feasibility prior to granting authorization under the CAA.[41]  EPA granted CARB's authorization request to enforce the 2020 Regulations based on CARB's claim that compliance would be technologically feasible by the compliance deadline—January 1, 2025.  But since EPA granted the authorization, no capture-and-control system has been approved by CARB and made broadly available for commercial tanker applications.  While CARB represented to EPA in the authorization request that there was enough time to develop tanker emission-control systems in advance of the 2025 compliance deadline, at the time of this writing in February 2025, it is clear that these representations were overly optimistic, and stack-capture systems suitable for all tankers will not be CARB-certified, proven safe, manufactured and made available for the California tanker fleet for quite some time.

The CAA generally prohibits states from adopting their own emissions standards for nonroad engines like those in tankers and other marine vessels.  Only California has been granted a limited exception to this preemption, and **only** if EPA finds based on the evidence that California's standards (1) "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards";(2) California's determination is not "arbitrary and capricious"; (3) California needs such standards to meet "compelling and extraordinary conditions"; and (4) California's standards and accompanying enforcement procedures are consistent with 42 U.S.C. § 7543.[42]

---

[40] *Id*. at p. 33, fn. 9.
[41] *See Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1293 (D.C. Cir. 1977) (citing cases) (finding EPA did not exercise "reasoned discretion in concluding that the [] proposals" were "technologically feasible" and remanding to EPA for further proceedings).
[42]  42 U.S.C. § 7543(e)(2); *see also Motor Equip. Manufacturers Ass'n v. Nicols (MEMA III)*, 142 F.3d 449, 453 (D.C. Cir. 1998).

4917-8581-7634.v1

As relevant to the present petition, the third prong—consistency with 42 U.S.C. § 7543—has been historically interpreted by EPA to require that California standards and enforcement procedures be consistent with CAA sections 209(a), 209(e)(1), and 209(b)(1)(C), similar to how EPA analyzes CAA section 209(b) motor-vehicle waiver requests.[43]  This "effectively requires consistency with section 202(a)," and the EPA "[has] interpreted consistency with section 202(a) using a two-pronged test:

> (1) whether there is sufficient lead time to permit the development of technology necessary to meet the standards and other requirements, giving appropriate consideration to the cost of compliance in the time frame provided, and

> (2) whether the California and Federal test procedures are sufficiently compatible to permit manufacturers to meet both the state and Federal test requirements with one test vehicle or engine."[44]

The first element is referred to as "technological feasibility (or technological infeasibility)."[45] Consistent with this interpretation, courts have likewise ruled that consistency with CAA section 202(a) requires the proposed standard be "technologically feasible."[46]

To determine technological feasibility, EPA is required to consider "whether adequate technology is presently available or already in existence and in use" and "[i]f technology is not presently available, EPA will consider whether California has provided adequate lead time for the development and application of necessary technology prior to the effective date of the standards for which a waiver is being sought."[47]  If the standards are technologically infeasible by the deadlines mandated in the regulation at issue, EPA must deny California's authorization request.[48]

---

[43] 88 Fed. Reg. at 72463.
[44] *Id.* at 72468.
[45] *Id.*
[46] *See Motor & Equipment Manufacturers Association v. Environmental Protection Agency (MEMA I), 627 F.2d 1095, 1111 (D.C. Cir. 1979).*
[47] 88 Fed. Reg. at 72469.
[48] *See MEMA I,* 627 F.2d at 1111; *see also* 88 Fed. Reg. at 72469 (stating authorization cannot be granted if the standard is not "technologically feasible within the available lead time").

4917-8581-7634.v1

**A.** **EPA Should Convene a Reconsideration Proceeding Because New Evidence Of Central Relevance to the Authorization Determination Shows Compliance Is Technologically Infeasible.**

A reconsideration proceeding is warranted if a party raises an objection and shows: (1) it was "impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment"; and (2) the objection is "of central relevance to the outcome of the rule."[49] If an objection is properly raised, "EPA must grant reconsideration and conduct a new, full-dress, notice-and-comment rulemaking."[50]

Here, EPA granted CARB's authorization request based on CARB's finding that capture-and-control systems for tanker applications were technologically feasible, would be tested and shown feasible in a demonstration project no later than the end of 2023, and would be approved and commercially available by January 1, 2025.[51] No demonstration project occurred in 2023. No such tanker emission-control application was approved and available for tanker use by January 1, 2025. This evidence, which was available only after the public comment period, conclusively demonstrates this finding was not correct, and EPA should therefore convene proceedings to investigate this additional evidence and reconsider its authorization determination.

### 1. WSPA's Petition Is Timely

A petition for review and reconsideration is timely if "filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based **solely on grounds arising after** such sixtieth day, then any petition for review under this subsection **shall be filed within sixty days after such grounds arise**."[52]

---

[49] 42 U.S.C. § 7607(d)(7)(B); *see also Chesapeake Climate Action Network, et al. v. EPA*, 952 F.3d 310, 319–22 (D.C. Cir. 2020) (finding EPA erred in finding that issues for reconsideration did not meet § 7607(d)(7)(B) requirements).
[50] *Along Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 647 (D.C. Cir. 2019).
[51] 88 Fed. Reg. at 72470.
[52] 42 U.S.C. § 7607(b)(1) (emphasis added).

4917-8581-7634.v1

Here, WSPA brings its petition in light of the fact that, as of the January 1, 2025, compliance deadline, there remains an absence of any proven, certified, and commercially available stack-capture system for tankers. Compliance with the Regulations within the regulatory timeframe is not technologically feasible; there was, in fact, no compliant tanker emission-control system available to the Ports tanker fleet by the compliance deadline of January 1, 2025. By definition, this fact could not have been proven at the time of EPA's Authorization in 2023 – at that time, EPA relied on CARB's representations that tanker controls would be ready for Port tanker fleet compliance by January 1, 2025. It is now impossible for capture-and-control systems to be modified, tested, manufactured, proven safe, and made commercially available for use on all types and sizes of tankers by that January 1, 2025, deadline. Given this new development, this petition is timely.

### 2. New Evidence Establishes That Compliance Is Technologically Infeasible.

Facts discovered more than sixty days after the relevant notice of decision is published in the Federal Register constitute sufficient grounds for EPA to convene reconsideration proceedings.[53] A claim for reconsideration based on the "after-arising provision" ripens when a "subsequent factual or legal development creat[es] new legal consequences for petitioners."[54] "Subsequent factual or legal development" can include subsequent discovery that compliance is not technologically feasible.[55]

For example, in *Group Against Smog & Pollution*, the D.C. Circuit held that a petition challenging EPA's refusal to regulate certain emissions was timely because "considerable evidence" showed "that the technology of capturing and controlling secondary emissions had

---

[53] *See* 42 U.S.C. § 7607(b)(1).
[54] *Sierra Club de Puerto Rico v. E.P.A.*, 815 F.3d 22, 28 (D.C. Cir. 2016).
[55] *See Group Against Smog & Pollution, Inc. v. EPA*, 665 F.2d 1284, 1290 (D.C. Cir. 1981).

4917-8581-7634.v1

advanced" since the agency's prior refusal, such that "[t]he validity of that decision is now disputed."[56]  Similarly, in *American Petroleum Institute v. EPA*, the court held that a challenge was timely where the attack was based on EPA's inability to predict or forecast future events—which became apparent only when its earlier prediction did not come true.[57]

So too here.  CARB has been steadfast that compliance with the Regulations by using stack-capture systems for tankers would be possible by January 1, 2025.  But January 1, 2025, came and went, and there were no capture-and-control systems for Ports tankers available to comply. This means that, as of January 1, 2025, it was now known with certainty that CARB's representation was incorrect and that tanker compliance remains infeasible.

Any stack-capture system for tankers would first have to be successfully feasibility- and safety-tested before proceeding further toward commercial availability.  Once successful testing has occurred, CARB must issue an Executive Order certifying the technology as an approved CAECS for each type and size of tanker.  No CARB Executive Order has been issued approving a tanker control system.  For CARB to grant an Executive Order, the capture-and-control equipment must be proven to successfully reduce emissions, including through durability testing.[58] Durability testing generally requires over 200 hours of use testing.[59]  To reach 200 hours of use, an emission-control system requires between three and nine tanker calls, assuming the equipment is operating for the full duration of a vessel call averaging between 24 hours and 72 hours in length. All of these required steps have not occurred prior to the January 1, 2025, Ports tankers compliance deadline.

---

[56] *Id.* at 1290.
[57] *American Petroleum Institute v. EPA*, 706 F.3d 474, 476-77 (D.C. Cir. 2013)
[58] *See* Cal. Code Regs. tit. 17, § 93130.5(f)(2).
[59] *See* At Berth Frequently Asked Questions, California Air Resources Board, at 34, https://tinyurl.com/yxpbd2mk; *Recommended Emissions Testing Guidelines for Ocean-going Vessels*, California Air Resources Board, at p. 14, https://tinyurl.com/fp3dnmju.

4917-8581-7634.v1

Further, a single, tanker-capable stack-capture system cannot accommodate the full exhaust rates of all vessel sizes, which vary depending on the size and configuration of the vessel. Thus, the testing and approval process must be repeated on a variety of stack-capture systems that cover the range of different tanker sizes, configurations, and multiple fuel types. As of the date of this petition, not all of that has occurred.

Additionally, CARB has clarified that issuance of Executive Order does not confirm the *safety* of the technology. Technology providers have to complete significant upgrades to the existing capture-and-control technology to ensure safe implementation of the technology in proximity to hydrocarbon-carrying tankers. This, together with ensuring that capture-and-control barges have robust safety management and training and competency management systems, as well as sufficient competent people to meet all operations, station keeping, and emergency scenarios required for operation next to tankers still has not been demonstrated. As a result, industry organizations have been working to ensure the safe design and operation of the equipment by assessing the existing/proposed technologies, identifying design and operational gaps, and proposing mitigations to enable safe adoption of the technology on tankers. Several gaps have already been identified in the design and operational philosophy of the technology, and these will need to be addressed prior to adoption of the technology.

After all of these steps, sufficient capture-and-control systems still must be manufactured for use at multiple terminals for each type of tanker. Significant obstacles remain in the way of this final step as well. For example, there are substantial uncertainties about the applicability of the Jones Act to such manufacturing,[60] and whether the barges must be U.S.-built and in compliance with the Act. There is no guidance from regulators on this issue, but it is a central

---

[60] 46 U.S.C. § 55102.

question to the supply chain and viability of building a fleet of these stack-capture barges to serve all tankers calling at regulated terminals in California. If the barges must each be US-built, then the shipyard capacity will also factor into the timing and availability of the fleet of capture-and-control barges.

As outlined above, EPA was required to find that compliance with the Regulations was technologically feasible by the compliance deadline, January 1, 2025. EPA made this finding relying on representations from CARB that—even though the capture-and-control technology retrofitted for tankers did not exist—technological feasibility presented no problems "based on the existing technologies in place" and "the work already underway to expand emissions control technologies to new vessel types."[61] But now nearly two months after the January 1, 2025, compliance deadline, not a single capture-and-control system has even been completely *tested*— let alone approved by CARB, manufactured, or delivered—for tanker applications.

In addition, CARB's so-called "alternative compliance" methods are not sufficient to maintain EPA's CAA Authorization. As discussed above, the tanker fleet that calls on California ports is not and has never been designed to use shore power at berth and would need significant modifications to implement that capability. Moreover, there is only one terminal at the Ports that even has shore power available for a potential tanker vessel use.[62] Because of those intractable barriers to tanker use of shore power, even CARB has admitted that shore power is not a foreseeable compliance option for tankers,[63] and terminal plans submitted by the Ports have overwhelmingly indicated that capture-and-control systems will be the preferred compliance pathway. And CARB itself has recognized that capture and control play a significant role in

---

[61] *See* 88 Fed. Reg. at 72469.
[62] *See* ISOR, p. III-18.
[63] *Id.* p. III-19.

4917-8581-7634.v1

compliance with the Regulations.[64]  Regardless, WSPA's members that act as shippers have no control over if or when shore power will be available to it.

The Regulations' other provisions providing certain specific types of temporary relief from compliance are applicable in only extremely limited circumstances and likewise provide no relief from the Regulations' core requirements to install shore power or emission controls, both of which have now been shown to be technologically infeasible for Ports tankers by the compliance deadline.[65]  These other avenues for temporary relief include a Remediation Fund option, allowing payment into a remediation fund in lieu of controlling emissions under certain circumstances, including during equipment repairs, physical or operational constraints delaying implementation of an operational control, and other circumstances.[66]  But the Fund was created as a stopgap measure for specifically listed instances of temporary noncompliance only (e.g., repairs, construction delays) – not as a *permanent* alternative to the core emission-control requirements.[67] There are several barriers to use of the Remediation Fund even in these limited circumstances.[68] The Remediation Fund purports to be an alternative compliance method "due to a delay or interruption in controlling emissions or a failure of the CAECS operator," but it can be used only when "all parties have taken the required actions to use a CARB approved control strategy" and the vessel has a "contract to perform" for a certified CAECS.[69]  CARB has not yet clarified that by paying into the Remediation Fund, vessel owners will avoid other penalties and fines – meaning that participation in the Fund may not be "compliance" at all.  The Remediation Fund is therefore not currently a true compliance alternative.

---

[64] *WSPA v. California Air Resources Bd.*, Cal. Ct. App., No. B327663, Respondent CARB's Brief, at pp. 13–14, 18.
[65] *See* Cal. Code Regs. tit. 17, §§ 93130.15, 93130.11.
[66] *See id.* § 93130.15.
[67] *Id.* § 93130.15(b).
[68] *See id.*
[69] *Id.* § 93130.15(b)(3).

4917-8581-7634.v1

CARB has also included in the Regulation a certain number of exempted "Vessel Incident Events" ("VIE") and "Terminal Incident Events" ("TIE") available to allow an otherwise-noncompliant tanker visit.[70] This provision is not generally applicable but provides relief only with respect to a "limited number of situations where a vessel does not reduce emissions during a visit."[71] VIEs and TIEs are extremely limited in number and cannot sustain any tanker or tanker terminal in compliance permanently. In any event, EPA's authorization is for emission standards. These provisions are not themselves emission standards and do not substitute for them, as EPA recognized in finding feasibility without regard to the Remediation Fund.

None of the compliance alternatives under the Regulations provide a feasible method for tankers to comply with CARB's emission standard after January 1, 2025. Capture-and-control technology is the only potentially viable compliance pathway for the vast majority of tanker vessels and terminals. But as of January 1, 2025, no compliant tanker system had been approved or made commercially available for the tanker fleet, and it became clear that compliance by that date was indeed technologically infeasible.

**B. Technological Feasibility is of "Central Relevance" To the Authorization.**

An objection is "of central relevance" if it provides "substantial support for the argument that the regulation should be revised."[72] The petitioner must show "the errors identified were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made."[73]

The technological feasibility of the Regulations' tanker requirements is undoubtedly of

---

[70] *Id.* § 93130.11.

[71] *Id.*

[72] *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012).

[73] *Union Oil Co. of Calif. v. EPA*, 821 F.2d 678, 683 (D.C. Cir. 1987).

4917-8581-7634.v1

"central relevance" to EPA's October 2023 ruling. Technological feasibility is required under the CAA. As the D.C. Circuit has held, "[t]he Clean Air Act [] requires pollution sources to achieve the highest emission control level that is technologically . . . feasible. Conversely, ***the EPA cannot require a level of control technology that is technologically . . . infeasible***."[74]

*   *   *

The state of technology on January 1, 2025, confirmed that the 2020 At Berth Regulations are technologically infeasible. EPA should convene proceedings to reconsider CARB's October 2023 authorization and, in the interim, stay the portions of the Regulations applicable to tanker operators and terminals, to prevent CARB from potentially taking enforcement action and assessing penalties against those parties for noncompliance that they had no power to avoid.

### III.    RELIEF REQUESTED

#### A.    Request for Reconsideration.

Petitioner respectfully requests that, pursuant to 42 U.S.C. § 7607(d)(7)(B), the Administrator convene proceedings for reconsideration of the October 20, 2023 notice of decision granting CARB's request for authorization of amendments to its 2020 Ocean-Going Vessels At-Berth Regulations. Compliance with the Regulations is technologically infeasible.

#### B.    Request for Immediate Suspension or Delay of Compliance Deadlines.

Petitioner requests a stay under 42 U.S.C. § 7607(d)(7)(B), which authorizes "[t]he effectiveness of the rule [to] be stayed." Petitioner requests EPA take all necessary administrative actions to immediately suspend or delay the Regulations' provisions applicable to tankers while EPA considers this Petition.

---

[74] *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1293 (D.C. Cir. 1977) (citing cases) (finding EPA did not exercise "reasoned discretion in concluding that the [] proposals" were "technologically feasible" and remanding to EPA for further proceedings (emphasis added)).

4917-8581-7634.v1

**CONCLUSION**

New evidence conclusively demonstrates that compliance with the Regulations by the applicable January 1, 2025, deadline for Ports tankers is not technologically feasible. Capture-and-control systems for tanker applications have not yet been successfully CARB-approved, safety tested, manufactured, made commercially available for the tanker fleet, or delivered. Tankers have no viable alternative compliance methods. Thus, Petitioner respectfully requests EPA convene proceedings to reconsider its October 20, 2023 authorization decision.

Dated: February 28, 2025                     Respectfully submitted,


By:/s/ *Michael S. McDonough*

Attorney for PETITIONER WESTERN
STATES PETROLEUM ASSOCIATION

4917-8581-7634.v1